In the United States District Court
for the District of Columbia

Dr. John Breda, MD                              )
                                                )    Case: 1:23−cv−00420 JURY DEMAND
        Plaintiff,                              )    Assigned To : Kelly, Timothy J.
                                                )    Assign. Date : 2/24/2023
                                                )    Description: Employ. Discrim. (H-DECK)
v.                                              )    Civil Action No.
                                                )
Defendant Denis Richard McDonough,              )
Secretary of Veterans Affairs,                  )
        in his official capacity,               )
                                                )
Dr. Sharon Rounds, Dr. Wilfredo Curioso,        )
Dr. Satish Sharma, Dr. Matthew Jankowich        )
Susan MacKenzie, and Dr. Michael                )
Mayo-Smith                                      )
        in their official and personal          )
        capacities,                             )
        Jointly and Severally Defendants.       )

---

## COMPLAINT FOR DAMAGES, DECLARATORY and INJUNCTIVE RELIEF

Plaintiff, Dr. John Breda, MD does hereby allege, based upon personal knowledge as to acts and

omissions effecting himself and information and belief as to all other matters, the following violations of

his rights under the Constitution of the United States and the laws thereunder, including but not limited

to the First, Fifth and Fourteenth Amendments, Title VII of the Civil Rights Act of 1964 (Title VII) (42

USC §§2000e-3(a)), Rhode Island General Law 28-5-7, Nondiscrimination on account of age in Federal

Government employment [29 USC § 633a], [29 U.S.C. §621],  the Americans with Disabilities Act [42

U.S. Code § 12101, et seq.], Prohibition Against Retaliation and Coercion [42 U.S.C. § 12203], the

Rehab Act [29 U.S.C. § 701 et seq.], 42 USC §1981, 42 USC §1985, 28 U.S.C. §1343.  He also alleges

violations of the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101-11152 (1988 &

Supp. IV 1992) which has limited his freedom to enjoy his property rights to his medical license.

1

RECEIVED

FEB 24 2023

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

## JURISDICTION AND VENUE

1. This Court has jurisdiction under U.S. Constitution First, Fifth and Fourteenth Amendments, 28 U.S.C. §§1331 and 1343, 28 U.S.C. §1491, 29 USC § 633a(c), the ADA [42 U.S. Code § 12101, et seq.], the Rehab Act [29 U.S.C. § 701 et seq.], and 42 USC §1988. In addition to damages under these various causes of action, this action seeks declaratory and injunctive relief under 28 U.S.C. §§2201-2202. This Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local laws pursuant to 28 USC § 1367(a).

2. Venue lies in this District pursuant to 28 U.S.C. §1391(e) and 42 USC §2000e-5(f)(3) because the relevant employment records are maintained in this district.

## CONDITIONS PRECEDENT

3. Plaintiff has satisfied all conditions precedent to the filing of this suit or has been prevented by the Defendant from satisfying such conditions or are excused under the law from satisfying any other conditions.

## PARTIES

4. Plaintiff, Dr. John Breda, M.D., is a board-certified internal medicine physician, who resides in Massachusetts.

5. Dr. Breda is a citizen of the United States.

6. Dr. Breda has been a board-certified internal medicine physician for over 22 years, with no history of any adverse patient outcomes, no adverse board actions, and no history of any medical malpractice claims or settlements, who was unlawfully subject to federal workplace discrimination and retaliation resulting in being terminated from his employment from the Providence VA Medical Center and an accepted job offer rescinded at the Fargo VA Medical Center.Defendant Denis

Richard McDonough is the Secretary of the Department of Veterans Affairs and is named defendant in his official capacity.

7.   Defendant Dr. Wilfredo Curioso was Plaintiff's supervisor and is a Defendant in his Official and Personal capacities.

8.   Defendant Dr. Rounds was the Department Chair during the course of the allegations herein and is a Defendant in her Official and Personal capacities.

9.   Susan MacKenzie was the Medical Center Director during the course of the allegations herein and is a Defendant in her Official and Personal capacies.

10.   Dr. Satish Sharma was the Chief of Staff during the course of the allegations herein and Chair of the February 9, 2015 Medical Executive Committee meeting and is a Defendant in his Official and Personal capacities.

11.   Dr. Matthew Jankowich was the Chair of the August/September 2015 Hearing Committee and author of the Committee's September 30, 2015 decision and is a Defendant in his Official and Personal Capacities.

12.   Dr. Mayo-Smith was the VA New England Regional Director (VISN-1) during the course of the allegations herein and is a Defendant in his Official and Personal capacies.

13.   Other Defendants are to be named at a later time.

## BACKGROUND FACTS

14.   Plaintiff, Dr. John Breda is a board-certified internal medicine physician.

15.   Dr. Breda is licensed in the States of Massachusetts, Rhode Island and New Hampshire.  There have never been any adverse actions taken or proposed to be taken against Dr. Breda by any state licensing board.

16.   Dr. Breda started work at the Providence VA Medical Center on February 14, 2000 as a part-time

ER physician for the Providence VA and was terminated effective February 13, 2015 by a letter from Susan MacKenzie dated February 3, 2015.

17. Dr. Breda started work at the Providence VA Medical Center on February 14, 2000 as a part-time ER physician for the Providence VA and was terminated effective February 13, 2015 by a letter from Susan MacKenzie dated February 3, 2015.

18. At his orientation the VA HR department distributed a document that addressed various benefits. It represented that Federal retirement benefits were "automatic" and provided no additional information.

19. In December, 2013 Plaintiff learned that the document previously distributed by the HR Department was incorrect, and that Plaintiff needed to enroll in Federal Employee Health Benefits when he was hired to receive Federal retirement healthcare. He learned this from an outside VA Benefits office in Massachusetts who enrolled him that day to start the clock.

20. He complained to the Providence HR Department about the incorrect and incomplete information he had been previously given and requested credit for his years worked, and offered to pay for insurance he never received, but no solution was forthcoming.

21. Defendant Dr. Wilfredo Curioso advised Plaintiff, Dr. Breda of two complaints by nurses against him on May 25, 2014, to which Dr. Breda immediately identified as false in his conversation with Dr. Curioso and again by email on May 27, 2014.

22. Plaintiff asked Defendant Curioiso to speak with the nurses together about the complaints, but that conversation never occurred.

23. Plaintiff asked Defendant Curioso and the VA for access to the medical records of the cases related to the nurses' complaints but he was never provided that information.

24. Plaintiff asked Defendant Curioso and the VA that the nurses complaints be investigated but such investigation never occurred.

25.  Over the next several months after the May 25, 2014 complaint by Defendant Curioso, fifteen additional accusations were alleged by Plaintiff's supervisors against Plaintiff. Almost all were fabrications. Among the allegations, four never occurred, eight showed no error at all, and three were administrative matters that were immediately corrected. None represented medical errors by Dr. Breda and none resulted in any adverse patient outcomes or harm to any patient.

26.  The fifteen allegations were all independently investigated along with the related medical records by the Rhode Island Board of Medical Licensure and Discipline who issued their September 29, 2016 decision of "No Unprofessional Conduct."

27.  Plaintiff took voluntary leave without pay on June 6, 2014 due to a hostile work environment where he felt unsafe, to allow his supervisor, Defendant Curioso, sufficient time to investigate.

28.  Defendant Curioso became angered by Platiniff's leave and for the next five months acted alone, searching medical records to find fault with Plaintiff.

29.  Defendant Curioso claimed to be conducting a fact-finding, but did not follow any of the the procedures set forth in VA Policy 05-29 defining a fact-finding.

30.  Defendant Curioso was never appointed as a fact-finder nor was anyone else. No Fact Finding per the VA Policy 05-29 defining the procedures for a Fact Finding were ever conducted.

31.  Sham peer review or malicious peer review is a name given to the abuse of a medical peer review process to attack a doctor for personal or other non-medical reasons.

32.  Defendant Curioso's informal actions were the first of a series of sham proceedings conducted without due process of law, without following VA policies or law, and without investigation, resulting in spurious accusations and conclusory decisions.

33.  A November 13, 2014 meeting was held which was represented to be part of the so-called fact-finding. Plaintiff Breda was present with his wife as a witness. The meeting was hostile as Dr. Rounds berated Plaintiff, cut him off, and shouted over him. There was no desire by Dr. Rounds to

see that Plaintiff was given any opportunity to be heard. He was given no opportunity to review medical records prior to the meeting nor were medical records available at the meeting for Plaintiff's review. Plaintiff was forced to rely on his memory of patient encounters that occurred months earlier.

34.   Dr. Rounds discriminated and retaliated against Plaintiff due to his age and disability when Plaintiff tried to point out that he had been a dedicated, loyal employee putting his job first by coming to work despite symptoms of what was later diagnosed as Hodgkins Lymphoma. Rather than allow Plaintiff to speak, Dr. Rounds cut Plaintiff off stating that she did not want to hear about his Hodgkins and that she needed a younger person who knew when and when not to come to work.

35.   At a December 11, 2014 meeting, in violation of VA policy, plaintiff was counseled to resign (confirmed at her deposition) by his department chair Dr. Rounds who also threatened Plaintiff stating, "You have no idea what I can do to you."

36.   Given the sham Fact Finding, the failures to follow policies and the threats, Dr. Breda believed Dr. Rounds was setting the stage for further misconduct.

37.   On December 16, 2014 Plaintiff advised Dr. Sharma (Chief of Staff) and Tambra Holt (VA HR Department - who was present when Plaintiff was threatened and counseled to resign) via email that Defendants Dr. Rounds and Curioso acted improperly and that any resignation Plaintiff deemed necessary would be the result of constructive termination.

38.   Plaintiff requested in a December 16, 2014 email that an additional EEO complaint be filed and that it would be necessary to discuss retirement benefits which had been mishandled.

39.   Plaintiff asked the EEO to mediate his previously filed complaint and on January 7, 2015, the same day the VA was contacted by the mediator to confirm the mediation, Dr. Sharon Rounds wrote a memorandum calling for Plaintiff's termination. In writing her memorandum she derailed the EEO process and retaliated against Plaintiff for filing his prior EEO complaint. She listed the fifteen

unverified allegations created by Dr. Curioso's informal, independent review and used the falsified and embellished allegations against Plaintiff without due process.   She forwarded her Memorandum to Susan MacKenzie.

40.   Dr. Rounds testified under oath that she had no role in Dr. Curioso's review of Plaintiff's professional performance, did not review any of his medical charts, and did not know what Dr. Curioso did in performing his review, yet she wrote her Jan. 7, 2015 Memorandum wherein she advanced false accusations.

41.   Dr. Rounds also testified that she did not speak with the involved staff or the nurses in the patient cases relating to the allegations against Dr. Breda.

42.   Plaintiff resigned on February 1, 2015 due to the VA and its Defendant agents' hostility, threats, false accusations, failures of due process, and sham fact-finding, referencing the December 16, 2014 email.

43.   At the request of Dr. Sharon Rounds, the Medical Center Director, Susan MacKenzie terminated Plaintiff's employment effective one day before Plaintiff's five-year pension was to vest, by way of a letter dated February 3, 2015.

44.   The VA never recognized Plaintiff's resignation as constructive termination as stated in his December 16, 2014 e-mail and wrongly reported his separation from the VA as "Resignation in lieu of involuntary action" on his SF-50.

45.   To be considered an investigation for purposes of determining whether an activity is reportable to the NPDB, the activity generally should be the precursor to a professional review action.  (NPDB Guidebook, 2018, p. E-37)  Per Policy 05-29 the next step after a fact-finding would be a review by an Administrative Investigation Board (AIB).  An AIB was never convened and the fifteen Allegations were never verified.

46.   The second sham peer review occurred two days after the VA accepted Plaintiff's resignation.  The Medical Executive Committee met in a secretive meeting and Dr. Rounds presented her fifteen false and unverified accusations in violation of VA Policy 05-29 and the HCQIA (42 U.S.C. §11112). Ten physicians and six non-physicians allegedly voted unanimously to find Plaintiff  Breda guilty of substandard patient care, professional misconduct, professional incompetence and revoked his clinical privileges.  They did so in a 45-minute meeting without any due process, without Plaintiff's knowledge, presence or rebuttal, resulting in conclusory "decisions" without any investigation, medical errors or adverse patient outcomes.  The meeting did not constutute a professional review action as per 42 U.S.C. §11112.

47.   Dr. Rounds embellished Dr. Curioso's already false accusations without the benefit of an AIB or other objective investigation, without evidence of any adverse outcomes of the patients, and without speaking with any of the patients involved.  (Oct. 13, 2016 Rounds Deposition, pp. 81-96).   Dr. Rounds knew there had not been a fact-finding as she never requested one as required by VA Policy 05-29.

48.   Plaintiff never took any action to voluntarily limit his credentials.  There was no ongoing formal investigation by the hospital entity.  Given Dr. Rounds' threats, Plaintiff anticipated that the VA would report him for wrongdoing he did not commit and submitted his forced resignation.  Despite being counseled to resign by Dr. Rounds, after he did resign the VA wrongly reported him to the NPDB claiming that he resigned his credentials during an investigation.  Plaintiff neither resigned or limited his credentials nor was there an investigation.

49.   The NPDB Guidebook requires that before making an Adverse Action Report there must be a "formal, focused process by the hospital entity" which in this case never occurred.

50.   42 U.S.C. §11133 requires that before reporting a physician to the NPDB, the health care entity must take a professional review action that adversely affects the clinical priviliges of a physician for

a period longer than 30 days, or accepts the surrender of clinical priviliges of a physician while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct.

51.    Plaintiff never surrendered his clinical priviliges nor was there ever an investigation by the hospital entity.

52.    There was never a Professional Review per 42 U.S.C. §11112.

53.    The VA aknowledged in their June 24, 2021 letter to the NPDB that the MEC never had the authority to revoke Plaintiff's clinical priviliges.

54.    A fact finding was never conducted per Policy 05-29.  Per policy a fact-finding is defined as an "informal" process, not the "formal process by the hospital entity" required for reporting to the NPDB.  Even so, none of the procedures defining a Fact Finding were followed.

55.    Plaintiff received a letter dated February 3, 2015 from Defendant VA on  February 6, 2015 terminating his employment effective one-day before Plaintiff's five-year government pension was to vest.

56.    The three-person Jankowich Committee was convened eight months later. The Committee insisted on conducting their so-called fair hearing at a time when Plaintiff was contracted to work in Massachusetts and could not attend, preventing Plaintiff from receiving due process.

57.    In order to claim that Plaintiff resigned during an investigation, the committee fraudulently misrepresented VA Policy 05-29 in their decision document wrongly claiming that the policy provides that a review by a supervisor (Dr. Curioso) acting alone is considered to be an investigation under the policy.  There is no such language in Policy 05-29.

58.    The NPDB Guidebook specifically states that an investigation is a "formal, focused process by the hospital entity."  Dr. Curioso was never appointed as fact-finder and was never appointed by the hospital to conduct a review into Plaintiff Breda's practice. Under policy 05-29, the department must

request that the Medical Center Director approve that a Fact Finding be conducted, and a Fact Finder is appointed by the Medical Center Director only after an agreement to conduct a Fact Finding is given. Susan McKenzie, Medical Center Director, testified under oath at an August 12, 2015 EEO proceeding and at her October 13, 2016 deposition that she never received a request for a fact-finding, that she never appointed a factfinder, that she knew of no one else that was involved in Dr. Curioso's review, and that there was no investigation or hearing.

59. At no time was an investigation or a fact-finding conducted per VA policy, law, or the NPDB Guidebook regarding Plaintiff Breda..

60. A false Adverse Action Report was filed with the NPDB on October 27, 2015. It repeated the misrepresentations of VA policy. The Adverse Action Report states, "Voluntary limitation, restriction, or reduction of clinical privilege(s), while under or to avoid investigation relating to professional competence or conduct." Plaintiff Breda never took any action regarding his credentials, there was no investigation as defined by law or policy, and there were no issues of medical competence or conduct as the RI Board of Medicine found "No Unprofessional Conduct" and Dr. Rounds testified under oath at her October 13, 2016 deposition that there were no adverse patient outcomes in any of her fifteen allegations.

61. The VA never removed the report, but rather cited VA policy that does not apply to Plaintiff's appointment type claiming "Dismissal constitutes a revocation of privileges", and ignored the due process rights provided for Plaintiff's appointment type in VA Handbook 1100.19 14l(5)(e) and 14l(5)(g) pp 56-59 which were never followed.

62. The VA also failed to follow similar language in the Providence VA Bylaws of the Medical Staff.

63. Section C of the NPDB report requires a narrative description that must include sufficient detail to ensure that future queriers have a clear understanding of what the subject of the report is said to have done and the nature of and reasons for the event upon which the report is based. The VA never

provided this required information.  The NPDB stated to the VA in its June 10, 2021 letter that the Report showed insufficient substantiation and documentation as filed.

64.  Dr. Mayo-Smith, the former VISN-1 Director (NE Regional Director), attempted to cover-up what had occurred by wrongly claiming that "the fact finding conducted by the Providence VA Medical Center followed the procedures detailed in Providence VA Policy Memorandum 05-29...The Fact Finding in this case evidenced the rigor required to qualify as an investigation."  The Province VA followed none of the procedures for a Fact Finding in Policy 05-29.  Dr. Mayo-Smith denied Plaintiff's appeal that the false and illegal NPDB Adverse Action Report be retracted.

65.  Ryan Lilly, the present VISN-1 Director (NE Regional Director), attempted to cover-up for what had occurred when he replied to Senator Warren's inquiry by stating that "A fact finding...can be conducted by the supervisor of the employee in question."  There exists no provision in VA policy, law, or the NPDB Guidebook that allows for an investigation by a lone supervisor to be reportable to the NPDB.

66.  In violation of Title 5 §2302(b)(4) the VA retaliated for EEO and Whistleblowing activity, when Douglas McLeod (HR Director) stated to the Fargo VA that Plaintiff had "belittled staff," was terminated and reported to the NPDB.  Belitting of staff is a new fiction of McLeod's never before alleged.  McLeod's statements were recorded in the Fargo EEO's Report of Investigation.  However, when McLeod was investigated by the Providence EEO, he denied providing any comment at all to the Fargo VA regarding Plaintiff Breda.  As a result of McLeod's false comments to the Fargo VA, the position that Dr. Breda accepted was rescinded immediately.  The Fargo position was a full time ER physician position in the competitive service with full VA benefits.

67.  Defendant MacKenzie testified that she had personal knowledge of Policy 05-29.  She knew there had been no investigation compliant with the policy regarding Plaintiff's adverse actions taken against him.  Defendant MacKenzie never appointed a fact-finder to review Plaintiff's conduct and

Dr. Curioso was appointed by no one to conduct his review. There was no fact finding. A supervisor acting alone is neither a fact-finding nor an investigation pursuant to VA Policy 05-29, the NPDB Guidebook or the HCQIA, yet Susan MacKenzie knowingly authorized that the false report be sent to the NPDB.

68. Defendant Susan MacKenzie had personal knowledge that the provisions of due process in VA Handbook 1100.19, para. 14l(5)(e) and (g) had never been followed. She did not verify the allegations against Dr. Breda. Knowing the severe consequences that a false Adverse Action Report would have on Dr. Breda, she knowingly filed the false report with the NPDB.

69. Defendant MacKenzie testified that she had no knowledge of reports, memorandum or other papers authored by Defendant Curioso regarding Plaintiff during the timeframe of the so-called fact-finding.

70. Without a Report of Finding written by the person who conducted the so-called fact-finding, no fact-finding was ever conducted.

71. Defendant MacKenzie testified that she had trainings in relation to the NPDB and has read all of the directives involved with the NPDB.

72. Defendant MacKenzie testified that she was aware of the NPDB Guidebook and Directives. She therefore knew that: "[a]n investigation must be carried out by a healthcare entity, not an individual on the staff" to comply with federal law and regulations.

73. Defendant MacKenzie testified that she had personal knowledge of VA Policy 05-29. She knew that the Jankowich Committee's decision relied on a misrepresentation of VA Policy 05-29, wrongly claiming that an investigation may be conducted by Plaintiff's supervisor acting alone yet she accepted their findings.

74.  Defendant MacKenzie knew that Defendant Curioso's individual review of medical records could not be considered an investigation in compliance with VA Policy 05-29, NPDB Guidelines nor the HCQIA.

75.  Despite Defendant MacKenzie's knowledge of VA Policy 05-29 and NPDB Guidelines, Defendant MacKenzie improperly accepted the Jankowich panel's findings and announced her descision that Plaintiff's "resignation from his medical staff position while under investigation for professional incompetence or improper professional conduct will be reported to the National Practitioner Data Bank." (October 15, 2015 letter from Susan MacKenzie)

76.  Defendant MacKenzie testified that she did not know how the NPDB defined an investigation.

77.  Defendant MacKenzie did not personally confirm the facts regarding Plaintiff stated in the Adverse Action Report that she authorized be reported to the NPDB.

78.  Defendant MacKenzie had no knowledge as to whether the VA's allegations against Plaintiff were correct when she authorized that the Adverse Action Report with the NPDB be filed.

79.  Defendant Mackenzie had the role of oversight of all hospital activity at the Providence VA Medical Center and had the responsibility to follow regulations.

80.  Defendant Mackenzie testified under oath that there had been no investigation of Plaintiff, yet authorized the filing of an Adverse Action Report in violation of 18 U.S.C. §1001 falsely stating that there had been an investigation into Plaintiff's professional competence and conduct.

81.  Defendant MacKenize had the sole right to terminate Plaintiff's employment with the VA and did terminate Plaintiff's employment with the VA one daybefore Plaintiff's five-year pension was to vest.

82.  There have been no patient complaints filed with the VA against Plaintiff regarding the medical care he provided.

83.  Defendant VA is aware of numerous sham peer reviews improperly reported to the NPDB.

84. In violation of VA Policy, Plaintiff was never given an opportunity to review medical records or the facts regarding the VA's allegation before the MEC allegedly revoked Plaintiff's clinical privileges.

85. The MEC claimed to have revoked Plaintiff's clinical privileges on February 9, 2015, but six years later admitted in their June 24, 2021 letter to the NPDB that the MEC had no authority to do so.

86. The Adverse Action Report filed with the NPDB was not made for the betterment of healthcare, but was rather driven by the malice of Plaintiff's supervisors and department chair, Defendants Curioso and Rounds.

87. The VA chose to misrepresent and ignore policies to distract from the sham procedures, rather than properly investigate.

88. Defendant Rounds sought to terminate Plaintiff's employment as well as cause Plaintiff maximal harm by improperly reporting Plaintiff to the NPDB.

89. The VA filed a false Adverse Action Report against Plaintiff with the NPDB on October 27, 2015, eight months after Plaintiff's separation with the VA.

90. In order to generate the necessary language to make the false report to the NPDB, the VA conducted several sham meetings resulting in predetermined decisions and coverups which continued after Plaintiff separated from the VA.

91. The combination of sham peer reviews and the false Adverse Action Report filed with the NPDB created a perfect storm of retaliation which appears every time Plaintiff applies for employment or applies for recredentialing, from which he cannot escape.

92. By filing the false Adverse Action Report, the VA stole the value of Plaintiff's medical education, medical license and credentials, leading to the destruction of his career, life, and ultimately his health.

93. The foreseeable adverse effects of the fraudulent Adverse Action Report irreparably affected Plaintiff's health. Plaintiff has been affected by a severe medical condition that limits his daily life.

Its cause is linked to the stress and inactivity associated with the destruction of his career and his need to repeatedly write hundreds of document pages over seven years in search of a remedy for the VA's illegal, abusive retaliation.

94.    The Providence VA, VISN-1, VHA, the VA Central Office all have refused to investigate and have persistently stonewalled Plaintiff's attempts to exhaust his administrative remedies, seek resolution to these matters, and have frustrated Plaintiff's attempts to be heard. Plaintiff has never been afforded a fair hearing.

95.    There has been no accountability anywhere within the VA.  Plaintiff has persistently tried to escalate his concerns to the highest levels of VA and VHA leadership by writing copious, lengthy, fact-based documents but have been persistently ignored or stonewalled by suggestions that he address his concerns elsewhere.

96.    Plaintiff sent similar letters addressed to individual recipients dated September 22, 2022.  Plaintiff sent letters to VA Secretary McDonough, the Undersecretary of Health, Dr. Shareef Elnahal (VHA), VA OIG Inspector General Missal and Assistant Inspector General Johnson. (See Exhibit A - Affidavit and September 22, 2022 letter to Dr. Elnahal attached herewith)  Plaintiff received no direct response from any of the individual recipients.  VA OIG responded on November 10, 2022 (See Exhibit C - A true copy of the original) after Plaintiff telephoned the OIG hotline to follow up on his mailing.  OIG sent Plaintiff a letter dated January 3, 2023 (See Exhibit B - a true copy of the orininal) in response to his mailing to Dr. Elnahal (VA Undersecretary for Health) but only after he followed up with several e-mail to Dr. Elnahal.  In both replies, OIG stated "that further review by the OIG is not appropriate."  (See Affidavit and documents attached herewith)  VA OIG refused to investigate Plaintiffs complaints against the VA involving violations of law and policy per its mission.

97. Plaintiff also contacted the Office of Accountability and Whistleblower Protection (OAWP) on several occasions over four years.  His complaints to the VA Office of Accountability (April 4, 2017), to OAWP addressed to Undersecretary Bonzanto (February 10, 2019), and December 13, 2021 (addressed to Mr. Calhoun) were never investigated.  He met with Dr. Bonzanto in October, 2018 when she worked for the House VA Affairs Committee.  At that time she was completely in aggreement with Plaintiff's concerns and position.  That all changed immediately after she was confirmed as Undersecretary to OAWP.  Inspector General Missal recognized Dr. Bonzanto's failures to investigate at OAWP and took a blistering position against her due to her failures (See Hearing Before the Subcommittee On Oversight and Investigations of the Committee on Veterans Affairs, Serial No. 116-41, and Failures Implementing Aspects of the VA Accountability and Whistleblower Protection Act of 2017, October 24, 2019, Report No. 18-04968-249).  Despite his concern regarding OAWP's failures to investigate, Inspector General Missal failed to investigate Plaintiff's serious complaints about VA leadership and failures to follow policy and law.

98. Defendants created a fiction of allegations, without due process, without medical errors, malpractice or patient harm, and used their false claims to force Plaintiff to resign and fulfill Dr. Rounds' threat December 11, 2014 threat to him. (See paragraph 133(f) herein)

99. On one occasion in 2022 OAWP refered Susan MacKenzie's name to VHA for investigation of potential criminal activity (violations on 18 U.S.C. 1001).  That investigation was abandoned by VHA, and OAWP refused to conduct any investions itself.

100. The presence of the false Adverse Action Report in the NPDB has caused the rescission of several job offers during the credentialing process.   Plaintiff has spent over $400,000 trying to seek justice and accountability from the VA and its agent Defendants.

101. The VA and its agent Defendants' persistent fraud and retaliation have magnified Plaintiff's damages, were designed to delay discovery of facts, hide their impropriety, and squelch Plaintiff's attempts to find remedies and were designed to be retaliatory.

102. The VA did not follow its policies or controlling law regarding Plaintiff's termination and adverse employment actions, including its fraudulent reporting to the NPDB, denying Plaintiff due process.

103. Defendants were aware of their violations of law, policy, hospital bylaws, but repeatedly and persistently misrepresented facts, policies and law to cover up their misconduct and refused to engage discussions with Plaintiff to resolve the matters, thereby leaving Plaintiff no other recourse but to file this immediate action.

## COUNT I: Retaliation Due to Age, Disability, EEO Activity

104. Plaintiff realleges and incorporates paragraphs 1 through 103 of this complaint as if completely set forth herein.

105. Plaintiff engaged in EEO activity which is protected under Title VII.

106. Plaintiff at all times during his employment at the VA was over the age of 40 and as such is in a protected class.

107. Plaintiff was diagnosed with Hodgkins Lymphoma and commenced his treatment for such in February, 2012 and as such is in a protected class.

108. Defendants' retaliation against Plaintiff was sufficiently pervasive to alter the conditions of his employment and prospective employment.

109. As alleged herein the Defendants were aware of Plaintiff's protected EEO activities.

110. As alleged, the adverse actions followed after Plaintiff engaged in EEO activity and included loss of pay, reputation, opportunity for advancement and positions.

111. Plaintiff filed four EEO complaints against Defendants that were accepted for investigation for which he was retaliated against:

a) The first was filed on or about August, 2014 after he was the subject of false complaints against him by nurses. It involved Dr Curioso's denial of Plaintiff's request for leave to remove himself from a hostile work environment which was initially denied. He was subsequently falsely accused by his supervisors Drs Curioso and Rounds.

b) The second was filed on or about February, 2014 after Plaintiff was subjected to a sham Fact Finding which followed none of the procedures for a Fact Finding in VA Policy 05- 29 and was terminated by Susan MacKenzie by letter dated February 3, 2915.

c) The last two EEO complaints were filed on or about March, 2020 after Douglas McLeod interferred with a full-time job offer with the Fargo VA which Plaintiff accepted, causcausing the job to be rescinded.

112.  Plaintiff has exhausted his agency remedies with the EEO and EEOC.

113.  The sham fact finding set the stage for a string of three sham procedures designed to retaliate against Plaintiff for his EEO activity and cause him personal and professional harm.

114.  Dr. Rounds derailed the EEO process when she wrote a memorandum on January 7, 2015, the same date she learned of a scheduled EEO mediation. Her memorandum written to Susan MacKenzie, Medical Center Director, advenced fifteen false accusations against Dr. Breda and asked that Plaintiff be terminated. Susan MacKenzie was the only person at the Providence Medical Center who had the authority to terminate a physician's employment.

115.  Susan MacKenzie testified under oath to the EEO and during her deposition that there had been no investigation or hearing, that she had never appointed a fact finder, never consented to conducting a fact finding, had personal reasons to know that a fact finding per VA policy 05-29 had never been conducted, did not know if the allegations against Dr. Breda were correct, did not know how Dr. Breda's past performance was rated, had no personal knowledge of Dr. Breda's level of patient care,

and had never met nor spoken with Dr. Breda.  There was no legitimate basis for Dr. Breda's termination or loss of benefits, yet Susan MacKenzie terminated Dr. Breda at Dr. Rounds' request. His termination was in retaliation for his filing EEO complaints and requesting EEO mediation.

116.   On or about February, 2020 Douglas McLeod, Director of the Providence VA Medical Center HR Dept. provided false and misleading statments to the Fargo VA to ensure that the position accepted by Dr. Breda would be rescinded.  Douglas McLeod's statements were made in retaliation of Plaintiffs prior EEO complaints, protected activity, and Whistleblowing. The Fargo EEO Report of Investigation described Doug McLeod's negative reference and its consequence of immediate job rescission.  Doug McLeod wrongly stated to the Providence EEO that he provided no reference at all.

117.   Plaintiff was discriminated against due to his age and disability when he:

   a) received lesser pay for equal work as compared to much younger, lesser qualified physicians in training when he worked overnight shifts as a hospitalist moonlighter (approx. 2010-2011).

   b) returned back to work in 2012 after chemotherapy treatments for Hodgkins Lymphoma.  Prior to his diagnosis and treatment for Hodgkins Plaintiff worked every Wednesday night as a hospitalist physician, however Dr. Rounds refused to return him to his prior duties after his treatment favoring younger physicians without a history of illness,  despite the fact that they were much less experienced, many of which were still in  training.

   c) received false complaints from nurses and as a result was asked to change his schedule to times when he was already contracted to work at his full-time job Monday-Friday in Massachusetts.  The Defendant VA was aware of his work obligations in Massachusetts and the fact that he was unable to accommodate the schedule changes requested, forcing him to take leave or resign.

d) One of the side effects of chemotherapy is fatigue. Dr. Curioso complained of Plaintiff's occasionally yawning at work suggesting that Plaintiff was too old or too ill.

118.   Plaintiff was retaliated against for his age, disability and protected activity when he asked the VA to investigate the nurses' false complaints.   The VA conducted sham procedures without due process leading to adverse conclusory decisions about him, but despite his repeated requests that the VA investigate the nurses' false complaints, the VA never did so.

119.   Instead, the VA retaliated by conducting a sham fact-finding, a sham MEC meeting, and assembled a third sham committee (Jankowich Committee) in order to arrive at conclusory decisions that were used against Plaintiff to file a false Adverse Action Report with the NPDB to knowingly cause repeated harm.  The combination of sham peer reviews and the false Adverse Action Report filed with the NPDB created a perfect storm of retaliation which appears every time Plaintiff either applies for employment or applies for recredentialing, from which he cannot escape.

120.   Dr. Rounds discriminated and retaliated against Plaintiff for age, disability and his protected activity when she secretly wrote a completely negative performance evaluation at least a year or more after Plaintiff took his voluntary leave from the Providence VA and months after his separation from the VA. Dr. Rounds gave Plaintiff no notice of the negative review which was not based on Plaintiff's work, but rather was driven by Dr. Rounds' discriminatory and retaliatory motives.  He had previously received annual satisfactory or better reviews and annual bonus pay for meeting expectations.

121.   Dr. Curioso acted in a discrimatory manner regarding Plaintiff's age, disability and retaliated against him due to his EEO activity when on May 25, 2014 he allowed one physician to leave several hours early, ignored one physician's refusal to perform his assigned duties as Plaintiff's relief, and another who arrived one and one-half hours late.  On that date, Plaintiff performed his work and the work of three others.  Dr. Curioso inappropriately accused Plaintiff of neglect in his June 10, 2014 letter to

Plaintiff despite the fact that he remained on duty 2 1/4 hours past his shift to ensure that all patients were cared for properly. The three physicians whose indisretions were overlooked were younger and had no disabilities. Dr. Curioso's false accusations stated in his June 10, 2014 letter to Plaintiff were found by the RI Board of Medical Licensure and Discipline to show "No Unprofessional Conduct." Dr. Breda was disparately disciplined for claims of wrongdoing he did not committ, as compared to three younger physicians with no disabilities who received no discipline or reprimand for their failure to meet their responsibilities.

122. Two of the three younger physicians whose indiscretions were overlook by Dr. Curioso submitted letters of complaint against Plaintiff in support of Dr, Curioso's accusations. Plaintiff had personal knowledge that their statements were false and did not represent the facts as he personally knew them to be.

123. After review of the accusations made against Dr. Breda, Dr. Gillette, former Chief of Staff at the Providence VA, wrote in his August 10, 2016 letter:

> "...these apparently isolated and apparently post hoc aggregated cases remind me of the kinds of allegations that must, by federal regulation and policy, and by joint commission standards, be considered by protected peer review processes with the goal of improving provider performance, and if that process fails, must be adjudicated by the executive committee of the medical staff, with full involvement of the provider at all phases of this process. A statement I can safely make is that this two-step process was used effectively to address more egregious threats to patient safety by at least one other provider, resulting in no termination, during my tenure as Chief of Staff."

Neither of the two-step processes described by Dr. Gillette were performed in Dr. Breda's case.

124. Susan MacKenzie, Medical Center Director, retaliated against Dr. Breda for his EEO complaints and protected activity when she knowingly filed a false Adverse Action Report against Dr. Breda on or about October 27, 2015 with the NPDB. Dr. MacKenzie denied Dr. Breda's due process rights per VA Handbook 1100.19 subpara. 14l(5)(e) and 14l(5)(g).

125. Dr. Michael Mayo-Smith, former VA VISN-1 Director, retaliated against plaintiff for his EEO complaints and protected activity by denying his appeal and disallowing him his procedural due

process when he wrongly claimed that "the fact finding conducted by the Providence VA Medical

Center followed the procedures detailed in Providence VA Policy Memorandum 05-29"...and

that..."The fact-finding in this case evidenced the rigor required to qualify as an investigation."

The Providence VA followed none of the procedures outlined in Policy 05-29 and therefore no

Fact Finding per policy was ever conducted.

126. Ryan Lilly, the present VISN-1 Director, retaliated against plaintiff for his prior EEO

complaints, Whistleblowing,  and prior protected activity in his January 14, 2019 letter to Senator

Warren by attempting to subvert Plaintiff's procedural due process when he wrongly claimed that

"a fact-finding...can be conducted by the supervisor of the employee in question."   There is no VA

policy allowing an investigation or fact-finding to be conducted by a supervisor acting alone.  Dr.

Curioso was never appointed as fact finder and and did not act on behalf of the hospital.  He never

pointed out to Sen. Warren that I was forced to resign due to constructive termination, that the

Jankowich Committee fraudulently misrepresented policy 05-29 wrongly claiming that an

investigation could be conducted by a supervisor, and that I was given no due process at any time

during the three sham procedures (Fact-Finding, Feb. 9 MEC Meeting, and Jankowich Committee

Meeting).

127.  The VA has continually tried to subvert Plaintiff's due process rights under the law.  Plaintiff has

made every available attempt to exhaust administrative remedies yet has not been given any due

process rights and has not been given any opportunity to be heard.  Ryan Lilly in his January 29,

2019 letter to Plaintiff states, "it appears that you previously exhausted the available avenues of

redress here at the agency," when in fact the VA from all of its levels of management has shown no

accountability, no avenue of redress, no due process, and has persistently retaliated against Plaintiff

for seeking his rights via protected activity.   The VA has prolonged this dispute for eight years in

order to damage Plaintiff personally, professionally, and financially.

128. In December, 2013 Plaintiff became aware that the Providence VA HR Department distributed written materials at his 2010 orientation which misrepresented what was required for enrollment in VA Retirement Health Benefits. The incorrect representations disuaded Plaintiff to take any action as his enrollment was represented to be "automatic." He asked the Providence VA to correct the problem the misrepresentation caused. The Providence VA retaliated against Plaintiff for his EEO activity, Whistleblowing, age and disability by refusing to correct the Plaintiff's recorded dates of service so he may obtain his earned 5-year pension and his Federal Blue-Cross Retirement Health Care Benefits. As requested he enrollment in Federal Employee Health Benefits (FEHA) at the first opportunity once he was given the correct information (from a VA Benefits office in Massachusetts) and carried those health benefits until he separated from the Providence VA.

129. The VA retaliated against plaintiff due to his age, disability, EEO activity, and whistleblowing activity when the VA claimed in their June 24, 2021 letter to the NPDB that the revocation of his credentials was automatic. In doing so the VA cited a provision in the VA Handbook 1100.19 which does not apply to the Plaintiff but rather relates to full-time permanent Title 38 employees that "Dismissal constitutes a revocation of privileges..." (VA Handbook 1100.19 p. 55) and failed to recognize paragraphs 14l(5)(e) and 14l(5)(g) in the same Handbook whereby Plaitiff's rights to due process and rights to challenge the sham decision of the February 9, 2015 Medical Executive Committee are described on pages 56-59.

130. Per 42 U.S.C. §11133 in order for a hospital entity to report an adverse action report, the hospital must either take a professional review action affecting a physician's credentials, or accept a surrender of clinical privileges from the physician. The NPDB characterized the VA's Adverse Action Report as "unsubstantiated" (June 10, 2021 letter to VA) and accepted the VA's claim that "Dismissal constitutes revocation." 42 U.S.C. §11133(a)(1)(B) requires that the hospital entity "accepts the surrender of clinical privileges of a physician." It does not state that a hospital entity may file an

Adverse Action Report when credentials are automatically revoked by the hospital.  Revocation of privileges requires a professional review action per 42 U.S.C.(a)(1)(A) which never occurred.  The VA did not produce any evidence that a professional review action was taken and never reported that Plaintiffs' credentials were revoked.  The NPDB knew or should have known that the Adverse Action Report based on a claim that Plaintiff surrendered his privileges was improper yet allowed it to remain in the database despite its "unsubstantiated" state further injuring Plaintiff.

131.  As alleged in paragraphs 1 through 130, the aforesaid adverse employment actions, othe adverse actions, misconduct, and other conduct, acts and omissions to the Plaintiff's detriment, were all taken (or failed to be taken) by administrators, managers and supervisory personnel with the Providence VA in retaliation for the protected or EEO activity of Plaintiff including those set forth above.  They are the direct and proximate result of the EEO activity.

132.  Defendants have engaged in, directed, and/or ratified retaliatory conduct, and has frustrated the Plaintiff's efforts to obtain relief and intentionally maintained these retaliatory and unlawful practices to the detriment of its employees.  Defendants at all relevant time knew or should have known of the retaliatory actions being taken against the Plaintiff and failed to take necessary action to prevent or correct the retaliatory actions being taken and, in fact, ratified such conduct.

133.  As a result of the foregoing, Plaintiff has been damaged in both measurable and immeasurable ways.  Such damages include, but are not limited to loss of pay; loss of benefits; payment of attorneys' fees and legal costs; loss of an amicable work environment; loss of career and professional opportunities; harm to professional reputation; and humiliation, anxiety, degradation, embarrassment and severe emotional suffering and distress.  Plaintiff will continue to suffer the same damages absent relief from this court.

134. The EEO and EEOC did not allow Plaintiff to present his case and evidence of the persistent retaliation that occurred against him for almost eight years.  He discussed his concerns with the ALJ assigned to his case who agreed that he would be better served to file this matter in Federal Court.

a) An initial Dismissal Order dated April 19, 2022 was issued to satisfy Plaintiff's request to file in Federal Court.

b) A second Dismissal Order in the same action was issued on May 4, 2022 apparently superceeding the April 19, 2022 order. That order indicated that a Final Agency Decision on the complaint would be issued within 60 days of May 4, 2022.

c) On May 20, 2022 Plaintiff questioned the reason for the second order by e-mail.  Plaintiff received a reply e-mail from Jeanne Long on the same date stating the amended order was issued to correct an error so as to therefore retain Plaitiff's ability to file in Federal Court. Contrary to the May 20, 2022 reply e-mail, no notification of time limits to file in Federal Court were included with the May 4, 2022 Order.

d) On May 21, 2022 Plaintiff sent a further e-mail to Ms. Long stating that, "I did not receive any notification of time limits for filing in federal court. If there are stipulations regarding filing please send me the appropriate documentation or C.F.R. citations. It is my understanding that the statute of limitations for filing regarding the Fargo matter is three years."  He also advised that he remained seriously ill.

d) On May 23, 2022 Ms. Long wrote and confirmed the "60 day limit" of the May 4, 2022 Dissmissal Order stating, "OEDCA anticipates issuing a decision on your complaint within the next two months."

e) On January 30, 2022 Plaintiff replied stating, "I expect to file an action in federal court prior to February 25, 2023, which is the date representing three years from the date of the Fargo job rescission. I have not received a final."

f) Ms. Long responded on January 31, 2022 by stating that the Final Agency Decision (FAD) had been sent by e-mail on 9/19/2022.  The FAD was due on July, 5, 2022.  Plaintiff did not know of or receive the September 19, 2022 e-mail as it was expected over two months earlier. The Final Agency Decision (FAD) was never submitted to the EEO Public Portal in the related action, nor was the FAD sent by US Mail.  Plaintiff was away from home beginning mid-September through early mid-November, 2022 and has been home limited time since.

g) OEDCA did not provide the Final Agency Decision within the time frame set forth by the EEOC.   He learned of the FAD only when he raised questions of non-receipt on January 30, 2023.  He received the FAD for the first time on or about February 4, 2023.

h) The Final Agency Decision indicates that "Complainant...has the right to file a civil action in an appropriate United States District Court on the agency's decision. The complainant may file a civil action within 90 days of receipt of this final decision if no appeal to EEOC has been filed."  (See attached Exhibit D - true copies of the original)

135.  The Agency continues to knowingly advance in their FAD the false, unsupported and unilaterally derived decisions setforth in the 2015 sham proceedings, conducted without due process. The FAD wrongly claimed that 1) Plaintiff had resigned in lieu of termination when Plaintiff resigned due to Constructive Termination,  2) a report had been submitted to the NPDB when all sections of the report are false, 3) Plaintiff's competence was investigated when no investigation took place, and, 4) the MEC voted to revoke plaintiff's hospital privileges and terminated him due to complaints regarding alleged incidents of "substandard care, professional misconduct or professional

incompetence" after it acknowledge the MEC had no right to do so.  The Agency knew or should have known that it acknowledged eighteen months earlier on June 24, 2021 that the MEC did not revoke Plaintiff's privileges because it had no authority to do so.

## COUNT II: Hostile Work Environment

Plaintiff realleges and incorporates paragraphs 1 through 135 of this complaint as if completely set forth herein.

136. Defendants have engaged in harassment of Plaintiff and a pattern and practice of retaliation for engaging in EEO activity including but not limited to:

a) In May, 2014 Plaitiff recognized that complaints made against him by nurses were false and took voluntary leave so the harassment would not escalate.  His supervisors and VA leadership took advantage of the frivolous and false complaints from nurses and used them to retaliate against Plaintiff conducting a sham fact finding which followed none of the VA policies and procedures in Policy 05-29.

b) The VA conducted three sham processes during times when Plaitiff was away from the VA.  A sham fact finding occurred during Plaitiffs leave from about June, 2014 to about February, 2015.  A sham MEC meeting on February 9, 2015, and a sham Jankowich Committee meeting on or about August-September, 2014 occurred after Plaintiff had resigned due to Constructive Termination.  The conclusory decisions made in these three sham processes were obtained without due process, without investigation and without medical errors or patient harm and were used to file a false Adverse Action Report with the NPDB.

c) accepting false complaints from nurses without investigation, without speaking with the nuses (Deposition Dr. Sharon Rounds), and with Dr. Breda's rebuttal.

d) conducting a sham Medical Executive Committee Meeting on February 9, 2015 and a sham

Jankowich Committee meeting in August and September, 2015 to generate unsupported

conclusory decisions without due process which were used to file a false and illegal

Adverse Action Report with the NPDB.

e) repeatedly refusing to retract the false Adverse Action Report which did not meet filing

requirements and which was considered to be "unsubstantiated" by the NPDB.

f) The false Adverse Action Report was filed after Plaintiff was counseled by Dr. Rounds

to resign, a practice specifically not allowed by VA policy, and threatened by Dr. Rounds

when she stated directly to him, "You have no idea what I can do to you."

g) when Susan MacKenzie knowingly authorized that a false Adverse Action report be filed

against Plaintiff with the NPDB.

h) repeatedly and wrongly claimed that the VA conducted a fact finding when it had not

followed any of the procedures in VA Policy 05-29 defining a fact finding and when the VA

wrongly used the alleged fact finding as if it were a formal investigation by the hospital entity.

i) when Susan MacKenzie repeatedly claimed the Department conducted an intra- departmental

fact-finding when there is no such procedure provided in VA policies and is against the the

procedures in VA Policy 05-29 which she stated she signed and knew.

i) when Dr. Mayo-Smith alsely claimed in his November 16, 2015 letter that the Providence VA

followed all of its procedures and policies in conducting a fact finding and that "the fact finding

in this case evidenced the rigor required of an investigation."

j) repeatedly misrepresented facts and policies in order to cover up prior VA misconduct  and

to frustrate Plaintiff's search for a fair hearing, due process, and remedies for the injustices and damage he has endured.

k) termination one day before his 5-year pension annuity was to vest, and its refusal to correct its own errors in communication regarding Federal Blue-Cross Retirement Benefits to ensure Plaintiff would not receive the Federal Benefits he has earned,

l) refusal to correct his SF-50 when requested to do so by OPM.

m) interference with an accepted full-time job offer as an ER physician at the Fargo VA by providing a false and misleading negative employment recommendation causing the rescission of an accepted full-time job offer with full benefits.

n) The VA has created a hostile work place and continued its retaliation against plantiff long after his separation from the VA.  It has extended its illegal retaliatory acts beyond the workplace by filing the Adverse Action Report with the NPDB and allowing the report to remain so as to to continue the retaliation indefinitely.  Since the NPDB must be queried every time the Plaintiff applies for a new job as an internal medicine physician, and every two years thereafter, the mere presence of the false Adverse Action Report has the retaliatiatory effects of limiting or blocking completely his career options nationally in both the public and private sectors.  The retaliation for EEO activity went on throughout all material times.

o) The fabrication and perpetuation of a fiction of misconduct by Plaintiff without evidence of medical misconduct.

137.  Plaintiff has been subject to a hostile work environment based upon reprisal (EEO activity) including the material adverse actions alleged in paragraphs 1-136.

138. As a result of the foregoing, Plaintiff has been damaged in both measurable and immeasurable ways. Such damages include, but are not limited to loss of pay; loss of benefits; payment of attorneys' fees and legal costs; loss of an amicable work environment; loss of career and professional opportunities; harm to professional reputation; and humiliation, anxiety, degradation, embarrassment and severe emotional suffering and distress. Plaintiff will continue to suffer the same damages absent relief from this court.

139. Plaintiff has satisfied all conditions precedent to the filing of this suit or have been prevented by the Defendant from satisfying such conditions or are excused under the law from satisfying any other conditions.

**COUNT III: Prohibition Against Retaliation and Coercion [42 U.S.C. § 12203]**

Plaintiff realleges and incorporates paragraphs 1 through 139 of this complaint as if completely set forth herein.

140. Defendant VA by and through the Defendants Curioso, Rounds, MacKenzie, and McLeod did cause willfully and intentionally retaliate against Plaintiff for filing an EEO report.

141. Plaintiff was diagnosed and treated for Hodgkin lymphoma on or about February, 2012.

142. Defendant Curioso knew or should have known about Plaintiff's Hodgkin's disease as Plaintiff called Dr. Curioso from his hospital room in early February, 2012 to advise him of his potentially life-threatening illness and advise him of need time off. Dr. Curioso's only comment was to ask Plaintiff, "Who is going to work your shifts?"

143. When Plaintiff completed chemotherapy and returned to work, he had recently completed chemotherapy and was still immunocompromised. Because of his immunocompromised state, he requested that he return first to his prior hospitalist duties where he worked from a call room and interacted with fewer patients and staff than in the ER. His risk was much less for infection working

in the hospitalist environment.  Plaintiff's request for reasonable accommodation for his disability was denied.  He was never returned to the hospitalist service and worked only in the ER.

144. 42 U.S.C. §12203(a) provides that a mere request for an accommodation is a protected activity sufficient to support a retaliation claim (See Solomon v. Vilsack, 763 F.3d 1, 15 n.6 (D.C. Cir. 2014).  Dr, Curioso's opposition to Plaintiff's request for leave to be hospitalized and receive chemotherapy, along with the denial of his reasonable accommodation to return to his prior hospitalist duties first before returning to the ER represent unlawful retaliation.

145. As a result of the foregoing, Plaintiff has been damaged in both measurable and immeasurable ways. Such damages include, but are not limited to loss of pay; loss of benefits; payment of attorneys' fees and legal costs; loss of an amicable work environment; loss of career and professional opportunities; harm to professional reputation; and humiliation, anxiety, degradation, embarrassment and severe emotional suffering and distress.  Plaintiff will continue to suffer the same damages absent relief from this court.

## COUNT IV: THE REHABILITATION ACT 29 U.S.C. §701

Plaintiff realleges and incorporates paragraphs 1 through 145 of this complaint as if completely set forth herein.

146. Plaintiff early symptoms of Hodgkins were slowly progressive and Plaintiff continued being a conscientous, loyal employee.  He continued to work until days before his diagnosis.  When diagnosed he was found to have a high grade Hodgkin Lymphoma that was life threatening.  Upon his return to work the personal responsibility and loyalty he had shown to his supervisors was not respected, his advanced sick leave that had been approved by HR was not paid to him by his Department (Dr. Sharon Rounds was the Department Chair), he was not given the reasonable

accommodations he requested, namely to work first as a hospitalist due to his immunocompromised state, and was not given the support policy provides.

## COUNT V: Whistleblower Retaliation

Plaintiff realleges and incorporates paragraphs 1 through 146 of this complaint as if completely set forth herein.

147.   The Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017, Pub. L. No. 115-41, 131 Stat. 862 (2017), encompasses Merit System Protection Board (MSPB) review of an agency's action for accordance with law, including whether the Secretary of Veterans Affairs' final decision with respect to a removal, demotion, or suspension under 38 U.S.C.S. § 714 provides specific reasons for the chosen penalty. 38 U.S.C.S. §§ 714(c)(2), 714(d)(1) Further, the Act expressly provides that the appellate court review the agency action for accordance with law, abuse of discretion, and arbitrary and capricious decision making. 38 U.S.C.S. § 714(d)(5)(A). An agency abuses its discretion where, inter alia, the decision represents an unreasonable judgment in weighing relevant factors. A decision is arbitrary and capricious where the agency fails to articulate a rational connection between the facts found and the choice made. Therefore, the plain meaning of 38 U.S.C.S. § 714, when considered in its entirety, conveys that when determining whether the decision is supported by substantial evidence, the MSPB (or administrative judge) must necessarily consider the agency's penalty choice as part of that review.

148.   Plaintiff has a MSPB review pending and may include the MSPB decision in this complaint depending on the outcome of that review.

## COUNT VI: BIVENS CLAIM 1

Plaintiff realleges and incorporates paragraphs 1 through 148 of this complaint as if completely set forth herein.

149.  Dr. John Breda alleges that he was deprived of his constitutional right to due process as set out

hereinafter prior to the loss of his rights in his employment at the Department of Veterans Affairs at

the hands of the Defendants herein who are federal officials, by constructive discharge.

150.  Dr. Breda has been denied all other legal remedies otherwise available to federal employees at the

Department of Veterans Affairs and Dr. Breda has no other legal remedies available to him.

151.  There are no special factors or immunity defenses that the Defendants can raise to defeat Dr.

Breda's claims.

152.  Dr.  Breda alleges that he was deprived of his constitutional right to due process by being denied a

fair and impartial hearing with proper notice and opportunity to participate prior to losing his

employment by constructive discharge on February 1, 2015, and having his discharge published as a

resignation while under investigation in the National Practitioners Data Bank where any entity with

whom he desires to associate with can require him to grant them access to same or refuse to

associate with him. This includes third-party insurance participation entities, malpractice insurance

coverage entities, HMO's, Hospital authorities, IPAs, government programs, the Medicare program,

Medicaid programs, potential employers, etc.

153.  Nevertheless, the Defendants caused the Department to undertake a:

a) Sham Fact Finding which followed none of the the procedures in VA

policy 05-29 and leading to false accusations and conclusory decisions

without due process;

b) Secretive sham due process hearing on February 9, 2015, by the MEC

after Dr. Breda resigned without his being afforded proper notice.  The meeting did not

constitute a Professional Review as definded in 42 U.S.C. §11112 and denied him his rights to

due process under the law; and

c) Fraudulent, sham hearing by the three person Jankowich Committe to decide if Plaintiff resigned his credentials during an investigation. Per 42 U.S.C. §11133(a)(1)(B) the hospital entity must "accepts the surrender of clinical privileges of a physician while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct." In this case Plaintiff never surrendered his clinical privileges nor was there an ongoing investigation by the hospital entity when he resigned his employment due to constructive termination. The Jankowich fraudulently misrepresented VA Policy 05-29 in their September 30, 2015 decision document wrongly claiming that an investigation can be conducted by a supervisor acting alone which is in violation of law and policy. The Committee meeting was held at a time when Plaintiff was contracted to work in Massachusetts denying him his rights and due process under the law.

154. The Defendants did and did cause the Department of Veteran Affairs to fraudulently represent the facts and circumstances of this matter to Dr. Breda and the public that Dr. Breda had his clinical privileges revoked on February 9, 2015, by the MEC when in truth and fact the MEC had no authority to revoke said privileges. The Department did admit in a June 24, 2021 letter to the National Practitioners Data Bank (NPDB) that it had no such authority. This false and misleading representation caused a tolling of the Statute of Limitations until its starting to run on June 24, 2021, when the Department of Veteran Affairs acknowledged to the National Practitioners Data Bank that the MEC did not revoke Dr. Breda's privileges.

155. Due to the Defendants' false and fraudulent manipulation of the mechanisms of the Department of Veteran Affairs, Dr. Breda has no alternative relief unless this Court intervenes.

156. The Rhode Island Board of Medical Licensure and Discipline Reviewed many of the allegations against Dr. Breda and made a finding of "No Unprofessional Conduct" on his part as to any alleges that it reviewed.

## COUNT VII: BIVENS CLAIM 2

Plaintiff realleges and incorporates paragraphs 1 through 156 of this complaint as if completely set forth herein.

157.  Dr. John Breda alleges that he was deprived of his constitutional right to due process as set out hereinafter prior to the loss of his rights in his employment at the Department of Veterans Affairs at the hands of the Defendants herein who are federal officials, by constructive discharge.

158.  Dr. Breda has been denied all other legal remedies otherwise available to federal employees at the Department of Veterans Affairs and Dr. Breda has no other legal remedies available to him.

159.  There are no special factors or immunity defenses that the Defendants can raise to defeat Dr. Breda's claims.

160.  Dr. Breda alleges that he was deprived of his constitutional right to due process by being denied the opportunity to confront his accusers prior to losing his employment by constructive discharge on February 1, 2015, and having his discharge published as a resignation while under investigation in the National Practitioners Data Bank where any entity with whom he desires to associate with can require him to grant them access to same or refuse to associate with him. This includes third-party insurance participation entities, malpractice insurance coverage entities, HMO's, Hospital authorities, IPAs, government programs, the Medicare program, Medicaid programs, potential employers, etc.

161.  Nevertheless, the Defendants caused the Department to undertake a:

a) Sham Fact Finding which followed none of the the procedures in VA policy 05-29 and leading to false accusations and conclusory decisions without due process;

b) Secretive sham due process hearing on February 9, 2015, by the MEC

after Dr. Breda resigned without his being afforded proper notice.  The

meeting did not constitute a Professional Review as definded in 42 U.S.C.

§11112 and denied him his rights to due process under the law; and

c) Fraudulent, sham hearing by the three person Jankowich Committe to decide if Plaintiff

resigned his credentials during an investigation.  Per 42 U.S.C. §11133(a)(1)(B) the

hospital entity must "accepts the surrender of clinical privileges of a physician while

the physician is under an investigation by the entity relating to possible incompetence or

improper professional conduct."  In this case Plaintiff never surrendered his clinical privileges

nor was there an ongoing investigation by the hospital entity when he resigned his

employment due to constructive termination.  The Jankowich fraudulently misrepresented VA

Policy 05-29 in their September 30, 2015 decision document wrongly claiming that an

investigation can be conducted by a supervisor acting alone which is in violation of law and

policy.  The Committee meeting was held at a time  when Plaintiff was contracted to work in

Massachusetts denying him his rights and due process under the law.

162.  The Defendants did and did cause the Department of Veteran Affairs to fraudulently represent the

facts and circumstances of this matter to Dr. Breda and the public that Dr. Breda had his clinical

privileges revoked on February 9, 2015, by the MEC when in truth and fact the MEC had no

authority to revoke said privileges. The Department did admit in a June 24, 2021, letter to the

National Practitioners Data Bank (NPDB) that it had no such authority. This false and misleading

representation caused a tolling of the Statute of Limitations until its starting to run on June 24, 2021,

when the Department of Veteran Affairs acknowledged to the National Practitioners Data Bank that

the MEC did not revoke Dr. Breda's privileges.

163.  Due to the Defendants' false and fraudulent manipulation of the mechanisms of the Department of Veteran Affairs, Dr. Breda has no alternative relief unless this Court intervenes.

164.  The Rhode Island Board of Medical Licensure and Discipline Reviewed many of the allegations against Dr. Breda and made a finding of "No Unprofessional Conduct" on his part as to any allegations that it reviewed.

## COUNT VIII: BIVENS CLAIM 3

Plaintiff realleges and incorporates paragraphs 1 through 164 of this complaint as if completely set forth herein.

165.  Dr. John Breda alleges that he was deprived of his constitutional right to due process as set out hereinafter prior to the loss of his rights in his employment at the Department of Veterans Affairs at the hands of the Defendants herein who are federal officials, by constructive discharge.

166.  Dr. Breda has been denied all other legal remedies otherwise available to federal employees at the Department of Veterans Affairs and Dr. Breda has no other legal remedies available to him.

167.  There are no special factors or immunity defenses that the Defendants can raise to defeat Dr. Breda's claims.

168.  Dr. Breda alleges that he was deprived of his constitutional right to due process by being denied the opportunity to procure exculpatory evidence in the possession of the Department of Veteran Affairs due to the acts and conduct of the Defendants prior to his losing his employment by constructive discharge and having his discharge published as a resignation while under investigation in the National Practitioners Data Bank where any entity with whom he desires to associate with can require him to grant them access to same or refuse to associate with him. This includes third-party insurance participation entities, malpractice insurance coverage entities, HMO's, Hospital

authorities, IPA's, government programs, the Medicare program, Medicaid programs, potential employers, etc.

169. Nevertheless, the Defendants caused the Department to undertake a:

a) Sham Fact Finding which followed none of the the procedures in VA policy 05-29 and leading to false accusations and conclusory decisions without due process,

b) Secretive sham due process hearing on February 9, 2015, by the MEC after Dr. Breda resigned without his being afforded proper notice. The meeting did not constitute a Professional Review as definded in 42 U.S.C. §11112 and denied him his rights to due process under the law; and

c) Fraudulent, sham hearing by the three person Jankowich Committe to decide if Plaintiff resigned his credentials during an investigation. Per 42 U.S.C. §11133(a)(1)(B) the hospital entity must "accepts the surrender of clinical privileges of a physician while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct." In this case Plaintiff never surrendered his clinical privileges nor was there an ongoing investigation by the hospital entity when he resigned his employment due to constructive termination. The Jankowich fraudulently misrepresented VA Policy 05-29  in their September 30, 2015 decision document wrongly claiming that an investigation can be conducted by a supervisor acting alone which is in violation of law and policy. The Committee meeting was held at a time  when Plaintiff was contracted to work in Massachusetts denying him his rights and due process under the law.

170. The Defendants did and did cause the Department of Veteran Affairs to fraudulently represent the facts and circumstances of this matter to Dr. Breda and the public that Dr. Breda had his clinical privileges revoked on February 9, 2015, by the MEC when in truth and fact the MEC had no

authority to revoke said privileges. The Department did admit in a June 24, 2021, letter to the National Practitioners Data Bank (NPDB) that it had no such authority. This false and misleading representation caused a tolling of the Statute of Limitations until its starting to run on June 24, 2021, when the Department of Veteran Affairs acknowledged to the National Practitioners Data Bank that the MEC did not revoke Dr. Breda's privileges.

171. Due to the Defendants' false and fraudulent manipulation of the mechanisms of the Department of Veteran Affairs, Dr. Breda has no alternative relief unless this Court intervenes.

172. The Rhode Island Board of Medical Licensure and Discipline Reviewed many of the allegations against Dr. Breda and made a finding of "No Unprofessional Conduct" on his part as to any alleges that it reviewed.

## COUNT IX: BIVENS CLAIM 4

Plaintiff realleges and incorporates paragraphs 1 through 172 of this complaint as if completely set forth herein.

173. Dr. John Breda alleges that he was deprived of his constitutional right to due process as set out hereinafter prior to the loss of his rights in his employment at the Department of Veterans Affairs at the hands of the Defendants herein who are federal officials, by constructive discharge.

174. Dr. Breda has been denied all other legal remedies otherwise available to federal employees at the Department of Veterans Affairs and Dr. Breda has no other legal remedies available to him.

175. There are no special factors or immunity defenses that the Defendants can raise to defeat Dr. Breda's claims.

176. Dr. Breda alleges that he was deprived of his constitutional right to due process by being denied the opportunity to have a fair and impartial investigation by the Department of Veteran Affairs due to the acts and conduct of the Defendants prior to his losing his employment by constructive discharge and having his discharge published as a resignation while under investigation in the National

Practitioners Data Bank where any entity with whom he desires to associate with can require him to grant them access to same or refuse to associate with him. This includes third-party insurance participation entities, malpractice insurance coverage entities, HMO's, Hospital authorities, IPA's, government programs, the Medicare program, Medicaid programs, potential employers, etc.

177. Nevertheless, the Defendants caused the Department to undertake a:

a) Sham Fact Finding which followed none of the the procedures in VA policy 05-29 and leading to false accusations and conclusory decisions without due process;

b) Secretive sham due process hearing on February 9, 2015, by the MEC after Dr. Breda resigned without his being afforded proper notice. The meeting did not constitute a Professional Review as definded in 42 U.S.C. §11112 and denied him his rights to due process under the law; and

c) Fraudulent, sham hearing by the three person Jankowich Committe to decide if Plaintiff resigned his credentials during an investigation. Per 42 U.S.C. §11133(a)(1)(B) the hospital entity must "accepts the surrender of clinical privileges of a physician while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct." In this case Plaintiff never surrendered his clinical privileges nor was there an ongoing investigation by the hospital entity when he resigned his employment due to constructive termination. The Jankowich fraudulently misrepresented VA Policy 05-29  in their September 30, 2015 decision document wrongly claiming that an investigation can be conducted by a supervisor acting alone which is in violation of law and policy. The Committee meeting was held at a time  when Plaintiff was contracted to work in Massachusetts denying him his rights and due process under the law.

178. The Defendants did and did cause the Department of Veteran Affairs to fraudulently represent the facts and circumstances of this matter to Dr. Breda and the public that Dr. Breda had his clinical privileges revoked on February 9, 2015, by the MEC when in truth and fact the MEC had no authority to revoke said privileges. The Department did admit in a June 24, 2021, letter to the National Practitioners Data Bank (NPDB) that it had no such authority. This false and misleading representation caused a tolling of the Statute of Limitations until its starting to run on June 24, 2021, when the Department of Veteran Affairs acknowledged to the National Practitioners Data Bank that the MEC did not revoke Dr. Breda's privileges.

179. Due to the Defendants' false and fraudulent manipulation of the mechanisms of the Department of Veteran Affairs, Dr. Breda has no alternative relief unless this Court intervenes.

180. The Rhode Island Board of Medical Licensure and Discipline Reviewed many of the allegations against Dr. Breda and made a finding of "No Unprofessional Conduct" on his part as to any alleges that it reviewed.

## COUNT X: BIVENS CLAIM 5

Plaintiff realleges and incorporates paragraphs 1 through 180 of this complaint as if completely set forth herein.

181. Dr. John Breda alleges that he was deprived of his constitutional right to due process as set out hereinafter prior to the loss of his rights in his employment at the Department of Veterans Affairs at the hands of the Defendants herein who are federal officials, by constructive discharge.

182. Dr. Breda has been denied all other legal remedies otherwise available to federal employees at the Department of Veterans Affairs and Dr. Breda has no other legal remedies available to him.

183. There are no special factors or immunity defenses that the Defendants can raise to defeat Dr. Breda's claims.

184. Dr. Breda alleges that he was deprived of his constitutional right to due process by being denied the opportunity to defend himself before the Department of Veteran Affairs due to the acts and conduct of the Defendants prior to his losing his employment by constructive discharge and having his discharge published as a resignation while under investigation in the National Practitioners Data Bank where any entity with whom he desires to associate with can require him to grant them access to same or refuse to associate with him. This includes third-party insurance participation entities, malpractice insurance coverage entities, HMO's, Hospital authorities, IPA's, government programs, the Medicare program, Medicaid programs, potential employers, etc.

185. Nevertheless, the Defendants caused the Department to undertake a:

a) Sham Fact Finding which followed none of the the procedures in VA policy 05-29 and leading to false accusations and conclusory decisions without due process;

b) Secretive sham due process hearing on February 9, 2015, by the MEC after Dr. Breda resigned without his being afforded proper notice. The meeting did not constitute a Professional Review as definded in 42 U.S.C. §11112 and denied him his rights to due process under the law; and

c) Fraudulent, sham hearing by the three person Jankowich Committe to decide if Plaintiff resigned his credentials during an investigation. Per 42 U.S.C. §11133(a)(1)(B) the hospital entity must "accepts the surrender of clinical privileges of a physician while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct." In this case Plaintiff never surrendered his clinical privileges nor was there an ongoing investigation by the hospital entity when he resigned his employment due to constructive termination. The Jankowich fraudulently misrepresented VA Policy 05-29 in their September 30, 2015 decision document wrongly claiming that an

42

investigation can be conducted by a supervisor acting alone which is in violation of law and

policy.  The Committee meeting was held at a time  when Plaintiff was contracted to work in

Massachusetts denying him his rights and due process under the law.

186.  The Defendants did and did cause the Department of Veteran Affairs to fraudulently represent the

facts and circumstances of this matter to Dr. Breda and the public that Dr. Breda had his clinical

privileges revoked on February 9, 2015, by the MEC when in truth and fact the MEC had no

authority to revoke said privileges. The Department did admit in a June 24, 2021, letter to the

National Practitioners Data Bank (NPDB) that it had no such authority. This false and misleading

representation caused a tolling of the Statute of Limitations until its starting to run on June 24, 2021,

when the Department of Veteran Affairs acknowledged to the National Practitioners Data Bank that

the MEC did not revoke Dr. Breda's privileges.

187.  Due to the Defendants' false and fraudulent manipulation of the mechanisms of the Department of

Veteran Affairs, Dr. Breda has no alternative relief unless this Court intervenes.

188.  The Rhode Island Board of Medical Licensure and Discipline Reviewed many of the allegations

against Dr. Breda and made a finding of "No Unprofessional Conduct" on his part as to any alleges

that it reviewed.

## COUNT XI: Constitutional Defamation Violation of Fifth Amendment Liberty, Property and/or Due Process

Plaintiff realleges and incorporates paragraphs 1 through 188 of this complaint as if completely set forth

herein.

189.  Plaintiff has been subject to a litany of false statements and false accusations by Defendants across

several departments and heirarchy of leadership regarding his employment with the VA, including

those false statements resulting in material adverse actions alleged in the foregoing paragraphs.

190. Plaintiff has an interest in his reputation, which affects his standing in the community and future employment prospects.

191. Defendants have repeteadly and wrongfully perpetuated their false statements against Plaintiff in every avenue of redress purported to be available to Plaintiff, which has yet to be corrected.

192. Defendants' false statements against Plaintiff stigmatized and continue to stigmatize Plaintiff in spite of Plaintiff's numerous attempts to refute them by exhausting administrative remedies.

193. Repeating false statements do not make false statements true.

194. Defendants' false statements regarding Plaintiff government's action formally or automatically excluded him from government and private employment opportunities, particularly with Plaintiff's job offer in Fargo, which was rescinded after Defendants' false statements stigmatized Plaintiff resulting in recission of that job offer.

195. The VA circumvented its own policies to arrive at conclusory decisions without Dr. Breda's presence or rebuttal. It ignored federal law to file the conclusory decisions with the NPDB. Per 42 U.S.C. §11133 in order for a hospital entity to report an adverse action report, the hospital must either take a professional review action affecting a physician's credentials, or accept a surrender of clinical privileges from the physician. The NPDB characterized the VA's Adverse Action Report as "unsubstantiated" (June 10, 2021 letter to VA) and accepted the VA's claim that "Dismissal constitutes revocation." An NPDB report due to resignation requires that the hospital entity "accepts the surrender of clinical privileges of a physician." 42 U.S.C. §11133(a)(1)(B) There is no provision in 42 U.S.C. §11133(a)(1)(B) to accept an Adverse Action Report when the hospital automatically revokes privileges. Revocation of privileges requires a professional review action per 42 U.S.C.(a)(1)(A) which never occurred.

196. When the VA wrote its June 24, 2021 letter to the NPDB, the VA knew or should have known that the provision in VA Handbook 1100.19 14l(5)(a)(2) upon which it relied claiming Plaintiff's

44

credentials were automatically revoked pertains to "permanent, full-time Title 38 employee(s)" and does not apply to Plaintiff.  The VA ignored the provisions 14l(5)(e) and 14l(5)(g) in Handbook 1100.19 which do apply to Plaintiff and provide due process rights to Plaintiff when there are claims of substandard care, professional misconduct or professional incompetence.  Such conclusory decisions were made by the MEC Committee on February 9, 2015 without due process and perpetuated in the October 27, 2015 NPDB Report wherein the VA publicized their false claims without the required narrative leaving any querrier to imagine the worst about Dr. Breda.

197. By June 24, 2021 the VA and the NPDB knew or should have known that the Adverse Action Report was improper, yet allowed the "unsubstantiated" report to remain further injuring Plaintiff.

198.   The HCQIA encourages peer review by providing civil damage immunity to those who participate in a "professional review action...of a professional review body."  42 U.S.C. §11111(a).  For this immunity certain standards "must be taken... after a reasonable effort to obtain the facts of the matter," and "after adequate notice and [fair] hearing procedures are afforded to the physician involved..."   Neither occurred.  The VA and its Defendants knew that the sham fact finding, sham MEC meeting, and the deliberate misrepresentations by the Jankowich Committee, were all made without due process of law, without Plaintiffs presence or rebuttal, and were not made to further the quality of health care.  42 U.S.C. § 11112(a).

199. Dr. Curioso and Dr. Rounds exaggerated facts making unsupported allegations against Dr. Breda. The first time Dr. Breda was allowed to provide his accounting of each allegation was eleven months after he separated from the VA when the RI Board of Medical Licensing and Discipline asked him for his explanation.  Dr. Breda was forced to obtain the related medical records by FOIA request to the VA.  The VA never voluntarily provided them.  The RI Board found "No Unprofessional Conduct."

200. The Defendant again advanced the same conclusory decisions to the EEOC in 2022 when its attorney, Paul Usera, stated in his Motion for Summary Judgment, "it is hard to think of a bigger red flag for a physician applicant than having been previously terminated for professional competence and conduct issues."   From the outset of this case Atty. Usera has claimed that, the VA had to report Plaintiff to the NPDB as "he resigned." As an attorney, Usera knew or should have known that the surrender of clinical privileges and a formal review by the hospital entity constituting an investigation are all required to report a physician to the NPDB under 42 U.S.C. §11133(a)(1)(B). Conclusory decisions made without due process, not conducted by the hospital entity, or without a professional review are not reportable.  A physician's resignation of his employment, with and ongoing investigation by the hospital entity is not reportable.  The report should never have been filed or should have been retracted.

201. Defendants' actions regarding Plaintiff impugned Plaintiff's professional competence and reputation and placed significant roadblocks in his ability to obtain full time employment in his chosen field of internal medicine.

202. In fact, Plaintiff's job offer to Fargo VA was rescinded after Defendant's false statements were communicated with the Fargo VA.

203. Said actions created a stigma that foreclosed Plaintiff's freedom to take advantage of other employment opportunities, including losing his wages, benefits, and pursuing employment in his chosen field of internal medicine.

204. Defendants' false statements regarding Plaintiff has precluded and continues to preclude Plaintiff from such a broad range of opportunities that it interferes with his constitutionally protected right to follow his chosen trade or profession.

205. Defendant's termination of Plaintiff's employment and continued false statements perpetrated in the NPDB, among others, substantially reduced the value of Plaintiff's human capital and his professional responsibilities.

206. As a result of the Defendant's false statements against Plaintiff, Plaintiff lost his employment, and continues to suffer statutory impediments to employment as described in the foregoing paragraphs.

207. Defendants' have degraded the value of Plaintiff's medical education, work experience, and no longer can freely enjoy his property interest in his medical license because he is prejudged by credentialing committees who refuse to hire him because of the false Adverse Action Report Defendants filed with the NPDB.

208. As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer from his injury to his property, liberty and/or due process interests under the Fifth Amendment, including embarrassment, humiliation, mental anguish and loss of reputation.

209. Defendants' wrongful conduct has had significant effects on Plaintiff's overall physical and emotional wellbeing manifesting a chronic illness which limits his life daily life.

210. As a result of the foregoing, Plaintiff has been damaged in both measurable and immeasurable ways. Such damages include, but are not limited to loss of pay; loss of benefits; payment of attorneys' fees and legal costs; loss of an amicable work environment; loss of career and professional opportunities; harm to professional reputation; and humiliation, anxiety, degradation, embarrassment and severe emotional suffering, distress and loss of health. Plaintiff will continue to suffer the same damages absent relief from this court.

211. The nationalized defamation due to the false Adverse Action Report, the acts described in paragraphs 1-210, together with the loss of his govenment employment in Providence, the rescission of the accepted Fargo position, and the loss of his ability to freely enjoy the expected property interest in his medical license is sufficent to meet the stigma-plus test.

**COUNT XII: Conspiracy to Deprive Plaintiff's Civil Rights under 42 USC § 1985**

Plaintiff realleges and incorporates paragraphs 1 through 211 of this complaint as if completely set forth herein.

212. Defendants engaged in a conspiracy to deprive Plaintiff of the equal protection of the laws.

213. The Defendants did and did cause the Department of Veteran Affairs to fraudulently represent the facts and circumstances of this matter to Dr. Breda and the public that Dr. Breda had his clinical privileges revoked on February 9, 2015, by the MEC when in truth and fact the MEC had no authority to revoke said privileges. The Department did admit in a June 24, 2021, letter to the National Practitioners Data Bank (NPDB) that it had no such authority. This false and misleading representation caused a tolling of the Statute of Limitations until its starting to run on June 24, 2021, when the Department of Veteran Affairs acknowledged to the National Practitioners Data Bank that the MEC did not revoke Dr. Breda's privileges.

214. Defendants had a duty to follow policies and law but failed to do so.  As shown throughout this case, Plaintiff's supervisors and VA leadership did not follow VA policies, NPDB reporting criteria, or law.   As such, the involved individuals  did not act within the scope of their jobs.   The actions of these individuals have occurred throughout various levels of management and have continued over a scope of several years.

215. On many occasions Plaintiff's supervisors, the Medical Center Director, VISN-1 Directors, Human Resource Personnel, and others repeatedly claimed that they had follwed VA policies and law when none of the applicable policies and law had been followed.  Defendants claimed that Plaintiff had exhaused his agency remedies when in fact he was provided no fair hearing or due process at all. Defendants' knew or should have known that their representations were false.

216. Defendants' followed their own agendas in order to deprive Plaintiff of his rights even though their actions were against VA policies, NPDB Policies, and law. Plaintiff was denied equal protection under the law.

217. As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer from his injury to his property, liberty and/or due process interests under the Fifth Amendment, including embarrassment, humiliation, mental anguish and loss of reputation.

218. Defendants' wrongful conduct has had significant effects on Plaintiff's overall physical and emotional wellbeing manifesting a chronic illness which limits his life daily life.

219. As a result of the foregoing, Plaintiff has been damaged in both measurable and immeasurable ways. Such damages include, but are not limited to loss of pay; loss of benefits; payment of attorneys' fees and legal costs; loss of an amicable work environment; loss of career and professional opportunities; harm to professional reputation; and humiliation, anxiety, degradation, embarrassment and severe emotional suffering, distress and loss of health. Plaintiff will continue to suffer the same damages absent relief from this court.

WHEREFORE, Plaintiff respectfully requests judgment as follows:

A. Award Plaintiff his past and future loss of wages and benefits, plus interest;

B. Order Defendant's to reinstate Plaintiff to a position comparable to his former position, or, in lieu of reinstatement, award him front pay including benefits;

C. Award to Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action;

D. Award to Plaintiff compensatory damages;

E. Award to Plaintiff punitive damages; and

F. Grant Plaintiff such additional or alternative relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims properly triable by jury.


Dated:  12/23/2023


                                        Respectfully submitted,

                                        Dr. John Breda, MD

                                                                *Pro se*

                                        253 Greendale Ave.
                                        Needham, MA 02494
                                        (617) 877-0025
                                        john.breda@gmail.com