Case 1:15-cv-13263-DJC Document 2 Filed 03/24/15 Page 1 of 191

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
JOHN BREDA, M.D.,                           )
                                            )
                  Plaintiff,                )
                                            )
            v.                              )        C.A. No. 15-13263-DJC
                                            )
ROBERT A. McDONALD,                         )
*Secretary of Veterans Affairs*, et al.     )
                                            )
                  Defendants.               )
_____ )

## DECLARATION OF SUSAN MACKENZIE, PH.D.

I state the following under penalty of perjury pursuant to 28 U.S.C. § 1746.

1.      I am employed as the Director of the Veterans Administration Medical Center in Providence, Rhode Island (the "VAMC"). I have held this position since October 2013.

2.      John Breda, M.D., formerly worked as a part-time physician in the VAMC's Emergency Department.

3.      Attached as <u>Exhibit A</u> is a letter dated February 3, 2015, to Dr. Breda from me stating that his employment at the VAMC would be terminated effective February 13, 2015. The letter informed Dr. Breda that he would have the right to a fair hearing and appeal if the VAMC made an initial determination that the reasons for his termination rose to the level of substandard care, professional misconduct, or professional incompetence, any of which would trigger a report to the National Practitioner Data Bank ("NPDB"). The letter cautioned Dr. Breda about resigning before the effective date of his termination. It states:

**IMPACT OF VOLUNTARY SURRENDER OF PRIVILEGES**: Should you surrender or voluntarily accept a restriction of your clinical privileges, or resign or retire from your medical staff position with the Department of

Veterans Affairs prior to the effective date of your termination, your fair hearing and appeal rights regarding privileges will be limited to a hearing on whether you took such action while under investigation for professional incompetence, professional misconduct or substandard care.

According to the UPS receipt that is part of <u>Exhibit A</u>, the letter was delivered to Dr. Breda the morning of February 6, 2015.

4. The following morning, Saturday, February 7, 2015, Dr. Breda sent Tambra Holt in Human Resources and Satish Sharma, M.D., the VAMC's Chief of Staff, an email to which he attached a resignation letter dated February 1, 2015. In his email Dr. Breda wrote that he had placed his signed resignation letter in the mail. Dr. Breda's email and attached unsigned letter, as well as the signed letter later received by the VAMC, are attached as <u>Exhibit B</u>.

5. On Tuesday, February 10, 2015, Ms. Holt replied to Dr. Breda's email. She wrote: "Dr. Breda, unfortunately, we are unable to back date your resignation. You noted in your December 16, 2014 e-mail that your resignation would be forthcoming. The e-mail you sent, dated February 7, 2015, is the official resignation, which will be processed, effective February 7, 2015, not February 1, 2015." A printout of this email is attached as <u>Exhibit C</u>.

6. The VAMC documented Dr. Breda's separation as a resignation in lieu of involuntary action, effective February 7, 2015. A Notification of Personnel Action to this effect is attached as <u>Exhibit D</u>.

7. On February 9, 2015, the VAMC's Medical Executive Committee met to discuss performance and conduct allegations that had been asserted against Dr. Breda. A copy of the meeting minutes, which Dr. Sharma and I signed, is attached as <u>Exhibit E</u>. As the minutes state, the Committee decided that the issues demonstrated "substandard care, professional misconduct and professional incompetence" by Dr. Breda, and the Committee decided to revoke Dr. Breda's staff privileges at the VAMC.

8.      After the meeting, I sent Dr. Breda a letter informing him of these decisions by the Medical Executive Committee. The letter, which is dated February 9, 2015, is attached as <u>Exhibit F</u>.

9.      On February 12, 2015, I sent Dr. Breda a letter informing him that his decision to resign pending an investigation into his clinical competency affected his due process rights with regard to VAMC's decision whether or not to report him to the NPDB. As I explained in the letter, he no longer had the right to a hearing to determine whether the reasons for his termination rose to the level of substandard care, professional misconduct, or professional incompetence (which would mandate a report to the NPDB). Instead, he was entitled to a hearing only on the issue of whether he had resigned during an investigation regarding his clinical competency (which also would mandate a report to the NPDB). The letter advised Dr. Breda that he had ten days to request such a hearing. A copy of my letter is attached as <u>Exhibit G</u>.

10.      On February 16, 2015, Dr. Breda sent me a letter requesting a hearing. A copy of the letter is attached as <u>Exhibit H</u>.

11.      On April 14, 2015, Dr. Breda sent a letter through his attorney, Paul Merry, to Dr. Sharma, setting forth his position as to why he "did not resign from his employment in the face of an investigation into allegations of professional errors." A copy of the letter is attached as <u>Exhibit I</u>.

12.      After reviewing Attorney Merry's letter, I determined that Dr. Breda had indeed resigned while under investigation for possible professional incompetence, professional misconduct, or substandard care. I notified Dr. Breda of my decision, which then triggered his right to a hearing, in a letter to Attorney Merry dated May 1, 2015. A copy of my letter is attached as <u>Exhibit J</u>.

13.     On May 15, 2015, I sent Attorney Merry a letter informing him that the hearing requested by Dr. Breda would take place on June 2, 2015, and that Dr. Breda had the right to appear at the hearing either with or without counsel (or another representative). A copy of my letter is attached as Exhibit K.

14.     After being rescheduled, the hearing took place on August 27, 2015 and concluded on September 3, 2015. Neither Dr. Breda nor Attorney Merry appeared at the hearing. However, on August 27, 2015, Attorney Merry faxed the hearing committee members a letter setting forth Dr. Breda's position. A copy of Attorney Merry's letter is attached as Exhibit L.

15.     On September 30, 2015, the chair of the hearing committee, Matthew Jankowich, M.D., sent me a memo stating that the committee had unanimously determined that Dr. Breda had resigned while under investigation with regard to his clinical competency. A copy of the memo is attached as Exhibit M.

16.     One of the attachments to Dr. Jankowich's memo (Exhibit M) is a memo dated December 16, 2011, from the VA Deputy Under Secretary for Health for Operations and Management, to all VA Medical Center Directors and VISN (Veterans Integrated Service Network) Directors re: "Resignation or Retirement While Under Investigation." The December 16, 2011, memo states in relevant part:

> The purpose of this memorandum is to provide direction to all Veterans Health Administration (VHA) organizational entities for immediate implementation when the clinical competency of a privileged physician or dentist is under investigation. The process begins with the notification to the provider, and is not considered complete until the due process and appeal process have been exhausted….

Dec. 16, 2011 memo (Exhibit M), ¶ 1 (emphasis in original).

17.     After reviewing Dr. Jankowich's memo, I made a final decision on behalf of the VAMC that Dr. Breda indeed had resigned while under investigation for professional

incompetence or improper professional conduct. I sent a letter dated October 15, 2015, to
Attorney Merry advising him of my final decision, and the fact that the VAMC would be
reporting Dr. Breda to the NPDB. A copy of my letter is attached as Exhibit N. On October 21,
2015, I followed up with a letter to Attorney Merry stating that copies of the report to the NPDB
would be sent to the state licensing boards in Rhode Island and Massachusetts, as legally
required. A copy of my October 21, 2015 letter is attached as Exhibit O.

18.     One of the attachments to Dr. Jankowich's memo (Exhibit M) is VAMC Policy
Memorandum 05-29, entitled "Supervisory Fact Finding and Administrative Investigations." The
policy memorandum explains that we have two types of investigations at the VAMC:
investigations by an Administrative Board of Investigation ("AIB"), and less formal "fact
findings."

19.     On or about August 12, 2015, I answered questions from an EEO investigator
named John Nicholas who was investigating an EEO complaint filed by Dr. Breda. One of the
questions Mr. Nicholas asked me was whether there had been an investigation or hearing into Dr.
Breda's professional competence. I answered, "So it wasn't an investigation or a hearing. It was
a fact finding that was conducted through the clinical chain of command and I did not review
that document." What I meant is that the investigation into Dr. Breda's clinical competence was
handled through a fact finding, not an AIB. The fact finding, however, was indeed a type of
"investigation." This is clear both from VAMC Policy Memorandum 05-29, and from my letters
to Dr. Breda dated February 9, 2012 ("Should you surrender or voluntarily accept a restriction of
your clinical privileges, including by resignation or retirement while your professional
competence or professional conduct *is under investigation during these proceedings* ….")
(Exhibit F) (emphasis added), February 12, 2015 ("In the enclosed letter dated June 10, 2014,

you were notified of *an investigation regarding your clinical competency*.") (Exhibit G)

(emphasis added), and May 1, 2015 ("I have determined that ... you resigned your position

pending the final result of *the investigation via the Medical Executive Board. ...* Your

resignation signifies the end of an administrative matter, not the end of *the Investigation*

*conducted by the Medical Executive Board.* Therefore, you resigned your position *pending the*

*result of an investigation*.") (Exhibit J) (emphasis added).

Signed in Providence, R.I., on November __5__, 2015.

Susan MacKenzie, Ph.D.
Director
Veterans Administration Medical Center
Providence, Rhode Island

AFFIDAVIT OF FRANCIS SULLIVAN, M.D.

NOW COMES your AFFIANT, FRANCIS SULLIVAN, M.D., and hereby deposes and states as follows:

1.      My name is Francis Sullivan and I currently live at 35 East View Street, Warwick, Rhode Island.

2.      I am a physician duly licensed to practice medicine in the States of Rhode Island, Massachusetts, Connecticut, and South Carolina and have been licensed for more than thirty nine years.  I am board certified in internal medicine and in emergency medicine, although my practice for the last thirty three years has been exclusively in emergency medicine.

3.      I also work in the emergency departments at Miriam Hospital and Rhode Island Hospital (busy academic hospitals affiliated with Brown University) and am familiar with emergency room procedures generally.

4.      I have personally worked with Dr. John Breda, M.D. in the Emergency Room of the Providence Veterans Administration Hospital for four and one half years, from 2010 – 2014.  At no time did I notice any deficiency of his care of patients, substandard medical decision making or issues of questionable professional conduct or ethics.

5.      I was, as part of a universal staff peer review process, regularly required to review the medical records of my emergency room colleagues, including the medical records of Dr. Breda.  I have always found his medical decision making, medical records, medical knowledge and care of his patients as evidenced by his medical records to be at  the level of work of his colleagues and at the standard of care for the Veteran's Hospital medical community.

6.      I have reviewed the fifteen allegations the Veteran's Administration has made against Dr. Breda alleging substandard patient care, professional incompetence and professional

misconduct and which it used to terminate Dr. Breda's employment at the Veterans

Administration. The Veterans Administration used these same allegations to support a report to

the National Practitioner Data Bank alleging concerns involving Dr. Breda regarding his

professional competence and conduct.

6.      Emergency physicians need to multitask and manage several patients

concurrently. Many of the episodes alleged are purely administrative and occur frequently, if

not daily, in the Veteran's Hospital emergency room. I do not recall any physician being

terminated, reported to the National Practitioner Data Bank, or disciplined in any way for similar

occurrences.

To do so suggests an ulterior motive.

7.      Many of the alleged errors represent no error at all or issues that either were

corrected immediately, or could be avoided in the future with good communication. In response

to the nurse's complaint regarding the need for IV access, ER nurses routinely start IV access

without specific orders to do so and the VA has a specific protocol allowing them to do so. This

is an example of just one instance where Dr. Breda has been wrongly accused.

8.      Dr. Breda wrote an order for a Unasyn dose based on the penicillin component of

the drug. This is one way or ordering the medication, and is not an error, however, the VA

treated it as such. This is also an example where a single phone call from the pharmacy clarified

the issue entirely. This is not an example of something that should rise to the level of a report to

the National Practitioner Data Bank. Collaboration between nurses, the pharmacy and

physicians is necessary and should be practiced routinely. This is not an error on Dr. Breda's

part, but could be a topic for further evaluation of VA systems and protocols.

9.      From my review of the fifteen allegations against Dr. Breda, none of these either

taken separately or as a whole are issues which support a report to the National Practitionar Data Bank and none are the basis for a finding of professional incompetence, professional misconduct or in any way suggest poor patient care..

10.     I am not aware of any adverse patient outcomes involving patients Dr. Breda cared for at the Providence VA, including the patients involved in the fifteen allegations.

11.     In several of the allegations Dr. Breda did the best for the patients, specifically transferring a patient with an acute stroke to Rhode Island Hospital where there was a stroke team, and diverting an ambulance transporting a patient with a chainsaw injury to Rhode Island Hospital where there was a trauma team.

12.     In the incidence of the acute stroke patient, the stroke team at Rhode Island Hospital encourages immediate transfer by critical care ambulance without imaging if delay is felt to be likely, and to immediately transfer those who may be at risk for primary hemorrhage or more likely to be candidates for interventional radiologic care without imaging at the VA.  Dr. Breda, in this instance, followed expected protocols and committed no error.

12.     Dr. Breda was charged with "delays" in care on March 25, 2014.  The errors here were errors in management, not delays in patient care.  Dr. Breda was left to cover the ER alone when one physician was allowed to go home early, and another physician hired to relieve Dr. Breda at the end of his shift, refused to properly perform his work.  Although the ER Director was in house, he did not assist in covering the ER, despite his knowledge that the ER was exceptionally busy that afternoon.  Dr. Breda went above the call of duty and remained in the ER an extra two hours beyond his shift to complete the work of three physicians.  Despite his diligence and loyalty, Dr. Breda was accused of delays caused by management.

13.     His loyalty to the Veteran's Administration and to his professional responsibilities

was exemplary.  Dr. Breda was diagnosed with high grade Hodgkins Lymphoma in February, 2012.  Despite weeks of fevers, sweats (B symptoms), severe fatigue, and severe anemia, he continued to work at the Veteran's Administration Emergency Room until days before his diagnosis and admission to the hospital for chemotherapy in February, 2012.  Another example of his dedication and work ethic was on November 3, 2012, after just completing six months of chemotherapy, Dr. Breda presented to work in the Providence VA Emergency Room during a shift when I was working as well.  He presented to work with symptoms of right hand numbness and clumsiness. He tried for three hours to perform his duties when finally he advised me that he best go the Emergency Room at Miriam Hospital for further evaluation.  In these instances, he gave greater concern for his job responsibilities as an emergency room physician than he did for his own health.

14.    One allegation of error alleged by the VA was Dr. Breda documenting that a patient was given 324mg of aspirin when in fact the patient was given four 81mg tablets.  These doses are equivalent and absent of clinical impact as all of the other allegations are absent of clinical impact.

15.    In none of the situations representing allegations against Dr. Breda did the VA provide any discussion, perform a proper investigation or conduct an evaluation of its own systems which may have contributed to the end result.  No opportunity for performance criticism, no matter how picayune, was neglected to condemn Dr. Breda rather than recognizing environmental contexts for the identified problems.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY

_____

Francis Sullivan, M.D.

DATE:

Francis Sullivan appeared before me at his own free act and deed in the State of Rhode Island, County of _Providence_____.
Subscribed and sworn before me on this _____ day of August, 2016.

JENNIFER D'ALFONSO
Notary Public, State of Rhode Island
My Commission Expires April 04, 2020

 Gmail

John Breda <john.breda@gmail.com>

## OAWP Case 22-BedfordMA-18761

1 message

---

**Rudd, George E. (OAWP)** <George.Rudd@va.gov>            Fri, Apr 8, 2022 at 2:26 PM
To: John Breda <john.breda@gmail.com>
Cc: "Vanderkooy, Marcella (OAWP)" <Marcella.Vanderkooy@va.gov>

John Breda
Former VA Employee
john.breda@gmail.com

Re: OAWP Case 22-BedfordMA-18761

Dear Dr. Breda:

The Department of Veterans Affairs (VA), Office of Accountability and Whistleblower Protection (OAWP), received and reviewed your complaint submitted on February 2, 2022.

In accordance with VA Directive 0500, the subject matter of your allegations does not involve allegations of Senior Leader misconduct, Senior Leader poor performance, or Whistleblower Retaliation; therefore, the matter falls outside of OAWP's scope and has been closed.

Should you have any questions about this notification, or if you believe you have experienced whistleblower retaliation as a result of making this disclosure, you may contact OAWP at https://www.va.gov/accountability/.

Sincerely,

George Rudd
Supervisory Investigator
U.S. Department of Veterans Affairs
Office of Accountability and Whistleblower Protection

LAW OFFICES OF PAUL H. MERRY, ESQ.
50 CONGRESS STREET - 10TH FLOOR
BOSTON, MASSACHUSETTS 02109
(617)-720-2400
FACSIMILE (617)-742-1887

PAUL H. MERRY, ESQ.                                    PAUL.MERRY@FAIRWORKPLACE.NET
ANDREA L. HAAS, ESQ.                                   ANDREA.HAAS@FAIRWORKPLACE.NET

April 14, 2015

BY FACSIMILE TRANSMISSION TO 401-457-1430
BY CERTIFIED MAIL RETURN RECEIPT REQUESTED NO. 7009 3410 0001 2888 9185
BY ELECTRONIC MAIL (claudia.juskalian@va.gov, rachel.sartini@va.gov)

*C O N F I D E N T I A L*

Satish Sharma, M.D., Chief of Staff
United States Department of Veterans' Affairs Medical Center
830 Chalkstone Avenue
Providence, R.I.  02908

IN RE: John Breda, M.D.

Dear Dr. Sharma:

As you may be aware, this office represents John Breda, M.D., formerly employed as an Emergency Department ("ED") physician with the Veterans Administration Medical Center, Providence ("Center".) You provided Dr. Breda with a package of documentation relating to the circumstances of his departure from employment with the Center, raising the issue whether he resigned during an investigation into allegations of medical errors; and asking for his response. You also extended time for his response to these accusations until April 14, 2015.

Please be advised Dr. Breda did not resign from his employment in the face of an investigation into allegations of professional errors. Dr. Breda is a highly trained, very experienced physician, who is dedicated to the practice of medicine and felt honored to have the opportunity to use his skills on behalf of men and women who have faced the ultimate risk on behalf of our nation. He regrets the loss of that opportunity. His separation, however, occurred at the instigation of staff members at the Center, who terminated him after he objected to a pattern of harassing complaints that had made practicing in the ED insupportable, as is further set out below.

We are confident that upon your review of this response the Center will find the provided

Satish Sharma, M.D., Chief of Staff
April 14, 2015  Page 2

explanation sufficient and conclude this matter should be promptly closed, as suggested in your letter. However in the unlikely event that further questions arise Dr. Breda formally reiterates his request for a hearing before this matter goes any further[1]. Also, please be aware that neither Dr. Breda's participation in the Center's process thus far, this response, nor any attendance at a future hearing implies or equates to Dr. Breda's acceptance of this process as adequate due process to protect his legally cognizable interest in continued employment with the Center.

I.      BACKGROUND

        The National Practitioners Data Bank ("NPDB") was created as part of the federal Health Care Quality Improvement Act to serve as a central repository of serious adverse medical events directly attributable to poor patient care by licensed medical professionals. Institutions such as the Center are required to report egregious incidents of poor patient care. As a negative report in the NPDB is all but certain to have a devastating effect on a licensed professional's career, reporting is only permitted under a narrow range of circumstances. Institutions are bound by a set of strict regulations designed to balance public safety with a medical professional's oath and obligation to exercise independent medical judgment. One such requirement is that institutions report professionals who resign either for the purposes of avoiding a formal investigation into suspected incompetence or professional misconduct, or to avoid termination for the same.

II.     FACTS

        Dr. John Breda is a committed physician, board certified in internal medicine who worked at the Center successfully for three or more years before one or more nurses chose to raise spurious complaints about him. Indeed, he worked over this period with Dr. William Curioso, again without significant difficulty or questions being raised, until Dr. Curioso chose to find in the occasion of the nurse complaints a pretext to seek actions by Dr. Breda which he could attempt to call into question.

        Dr. Breda's commitment to providing highest quality care to veterans at the Center is demonstrated by his having deferred his own care on more than one occasion when demands in the ED indicated his attendance there was a priority. He thereafter found treatment for his condition (Hodgkins disease) and, once he had been successfully treated, promptly returned to his duty with you. Moreover, he reports that on many of his assigned shifts, patient needs were such that he chose to remain on duty until he was satisfied they were being cared for to the highest standard, sometimes several hours after he was technically no longer working. He worked tirelessly to improve the level of care provided to veterans requiring emergency treatment at the

---

        [1]In the unlikely event that this matter is not resolved as result of this response Dr. Breda also formally requests the opportunity to review any draft report to the National Practitioners Data Bank before any report is submitted, as required the Veterans Health Administration Handbook, VHA Handbook 1100.17 paragraph 9(c)(2).

Satish Sharma, M.D., Chief of Staff
April 14, 2015  Page 3

Center.

Dr. Breda's record reflects continuing efforts to improve his own skills in particular. The Center was aware when he was hired that his experience in emergency care was limited; but he took steps to become trained in best ED practices and new techniques. Moreover, of course, none of the actions complained of resulted in an unsatisfactory patient outcome.

As soon as he learned the nurses had made complaints against him, Dr. Breda requested sufficient detail to permit him to understand and learn from the incidents; but he was repeatedly denied access to this information. Following these complaints, he became a target for additional criticism; and after months of undergoing this harassment he ultimately was constrained to take unpaid leave to protect himself. In November, 2014, despite still being without the background information he had sought on the charges against him, he attended a meeting with supervisory staff in the ED.  The meeting was essentially another opportunity to assault him and his abilities; and provided no additional insights to enable him to respond. At or about this time, he again complained of the difficulty of working in an environment so hostile to and critical of him, and raised the possibility of a resignation if the situation could not be resolved fairly through a mediation process. The harassment did not cease, and after the Center notified him in early February that he was being terminated, he tendered his resignation effective in December.

III.    DR. BREDA'S EMPLOYMENT WITH THE CENTER ENDED ON ACCOUNT OF A TERMINATION BY THE CENTER NOT ON ACCOUNT OF A RESIGNATION.

As noted, for a number of months starting in June, 2014, Dr. Breda had repeatedly reported and complained about a pattern of groundless petty complaints being made against him by nursing staff in the ED. (A prior instance of complaints being raised against him, in or about autumn 2010, ended with his being exhorted by the then-chief of staff to continue practicing medicine at what the reviewer found to be the high level he customarily worked at.) But spurious issues continued to be raised, and management failed to take effective action to put a stop to the harassment. Finally, in an effort to make plain the seriousness of the harassment, and the negative impact it was having on his ability to provide veterans with the highest level of care, on or about December 16, 2014, Dr. Breda requested that Alternative Dispute Resolution be initiated to address the problems. Tab 11, p. 1, 3. He also suggested that, in the absence of an amicable resolution of the problems, he could well feel constrained to resign. Tab 4.

The Center's actions in response to Dr. Breda all occurred days (most more than a week) after his letter of February 1, 2015, reiterating his proposal to resign and citing the agreement under which the resignation was to be effective in mid-December of the prior year. Tab 4, p. 4. In response, the Center notified him he was being terminated from employment by letter of February 3, 2015; Tab 7; Tab 5, (Medical Executive Committee vote February 9). Indeed, the Center did not get around to responding to Dr. Breda's letter concerning possible resignation until February 10, 2015 (Tab 4).

Satish Sharma, M.D., Chief of Staff
April 14, 2015  Page 4

In short, no resignation was ever accepted by the Center; to the contrary, the Center declared Dr. Breda's employment ended and ended his clinical privileges before any investigation initiated by the Center commenced. In the absence of a resignation, then, no requirement exists that the Center make a report to the NPDB in the present circumstances.

IV.    DR. BREDA PROPOSED RESIGNING IN NOVEMBER AND DECEMBER 2014 TO AVOID WORKING IN A HOSTILE WORK ENVIRONMENT, WELL IN ADVANCE OF ANY "INVESTIGATION" OR PROFESSIONAL REVIEW ACTION. THERFORE NO REPORTING IS PERMITTED BY STATUTE.

In May and June 2014, almost immediately after Dr. Breda learned informal fact finding was being undertaken by Dr. Curioso, he realized that the action was not being conducted in a fair or open manner and that Dr. Curioso had no interest in uncovering any information about the actual patient care administered by Dr. Breda. Despite Dr. Breda's repeated written and oral requests for patient charts or physician notes Dr. Curioso and the Center refused to make those materials available, suggesting that this informal process was not designed to assist Dr. Breda in improving his skills; nor even to uncover the truth; but rather to perpetuate ill treatment of Dr. Breda.

Recognizing the situation he was experiencing, Dr. Breda appropriately identified the complaining nurse's conduct, and Dr. Curioso's actions, as creating a hostile work environment based on his protected classes[2], and promptly notified the hospital that he did not feel safe continuing to work in an environment where his medical judgment was subject to second guessing and the nursing staff's petty and factually incorrect complaints were treated as unrebuttable truth. Tab 18, p. 2 (Dr. Breda wrote "it is inappropriate that I work in a position where I do not feel safe").

Despite having his repeated requests to be provided with patient charts and physician notes for each of the alleged incidents denied, Dr. Breda participated in the November 13, 2014 meeting with Dr. Curioso and attempted to provide his off-the cuff explanation for each of the alleged incidents identified in Dr. Curioso's sparse list. Soon thereafter Dr. Breda also submitted a written explanation of his patient care in connection with each of the questions raised by Dr. Curios. This effort was obviously greatly hampered by the absolute lack of access to patient charts and physician notes afforded Dr. Breda. See Dr. Breda's Response, Attachment 1. Reasonably not wishing to continue to subject himself to an unnecessarily hostile work environment Dr. Breda communicated his intention to resign as soon as some questions in connection with his benefits were resolved. Tab 11, p. 1. In response the Center  induced Dr. Breda to remain an employee pending mediation of his EEO complaint, scheduled for late

_____

[2]Dr. Breda has initiated two separate, presently pending, formal Equal Employment Opportunity complaints regarding the discrimination he experienced in connection with the present matter.

Satish Sharma, M.D., Chief of Staff
April 14, 2015  Page 5

February 2015.  See EEO Agreement to Mediate, Attachment 2.  After considerable persistence Dr. Breda was able to participate in a follow up meeting on December 11, 2014. Following this meeting without regard for the explanations provided by Dr. Breda, and still refusing to provide patient charts, Dr. Rounds unjustifiably moved to terminate Dr. Breda's employment, without having even initiated a formal investigation under any established hospital committee or protocol.

     1. Resignation for Personal Reasons Not Reportable to NPDB

     Upon learning of Center's egregious action to move for termination Dr. Breda formalized his previously promised resignation, effective December 16, 2014 to formally remove himself from the hostile work environment that the Center had become for him. Were this resignation deemed to underlie the separation from employment, it was effected for personal (and lawful) reasons well before any professional action (or investigation) by the Center occurred; and no reporting is permissible. NPDB Guidebook[3] ("Guidebook"), E-34 Q.26. ("(T)o be considered reportable a practitioner's resignation must be tendered "in order to prevent a professional review action")[4].

     2. Termination Outside of a Formal Professional Review Action Not Reportable to NPDB

     Furthermore, the actions of the Center to move to terminate Dr. Breda outside of any formal review process do not implicate reporting to the NPDB, as clearly explained in the Guidebook. When a hospital, such as the Center, has a system of professional review protocols established under its bylaws, yet chooses to ignore those protocols and instead simply moves for termination, and attendant revocations of privileges, without the use of the professional review process report to the NPDB is not appropriate because the termination was not in connection with a professional review action. NPDB Guidebook, F-9. (The Secretary overseeing the NPDB ordered an adverse physician report to be voided "since the professional review process had not been followed in terminating the practitioner's privileges. The termination was not a professional review action. ...Health care entities are reminded that in order to be reportable to NPDB, adverse actions must be the result of professional review").

---

    [3]Citations herein are provided to the National Practitioner Data Bank Guidebook, published by U.S. Department of Health and Human Services,  September 2001 edition, the edition available during the events in question.  For referenced excerpts see Attachment 3.

    [4] The wording of this sentence is consistent with the reporting requirement being imposed in circumstances where a physician resigns to avoid loss of privileges r other adverse actions. Where this kind of arrangement is made, without the reporting requirement it would appear possible that no information would be forwarded to the NPDP.  The provision would appear inapplicable here, then, where no such bargain was struck and the Center did not cease its actions against Dr. Breda.

Satish Sharma, M.D., Chief of Staff
April 14, 2015  Page 6

V.    DR. BREDA DID NOT RESIGN IN THE FACE OF AN INVESTIGATION INTO
      PROFESSIONAL ERRORS BECAUSE NO SUCH INVESTIGATION WAS UNDER
      WAY AT THE TIME OF ANY RESIGNATION, OR IN THE MONTHS FOLLOWING
      IT.

In the present matter the Center alleges that Dr. Breda resigned during an "investigation"
into his professional competence as the term "investigation" is found in 42 U.S.C.S.
§11133(a)(1)(B)(I), which requires that "(e)ach health care entity which… (B) accepts the
surrender of clinical privileges of a physician (I) while the physician is under an investigation by
the entity relating to possible incompetence or improper professional conduct… report to the
Board of Medical Examiners". While the statute leaves the critical word "investigation"
undefined, the federal enforcing agency, the U.S. Department of Health and Human Services, has
published the NPDB Guidebook to provide guidance on the required level of formality a
investigation must maintain to trigger reporting. Doe v. Leavitt, 552 F. 3d 75, 81 (1st. Cir 2009).
Any review of Dr. Breda's patient care practices under taken by the Center fell far short in both
structure and quality, as is further described below., making reporting unsupportable.

    1. The Center followed none of its established protocols in reviewing Dr. Breda's past
    patient charts and now improperly attempts to elevate an informal review to a formal
    investigation.

The Center utilizes multiple formal protocols for performing reviews of a medical
professional's actions or privileges. The Center may, and frequently has, conducted various
formal investigations into either a professional's general competency or a specific incident,
including Peer to Peer Reviews, Ongoing Professional Practice Evaluations ("OPPE"), and
Focused Professional Performance Evaluations ("FPPE"). At the Center each of these types of
reviews presumably has associated forms, time frames, safeguards, and protocols, including by
no means at the least a full and fair opportunity for the physician involved to examine the facts of
any incidents alleged and offer such explanation as may be appropriate to explain the questioned
act or decision.

In the present matter, none of the Center's established mechanisms was employed; and
Dr. Breda is at risk of suffering the consequences. To the contrary, a single supervisor apparently
undertook an ad hoc review which was even titled a "fact finding" rather than an investigation
(indeed the word investigation does not appear in Dr. Curioso's June 10, 2014 letter announcing
the "fact finding"); and which seemed to employ no formal reporting mechanisms or defined
process. See, Simpkins v. Shalala, 999 F. Supp. 106, 115 (D.D.C. 1998)(Hospital's practices and
bylaws may shed light on whether an institution has instituted an investigation within the
purview of the NPDB statute). With only the minimal formality of a short letter, Dr. Breda was
notified that Dr. Curioso had *personally* decided to supervise Dr. Breda more closely and
undertake a general review of Dr. Breda's charts for the past year, including a review of his

Satish Sharma, M.D., Chief of Staff
April 14, 2015  Page 7

bedside manner[5]. Tab 19 ("I have concerns...," "I will now be looking into issues more
carefully," "I personally view ...") . This letter did not even hint of a formal investigation, and fell
far shy of initiating any type of formal review process, but rather primarily informed Dr. Breda
that Dr. Curioso wanted a work schedule change to permit greater observation[6]. Id.

　　　　According to the contemporaneous materials provided by the Center, Dr. Curioso's "fact
finding" was not requested or initiated by either the facility's established Professional Standards
Board ("PSB") or Medical Executive Committee ("MEC"). Any examination of Dr. Breda's
patient care practices conducted solely by Dr. Curioso, or in any case not at the direction of an
established hospital board, lacks the formality, structure, and safeguards required to fall within
the definition of an "investigation" as previously employed by the either the Center or the
governing statute. Simpkins, 999 F. Supp. 106, 115.

　　　　Furthermore, this putative notice of Dr. Curioso's fact finding offered no information
concerning the consequences of the review: for example, no mention of potential for reporting to
the NPDB or any state licencing board was included. Indeed, that necessary notice was first
provided by letter on or about February 12, 2015, after Dr. Breda had been terminated (and had
sought to instate his resignation.) Without this notice Dr. Curioso's review can hardly be deemed
the sort of "investigation" authorizing a report to NPDB. Additionally, of course, the mere fact
that the MEC acted on the informal review by Dr. Curioso in no way elevates that informal
process to a formal investigation. Costa v Leavitt, 442 F Supp 2d 754, 773 (DC Neb. 2006) (No
basis for hospital's assertion that minutes of certain hospital staff meeting were sufficient
evidence of investigation into a particular practitioner in keeping with NPDB Guidebook
requirements that reporting entity have contemporaneous documentation).

　　　　The specific facts surrounding Dr. Curioso's "fact finding," including its casual nature,
the absence of the formal processes customarily employed by the Center in investigations, and
the lack of notice concerning the potential risk of a report being sent to the NPDB, then, offer no
basis for a conclusion that an investigation as envisioned by the Health Care Quality
Improvement Act of 1986 was under way at the time of Dr. Breda's separation (whatever its
nature may be found to have been) from employment at the Center. Accordingly, no basis exists
on which to make any report to the NPDB.

_____

　　　　[5] While concerns with a physician's bedside manner may warrant a supervisor's comment
or constructive counseling the do not constitute an inquiry into professional competence or
conduct.  Any report to the NPDB for failures in bedside manner is readily voidable. NPDB
Guidebook, F-8.

　　　　[6]Dr. Curioso requested simply that Dr. Breda schedule his shifts to coincide with Dr.
Curioso's shifts.  There was no suggestion that Dr. Curioso would be approving Dr. Breda's
orders or otherwise strictly scrutinizing or proctoring Dr. Breda's future medical judgement. Tab
19.

Satish Sharma, M.D., Chief of Staff
April 14, 2015  Page 8

VI.    EVEN IF A REVIEWER FOUND THAT DR. BREDA RESIGNED IN FEBRUARY
       2015, THE INFORMAL REVIEW ACTIONS UNDERTAKEN BY THE CENTER DO
       NOT CONSTITUTE AN INVESTIGATION PERMITTING REPORTING UNDER THE
       NPDB GUIDEBOOK AND WILL NOT BE UPHELD BY A REVIEWING BODY

       For a myriad of distinct reasons the actions undertaken by the Center do not rise to the
formality of investigation as required by the federal statute. First, an informal review by Dr.
Curioso does not constitute a formal investigation by the Center. NPDB Guidebook E-19 ("An
investigation must be carried out by the health care entity, not an individual on the staff").
According to the complete records submitted by the Center (the "evidence file") Dr. Curioso's
actions were not requested by any hospital committee or board and accordingly can only be
classified as the investigation of one, not an investigation by the hospital permitting a report.
Costa, 442 F Supp 2d 754, 772 (finding it insufficient for a hospital to justify reporting to the
NPDB by simply stating that a doctor's competence and professionalism were under review in
committee minutes).  The Guidebook is quite clear that the type of investigation contemplated
within the federal statute is a formal review by a committee designated by a hospital leadership
committee, a characteristic simply absent from the review undertaken in connection with Dr.
Breda. Id.

       Second the process undertaken with Dr. Breda, even if not formally requested by a
hospital board, did not have the formality required of a formal peer review process, including
following a formally adopted written procedure which provides adequate notice and opportunity
for meaningful response, and therefore this process does not qualify as a formal peer review
process into Dr. Breda's competence or skill. 45 CFR §60.3. Critically absent from the Center's
process was both adequate notice to Dr. Breda of the details of the allegations against him and a
meaningful opportunity to respond, informed by full access to patient charts.

       Third, to justify submitting an adverse action report, an institution must be able to submit
contemporaneous documentation that an investigation is underway. NPDB Guidebook E-19.
Costa, 442 F Supp 2d 754, 773. Unlike in the present matter, evidence must be available to
support the conclusion that the institution's formal investigation was initiated prior to Dr.
Breda's separation. As a fair reading of the evidence file indicates that no formal investigation
ever commenced, the Center will be unable to make this showing and any submitted report is
likely to be ultimately voided. Id., NPDB Guidebook F-8 (When an entity is unwilling or unable
to provide contemporaneous documentation that an investigation was occurring at the time of a
practitioners departure the report will be voided). Suitable evidence includes "orders from
hospital officials directing an investigation, and notices to practitioners of an investigation" both
items which are absent from the Center's evidence file. NPDB Guidebook E-19.  Costa, 442 F
Supp 2d 754, 773 (No basis for hospital's assertion that minutes of certain hospital staff meeting
were sufficient evidence of investigation into a particular practitioner in keeping with NPDB
Guidebook requirements that reporting entity have contemporaneous documentation). In the
present matter the Center now seeks to retroactively classify Dr. Curioso's chart review and fact

Satish Sharma, M.D., Chief of Staff
April 14, 2015  Page 9

finding as a formal investigation by a hospital board, a revision of history simply unsupported by the evidence.

Fourth, Dr. Breda was explicitly denied access to the very patient charts and his own physician notes necessary to review and explain the patient care decisions he made during the occurrences selected by Dr. Curioso. The Veterans Health Administration's own handbook, the VA Handbook 1100.18 Reporting and Responding to State Licensing Boards, mandates the required notice and necessary evidence to be provided to a practitioner before reporting an adverse action to a state licensing board. These published standards represent the minimum information that the VHA deems appropriate to adequately allow a practitioner to respond including lab results, patient charts, internally consistent anonymous patient identifiers, and prescription records organized and indexed by individual allegation against a provider. See VA Handbook 1100.1, Appendix B, Guidelines for Compiling, Organizing and Preparing the State Licencing Board Reporting File and Decision Memorandum. Given that Dr. Breda was provided with only a scant description of the incidents examined by Dr. Curioso and no accompanying records, the materials provided obviously fall well short of these established standards, id., and cannot form the basis of a report to the NPDB.

VII.    DR. BREDA DID NOT RESIGN IN THE FACE OF AN INVESTIGATION INTO ALLEGATIONS OF PROFESSIONAL ERRORS BECAUSE THE OCCURRENCES RAISED AGAINST HIM REPRESENTED AT BEST AN AGGLOMERATION OF COMMONPLACE, INCONSEQUENTIAL INCIDENTS WHICH ARISE FREQUENTLY IN ALL BUSY MEDICAL FACILITIES AND NEITHER CAUSED PATIENT HARM OR CONSTITUTED BREACHES OF REASONABLE MEDICAL JUDGMENT WARRANTING A PROFESSIONAL REVIEW ACTION.

A total of fifteen allegations against Dr. Breda were garnered from a review of a year's service to the Department of Veterans' Affairs. The review, conducted by one individual, was initiated, surprisingly, within some months of a similar review which concluded that his care met or exceeded institutional standards, his privileges should be renewed, and he should be awarded a raise. Also of importance, the review was not precipitated by any poor patient outcomes. The fifteen questioned actions by Dr. Breda can be roughly grouped into three types: first are actions questioned on the basis of anecdotal reports but which were either not documented or documentation has not been forthcoming. Second were decisions of a more administrative rather than medical nature, which even if found to be errors would have resulted in minimal inconvenience rather than risk to patient health or an adverse outcome. And finally, the decisions were reasonable exercises of medical judgment, based on the limited information available to Dr. Breda at the time each decision was made.

Of the actions identified by Dr. Curioso fully two-thirds did not involve medical decisions or judgments; or were not accompanied by sufficient documentation to permit assessment of the correctness of the medical decision at issue. Of the remaining third which did

Satish Sharma, M.D., Chief of Staff
April 14, 2015  Page 10

involve medical judgments, the criticisms were factually in error or without basis in sound, compliant medical practice.

Dr. Breda has still not seen detailed records concerning these questioned actions, and therefore is not in a position to address many of them specifically. Without waiving his right to prepare and provide such a response in future, he offers herewith a brief discussion based on his memory of the incidents. (See Attachment 1[7]); and responds as follows:

Turning to some of the alleged actions, one "action", allegation five, involved a "dispute" with another ED physician, Dr. Mourad, relating to signing in on a patient's case, where a single nurse (with a history of spurious complaints against physicians) alleged an argument had arisen, despite the fact that both physicians involved denied it had been an argument; and neither raised his voice. The second physician, Dr. Mourad, was emphatic with Dr. Curioso that no argument had occurred; and laid responsibility for the groundless complaint at the feet of the nurse involved. Another "action", allegation eight, arose from a wholly unsubstantiated allegation of "inappropriate" language. Even substantiated bedside manner concerns do not support filing an adverse action report with the NPDB. NPDB Guidebook, F-8.

Two other questioned actions, surprisingly, arise from decisions concerning optimal treatment locations for the two patients involved. The first, on May 3, 2014, allegation nine, involved a veteran with a presumably serious chain saw injury who was being transported to the Center by ambulance. When the ambulance staff questioned the Emergency Department whether they should divert to a nearby hospital with a specialized trauma care unit, Dr. Breda agreed and directed the patient to the better-equipped trauma center at a different Rhode Island hospital rather than admitting him to the (then very busy) Center ED. This decision appears (like most of Dr. Breda's actions) to have been in the best interest of the patient; and is difficult to fault, particularly considering the time pressure Dr. Breda was under when he had to make the choice, and the total inability to examine the patient still miles away from facility. Whatever Center administrators may think, it is hard to see this action justifying review beyond a refresher of ED policies concerning sending veterans to other institutions.

The second patient was being transported to the Center with stroke symptoms, allegation three; but was near the end of the four-hour optimal period for administering the best quality anti-stroke medications. Again Dr. Breda, in consultation with the Center's on-call neurologist, made the decision to redirect the patient to another hospital with a stroke team fully prepared to administer the anti-stroke treatment swiftly. In light of the dramatically different potential outcomes when the anti-stroke treatment is provided timely, this decision also was clearly in the patient's best interest. Even could one dispute this assertion, the decision again was made under serious time constraints; and Dr. Breda made optimizing the patient's well being and chances for

---

[7]This document has previously been submitted to the Center directly by Dr. Breda but it has been excluded from the evidence file.

Satish Sharma, M.D., Chief of Staff
April 14, 2015  Page 11

full recovery his highest priority. But again, to seek to characterize such a judgment call, after the fact, as an error requiring review strains credulity, particularly in light of the Veterans' Administration's policy of seeking to provide the best quality care possible to our country's military veterans.

As for delay of treatment and unavailability of Dr. Breda for ED patients, Dr. Breda more than once remained on duty in the ED for two hours, allegation 15, or longer following the agreed end point of his shift, to be certain particular patients were appropriately cared for and received the highest level of treatment. On one such occasion, allegation 13, he remained at the bedside of the patient for more than an hour, assuring that prescribed intravenous medications were flowing properly and were reaching the patient's blood stream.

As acknowledged in the Veterans Health Administration's own handbook, frequently, multiple charges taken together may warrant examination sufficient for an organization to consider an adverse report to the NPDB or a state licensing board. However, as in the present matter where many of the allegations are unsupported by medical evidence or otherwise are so minimal, the remaining allegations cannot support an adverse report. VHA Handbook 1100.18 paragraph 12(b) (The Decision Stage: "Where some, but not all, of the charges are dropped, the remaining charges may or may not be sufficient to warrant reporting.")

VIII.    CONCLUSION

Proceeding in the present matter with a report to the NPDB is likely to result in having the report ultimately voided after submission to the NPDB, considering 1) the outright falsity or lack of evidence for some of the allegations against Dr. Breda, 2) the lack of severity of others, 3) the lack of formal investigation initiated by any Center board, 4) and the informal nature of the chart review undertaken by Dr. Breda's supervisor. In addition to the unnecessary administrative burden of resolving a false NPDB report, proceeding may expose the Center to liability. In Williams v. University Medical Center of Southern Nevada, et. al defamation claims proceeded against a hospital for it's decision to proceed with reporting of multiple incidents to the NPDB after alleged incidents had either been explained by the physician or shown to have not occurred. 688 F. Supp. 2d 1134, 1145 (D. NV 2010). In that case the court found that continued failure by a hospital to provide a physician with details about the alleged incident led to the inference by the court that incidents were unsupportable, that the hospital knew they were unsupportable, and therefore that the report to the NPDB was knowingly false and potentially defamatory. Id. Similarly, in the present matter despite having been provided with no more than a sentence or two about each of the alleged "incidents" and no medical records, Dr. Breda has explained the falsity of many of the "incidents" both orally and in writing. The Center's insistence on continuing to pursue each of the fifteen alleged "incidents," even after many have been demonstrated to be either false, non-events, or good faith judgment calls made based on the best interests of the involved patient both suggests defamatory motive and will provide ample grounds for voiding any report the Center submits to the NPDB.

Satish Sharma, M.D., Chief of Staff
April 14, 2015  Page 12

     Thank you very much for your attention to and consideration of this matter and Dr. Breda and I look forward to hearing from you.

Sincerely yours,

Paul Merryan

Paul H. Merry

cc: John Breda, M.D.

*C O N F I D E N T I A L*

IN RE: <u>John Breda, M.D.</u>

# Attachment 1

Dr. Breda's Written Comments on Alleged Incidents

VA Allegations

1)  On April 2, 2014, concern about an incident regarding an ED patient prescription written
    to a wrong patient. Dr. Breda was informed and corrected the progress note and the
    prescription on the wrong patient. A note and one antibiotic Amoxicillin was written on
    an ETOH withdrawal patient G.A. when it was intended for patient J.P. a patient here
    with upper respiratory infection.

    Reply: The VA failed to show any objective evidence that this even occurred.
    Throughout the "fact finding" process, the VA has charged me with inaccurate or
    unsubstantiated allegations. The VA has failed to be able to provide any verified, non-
    hearsay evidence as to this complaint. When I asked the VA for documentation that this
    occurred I was told there was no such evidence. I do not recall this happening.

2)  On May 17, 2014, patient C.C. was transferred from Morgan Health NH with fever and
    low BP, although his BP was stable on arrival to the ED, there was a sudden change in
    his condition while he was in the ED that his BP dropped to the 70's and tachycardia of
    140's. Concern regarding delay in stabilization and resuscitation.

    Reply: I met this patient when the patient was admitted to the ER. I received sign-out
    from the nurse and additionally was told by the nurse that she had incomplete and
    conflicting information from the outside facility. I saw the patient when the patient was
    placed into the treatment bay, examined the patient, ordered labs and at all times was
    within twenty feet of the patient's stretcher. When the patient was admitted to the ER
    HR and BP were stable. I went around the corner to the break room (within the ER and
    within twenty feet of the patient for approximately ten minutes). When I returned, to the
    central part of the ER, Dr. Pond said to me that the patient's heart rate had gone up. I
    went directly to the patient's bedside and ordered IV fluids, a broad spectrum antibiotic
    (cefepime) to treat suspected sepsis. Despite ordering the IV fluids, there was a delay
    from the nurses in implementing the order. I however stayed at the patient's bedside until
    the IV fluids and antibiotics were given and remained there for an additional 50 minutes
    until the HR and BP had stabilized. The patient was subsequently admitted to the ICU.
    The nurse complained that she had to ask another physician for orders as I was
    unavailable. I was at all times in the ER and immediately available to the nurse, and
    ultimately it was I that gave the orders. The nurse knew I was available and fabricated a
    set of facts claiming that I was not available for patient care. This was explained to Dr.
    Curioso as soon as I heard of the allegation, and I memorialized my explanation to him in
    an e-mail. Despite my explanation, Dr. Curioso has continued to attempt to charge me
    with alleged delays in patient care for this event. Further, at the fact finding session, Dr.
    Curioso criticized me for not documenting a decubitus ulcer for this patient. This would
    not have changed patient care in any way. The patient was being treated for pneumonia

and a urinary source for infection. I gave him a broad spectrum antibiotic which would cover these two sources as well as a skin source of infection. Further, my role as an ER physician was to see that the initial therapies were given for the suspected condition (sepsis) and see that the patient was properly admitted to the hospital.

3) On April 6, 2014, patient W.H. was brought to the ED by rescue with stroke symptoms. Concern regarding untimely CT scan of the head and labs in patient presenting with stroke symptoms.

Reply: This patient came into the ER after a call from rescue when the patient was very close to the hospital. The patient was brought to the ER very close to the end of the 4 hour time period allowing for an intervention for embolic stroke which was suggested by the patient's presentation and history. I called the neurologist on call who reviewed what I had seen of the case to that point and the neurologist agreed with me that given the time frame, we should sent the patient to RI Hospital where a stroke team was available. Neither one of us had the opportunity, given the time constraints, to check the patient's ago and the fact that the patient was on Coumadin, which would contradict thrombolytics. In each of our minds was the need to properly assess the presentation of embolic stroke and triage the patient properly and expediently given the time frames needed for stroke treatment. The next level of decision making, "is this patient a candidate for thrombolytics?" in our minds was to be made in the facility with a stroke team and after a CT scan. If the patient had presented earlier, we would not have felt so time pressured and could have made other decisions at the VA. This was a judgment call made by myself and the neurologist in order to keep treatment options open and a judgment call which needed to be made quickly.

4) (On April 18, 2014) sic  Concern  on April 6, 2014 regarding delay of treatment of alcohol withdrawal symptoms. Patient G.A.

Reply: When I asked for specifics about this complaint at the fact finding session, Dr. Curioso had no information of what the "alcohol withdrawal symptoms" were and what constituted a "delay in treatment."

5) On May 25, 2014, concerns regarding delay of care of patients who waited in the ED in excess of 3 hrs., I was informed of an argument between you with (sic) the in-coming physician Dr. Mourad. Dr. Breda was asked by Dr. Mourad to start ED notes on patients unseen in the ED. Dr. Breda confronted RN in the triage room, reportedly verbally abusive and loud enough for everyone to hear it.

Reply: I worked consistently seeing patients in a busy ER from the time I met with Dr. Curioso on May 25th until leaving at 9am (2 hours after my end of shift at 7pm. Dr Mourad came in a 6pm and I attempted to properly sign out a patient that I had yet to ER in the ER. Dr. Mourad refused to take sign-out (which is his responsibility as the relieving physician starting his shift) but rather asked that I start writing a note on the patient. I did not argue with Dr. Mourad at all. Jo-Ann, a nurse overhearing Dr. Moiurad yelled from the triage room, "I you stopped arguing you could have seen the patient." I walked over to Jo-Ann, who has a Hx of being nasty and difficult to work with, and stated "What did you say?" in a normal voice. She then reported to Dr. Curioso that Dr. Mourad and I were arguing, which was not true. Dr. Curioso called the two of us over, and Dr. Mourad, in my presence, stated to Dr. Curioso that we were not arguing, and that it was Jo-Ann that was attempting to create an issue where none existed.
Dr. Curioso has, despite Dr. Mourad's comments made to him in my presence, has continued to accuse me of disruptive conduct on my part which did not occur. I was simply doing my job in attempting to sing out a patient as normal protocol. When Dr. Mourad would not take sign-out, I took care of all the remaining patients as I did not want anyone to accuse me of not doing my work. I stayed an additional two hours to do so, yet despite my efforts, I continue to be wrongly accused.

6) On March 3/2014, concern regarding patient who fell with severe hip, thigh and back pain. There was no written order by Dr. Breda to indicate an IV at that point. Dr. Breda mumbled loud enough to be heard - when do you need an order for IV?

Reply: When I asked Dr. Curioso for specifics, he provided no objective documentation supporting this complaint.

7) On May 25, 2014, RN was informed by our pharmacist regarding a wrong Unasyn dose order for patient P> Pharmacist called Dr. Breda to correct dose.

Reply: Unasyn is a combination of ampicillin and sulbactam. The IV preparation comes in two strengths relative to the ration of ampicillin/sulbactam, either 1g/0.5g or 2g/1g. My order of 2 grams is not an improper order. Unasyn 2g implies the 2g/1g preparation and is based on the ampicillin component of the drug preparation. (similarly, Augmentin, the pill form of Unasyn is amoxicillin/sulbactam is available in a number of strengths and is routinely ordered based on the amoxicillin component of the drug).

8) On March 2, 2014, patient C.T. complain to the RN that she was hearing Dr. Breda personal problem and using inappropriate language.

Reply:  When I asked Dr. Curioso and Dr. Rounds for specifics of what the patient heard and what the "improper language" was, they had no specifics and could not provide and objective evidence supporting this complaint.

9)  On May 3, 2014, report of contact submitted by RN regarding a diversion of West Greenwich rescue to RIH ER.  Patient J.T. coming in to the ED with leg laceration from a chainsaw injury.

Reply:  A nurse in the ER received a call from rescue stating that they had a "chain saw injury" in transport and should they go to the VA or RI Hospital which has a trauma unit. The nurse called to me across the ER while I was seeing another patient, and provided me with no further information.  Formulating a mental image of what a chain saw injry might look like, I made a judgment call to protect the patient by deferring the patient to the hospital that had a trauma unit.  I made a judgment call which would be assured to protect the patient.

10) On May 25, 2014, patient S.P. 84 y/o male with a low hgb and hct who arrived in the ED at 14:25.  Patient was given blood transfusion on 5/24/14.  Blood was drawn by ED tech, result came back at 15:20.  From 17:00 to 18:30 report on nurses note of "awaiting MD. Evaluation."  Dr. Breda at bedside at 18:45 and discharged from the ED at 19:00.  3 and ½ hrs. delay to discharge a patient for a repeat CBC.

Reply:  The nurse, Michelle Fox, who was caring for the patient in the ER knew that this patient was in the ER only for a repeat CBC after transfusion.  She would have been aware that the result was back and should have called it to my attention while I was taking care of more urgent issues and new patients.  Work in the ER is a team effort between nurses and physicians, and this represents a delay caused by a lack of communication by the nurse taking care of the patient in not notifying me that the result was back.  Had such communication occurred earlier, the patient could have easily been discharged upon the return of a normal lab result.

11) On May 24, 2014, a report of contact from RN regarding blood transfusion consent for a patient S.P.  On 2 occasions, Dr. Breda used the computer that the orthopedic physician had used for a consent earlier on another patient L.

Result:  This was a simple computer error which occurs to everyone from time to time.  I certainly am not the only person to which such an even has occurred.  Nurses and physician's make such mistakes which is why there is a person at the VA whose responsibility is to correct such errors inadvertently made in the VA medical record.  The

fact that my supervisors have pursed this complaint suggests disparate treatment and bad faith. Further, the error was corrected at the time.

12) On May 3, 2014, patient R.B., there was no consent and time out from you to do an elective central line placement (no IV access), Dr. Kusupati was notified by the RN. There was no standard procedure note written for the elective placing a central line in the internal jugular vein (attempted) and femoral vein.

Reply: I was working with Dr. Kussapati to place a central line. She entered a consent and time out for placement of one line. I was unaware that a second consent and time out was needed and not entered.

13) Patient C.C. seen on May 25, 2014. Triage time in at 17:13, c/o chest pain. Bay #7 at 17:29 with EKG obtained in the ED at 17:29. RN gave EKG to Dr. Breda for review. Verbal order given RN for ASA 81 mg 3 tablets given to patient at 18:00. Dr Breda was made aware of "crampingCP" at 18:50, Verbal order of Toradol given at 18:55. 20:25 Dr. Breda at bedside per RN note.

Result: This patient was taken care of when they came in, a history, exam, labs, EKG and diagnosis of atypical chest pain was made by me and I discharged the patient to home after the 7pm end of my shift. I specifically stayed to take care of this patient from start to discharge so no one would accuse me of not completing my responsibilities. I stayed two hours after the end of my shift to obtain results and to discharge the patient home. In Dr. Curioso's June 10th letter he accused me of delays in patient care which did not occur. I took complete ownership of this patient's ER stay myself without signing this patient out to anyone else.

14) Patient R.J. seen on May 25, 2014. Triage time 17:02 h/o kidney stones with right flank pain. Patient was in bay #5 at 16:09. RN claimed that she did not see Dr. Breda evaluate patient in bay #5, verbal order for labs and Toradol, Flomax, Dilaudid, and Hydralazine. Case signed out to Dr. Mourad but Dr. Dolan took the case and he was at bedside per RN note.

Dr. Curioso testified that he watched "several hours" of video data from the surveillance cameras mounted in the ER and believed, based on the videos he allegedly watched, that I did not see the patient. I called the Chief of Police on 2/17/2015 to inquire about obtaining the surveillance camera data and was told that the system has an automatic overwrite feature. The chief of police advised me that a surveillance video is initially recorded on DVR and automatically overwritten ten days later. Dr. Curioso had not even started his "fact finding" when his June 10, 2014 letter was written. By that time, unless he specifically collected the video data onto DVD, the original DVR data would have

been erased by the time Dr. Curioso was involved in his fact finding. It may be that Dr. Curioso never did see the surveillance video but rather was caught in a fabrication which he testified to during the fact finding session in November, 2014. Further, my notes in the medical record stated that his patient had a Hx of 19 prior episodes of kidney stones. I would not have known this fact and recorded it had I not seen and interviewed the patient.

15) Patient J.C. seen on May 25, 2014. Triage 17:41. ED at 17:50. EKG done. EKG given to Dr. Breda for review. Verbal order for Aspirin 81mg 4 tablets but Dr. Breda entered in CPRS Aspirin 324mg 1 tablet at 18:38. EKG: Inc RBBB, Q's inf, Dr. Breda at bedside at 21:00. Patient discharged to home at 21:20.

Result: This patient was taken care of when they came in, a history, exam, labs, EKG and diagnosis of atypical chest pain was made by me and I discharged the patient to home after the 7pm end of my shift. I specifically stayed to take care of this patient from start to discharge so no one would accuse me of not completing my responsibilities. I stayed two hours after the end of my shift to obtain results and to discharge the patient home. In Dr. Curioso's June 10th letter he accused me of delays in patient care which did not occur. I took complete ownership of this patient's ER stay myself without signing this patient out to anyone else.

As for the aspirin order, this was a computer entry error which occurs to everyone from time to time. I certainly am not the only person to which such an even has occurred. Nurses and physician's make such mistakes which is why there is a person at the VA whose responsibility is to correct such errors inadvertently made in the VA medical record. The fact that my supervisors have pursed this complaint suggests disparate treatment and bad faith.

IN RE: <u>John Breda, M.D.</u>

# Attachment 2

Breda and Providence VA Agreement to Mediate



# Office of Resolution Management

*Department of Veterans Affairs*

## FOR USE IN EEO RELATED CASES

# AGREEMENT TO MEDIATE AND MAINTAIN CONFIDENTIALITY

Aggrieved Party: John Breda
Case Number: 200H-0650-2014103639

This is an agreement by the parties identified below to participate in mediation and adhere to the confidentiality provisions applicable to the mediation process as described in the Administrative Dispute Resolution Act of 1996, 5 U.S.C. § 574 (ADRA).

1. The parties understand that mediation is being used to discuss, and potentially resolve, issues that have arisen in the workplace and are the subject of the above-referenced EEO complaint. The parties understand that the mediator's role is to facilitate communication among the parties and assist them in exploring options for resolving the dispute. The mediator(s) does not make decisions for the parties, render a determination on the merit of the issue(s) raised, or act as an advocate for either party. Should either party designate an individual to serve as their representative, providing advice and counsel during the process, such information will be shared with all parties in advance of the session.

2. Mediation sessions are not recorded or transcribed. All notes taken by the mediator(s) are destroyed at the completion of the mediation process. The parties agree not to subpoena the mediator(s) or compel the mediator(s) to produce documents provided by a party in a pending or future administrative or judicial procedure. Also, the mediator(s) will not voluntarily testify on behalf of a party in any pending or future administrative or judicial proceeding.

3. The parties understand that any oral statement, or any written communication prepared specifically for the mediation, which is provided only to the mediator(s) in confidence will be kept confidential by the mediator(s) with the exception of information concerning fraud, waste, abuse, criminal activity, sexual harassment, or threats of imminent harm. The parties also understand that oral and written communications shared with all parties are not protected and may be disclosed and matters that are admissible in a court of law or other administrative process continue to be admissible even though brought up in the mediation process. The parties understand that they have the option of contracting to increase their own confidentiality obligations by initialing the **statement in the box below.**

4. Although communications made in the presence of all parties and written materials shared with all parties may be disclosed, no party shall be bound by anything said or done during the mediation process unless a written agreement is reached and executed by all necessary parties.

5. If an agreement is reached, it shall be reduced to writing and when signed and approved by the appropriate authorities for all parties, the document shall be legally binding upon the parties to the agreement.

6. If the matter is not resolved through mediation, a party may pursue other available avenues of redress. However, it is that party's responsibility to be aware of and comply with all time limits and deadlines associated with those processes. By electing to use mediation, such deadlines are not waived or tolled unless otherwise agreed to in writing.

Revised 5/2012

Agreement to Mediate
Aggrieved Party John Breda
Case Number: 200H-0650-2014103639

### Expanded Confidentiality Statement

_____In addition to the confidentiality described above, we further agree that oral communications made with all parties present or otherwise confidential documents a party makes available to all parties will be confidential in this mediation. We also understand that despite this agreement for additional confidentiality, outside parties may still have access under the Freedom of Information Act to documents which a party makes available to all other parties and that a party's failure to comply with any confidentiality obligations beyond the protections of ADRA may not be enforceable .

BY SIGNATURE BELOW, I ACKNOWLEDGE THAT I HAVE READ, UNDERSTAND, AND AGREE TO THE PROVISIONS OF THIS AGREEMENT.

John Breda                                                    12/26/2014
                                                              Date

Douglas Reynolds, Counsel to                                  12/22/2014
Dr. Breda                                                     Date

Wilfred Curioso                                               Date

Kerry Adams or Tammy Holt                                     Date

IN RE: <u>John Breda, M.D.</u>

# Attachment 3

Excerpts from National Practitioners Data Bank Guidelines, September 2001 edition

# *the* DataBanks

National Practitioner | Healthcare Integrity & Protection



# NPDB Guidebook
National Practitioner Data Bank



## Withdrawal of Applications

Voluntary withdrawal of an initial application for medical staff appointment or clinical privileges prior to a final professional review action generally is not reportable to the NPDB. However, if a practitioner applies for renewal of medical staff appointment or clinical privileges and voluntarily withdraws that application while under investigation by the health care entity for possible professional incompetence or improper professional conduct, or in return for not conducting such an investigation or taking a professional review action, then the withdrawal of application for clinical privileges **is** reportable to the NPDB.

## Investigations

Investigations should not be reported to the NPDB; only the **surrender or restriction of clinical privileges** while under investigation or to avoid investigation is reportable. This would include a failure to renew clinical privileges while under investigation.

A health care entity that submits an AAR based on surrender or restriction of a physician's or dentist's privileges while under investigation should have contemporaneous evidence of an ongoing investigation at the time of surrender, or evidence of a plea bargain. The reporting entity should be able to produce evidence that an investigation was initiated **prior** to the surrender of clinical privileges by a practitioner. Examples of acceptable evidence may include minutes or excerpts from committee meetings, orders from hospital officials directing an investigation, and notices to practitioners of an investigation.

## Guidelines for Investigations

- An investigation must be carried out by the health care entity, not an individual on the staff.

- The investigation must be focused on the practitioner in question.

- The investigation must concern the professional competence and/or professional conduct of the practitioner in question.

- A routine or general review of cases is not an investigation.

- A routine review of a particular practitioner is not an investigation.

- An investigation should be the precursor to a professional review action.

- An investigation is considered ongoing until the health care entity's decision making authority takes a final action or formally closes the investigation.

## Summary Suspension

A summary suspension is reportable if it is:

- In effect or imposed for more than 30 days.

- Based on the professional competence or professional conduct of the physician, dentist, or other health care practitioner that adversely affects, or could adversely affect, the health or welfare of a patient.

- The result of a professional review action taken by a hospital or other health care entity.

A summary suspension is often imposed by an individual, for instance, the chairman of a department. Commonly,

**Example 2:**  A 30-day suspension is imposed as a result of a professional review action based on a physician's professional competence.

*The action is not reportable because the adverse action taken by the professional review body did not last for **more** than 30 days.*

**Example 3:**  A hospital reviews a surgeon's professional competence and assigns a surgical proctor for 60 days.  The surgeon cannot perform surgery without being granted approval by the surgical proctor.

*Since the surgeon cannot practice surgery without approval from another surgeon, this restriction of clinical privileges is reportable.*

**Example 4:**  A 31-day suspension is imposed on a physician for failure to complete medical records.

*Such a suspension would be reportable to the NPDB if the failure to complete medical records related to the physician's professional competence or conduct and adversely affects or could adversely affect a patient's health or welfare.*

**Example 5:**  A physician's application for surgical privileges is denied because the physician is not board certified in the particular clinical specialty or subspecialty.

*The action is not reportable if the physician fails to meet the hospital's initial credentialing criteria applied to all medical staff or clinical privilege applicants.  Examples of initial criteria may include: (1) minimum professional liability coverage, (2) board certification,*

*(3) geographic proximity to the hospital, and (4) failure to have performed the minimum number of procedures prescribed for a particular clinical privilege.*

**Example 6:**  The hospital CEO summarily suspends a physician's privileges for failure to respond to an emergency department call.

*The action is reportable if the suspension continues for longer than 30 days and the hospital bylaws state that summary suspension decisions by the medical executive committee are considered to be professional review actions.  A CEO may be considered a committee assisting the governing body in a professional review activity.  If this is the case and the physician has been summarily suspended, the hospital medical staff bylaws will usually provide for an appeal to the medical executive committee within a few days of the CEO's decision.*

**Example 7:**  A hospital's professional review body terminates a provider-based physician contract for causes relating to poor patient care, which in turn results in loss of privileges with no right to a hearing as provided in the contract and the medical staff bylaws.

*The termination of the contract, in itself, is not reportable to the NPDB.  The termination of the practitioner's clinical privileges because of the termination of the contract for reasons relating to professional competence or professional conduct is reportable if it is considered a professional review action by the hospital.*

*Hospitals are advised to consult with legal counsel to review the State's case law concerning due process.*

**Example 8:** A physician surrenders medical staff privileges due to personal reasons, infirmity, or retirement.

*The surrender is not reportable. The reasons for surrender are irrelevant unless the physician surrenders while under an investigation by a health care entity relating to possible professional incompetence or improper professional conduct, or in return for not conducting such an investigation.*

**Example 9:** A physician was under investigation four weeks prior to the expiration of his clinical privileges. The physician failed to renew his clinical privileges.

*This event is considered a reportable surrender while under investigation. This action is reportable regardless of whether the physician knew he was under investigation at the time he failed to renew his clinical privileges. A practitioner's awareness that an investigation is being conducted is not a requirement for reportability.*

**Example 10:** A physician holding courtesy privileges in a hospital applies for full staff privileges. The full staff privileges are granted. As a condition of staff privileges, the physician is required to be on-call in the Emergency Department for one weekend a month. Due to personal reasons, the physician is unable to fulfill his Emergency Department commitment. The hospital and the physician eventually agree to change his clinical privileges from full staff to courtesy.

*The change in clinical privileges is not reportable. The change to the physician's privileges is not the result of a professional review action based on the physician's professional competence or conduct which affects or could adversely affect the health or welfare of a patient.*

25. **Are investigations reportable if they do not reach a conclusion?**

Investigations are not reportable events; however, if a practitioner surrenders or fails to renew clinical privileges, or if privileges are restricted while the practitioner is either under investigation by a health care entity for possible incompetence or improper professional conduct, or to avoid an investigation, the surrender or restriction must be reported to the NPDB.

26. **A practitioner is under investigation relating to possible incompetence or improper professional conduct and resigns from the hospital. If the practitioner did not receive notification of the investigation, is this a reportable event?**

Under the provisions of the *Health Care Quality Improvement Act*, the practitioner is not required to have direct knowledge of the investigation. Hospitals should be able to produce evidence of an on-going investigation in the event of questioning. See the Investigations section of this chapter for more information.

To be considered reportable, a practitioner's resignation must be tendered "in order to prevent a professional review action." A resignation tendered with the understanding that the hospital will cease an investigation or professional review action is reportable.

27. **Must a hospital or other health care entity report adverse actions concerning the clinical privileges of medical and dental residents and interns?**

Not if the action was taken within the scope of the training program. Since residents and interns are trainees in graduate health professions education programs, they are not granted clinical privileges *per se*, but are authorized by the sponsoring institution to perform clinical duties and responsibilities within the context of their graduate educational program.

However, a resident or intern may practice outside the scope of the formal graduate education program, for example, moonlighting in the Intensive Care Unit or Emergency Department. Adverse clinical privileges actions related to practice occurring outside the scope of a formal graduate educational program are reportable.

28. **If an initial application for clinical privileges is denied or the privileges granted are more limited than those requested, must this be reported to the NPDB?**

Yes, if the denial or limitation of privileges is the result of a professional review action and is related to the practitioner's professional competence or professional conduct.

**Narrative Description - Misleading**

**Example:** A practitioner disputed a hospital's report that he resigned while under investigation. The narrative stated that there were no questions of professional competence or conduct, but that the issues that led to the investigation and the resignation were problems in the practitioner's bedside manner.

**Outcome:** The Secretary found that the report should be voided because the reason for the investigation as shown in the narrative was unrelated to professional competence or conduct. The hospital changed the narrative of the report to indicate that the investigation was undertaken as a matter of professional competence due to a misdiagnosis of a patient in the emergency room. The practitioner disputed this revised report. The Secretary reviewed the corrected report and the supporting material submitted by the hospital and found that the corrected report showed a reportable event.

It is unclear why the hospital submitted the initial report with language in the narrative that made the resignation appear unreportable. This case serves to emphasize the importance of providing accurate and complete information when composing the narrative section of a report.

**Privileges - Resignation and Surrender While Under Investigation**

**Example:** A practitioner disputed a report that he had resigned privileges during an investigation concerning professional competence. The practitioner disputed the report on the basis that he was unaware of any investigation and did not believe one was ongoing at the time. The practitioner also stated that he did not resign in order to avoid a review, but because his contract was expiring and he had found a new job.

**Secretary's Response:** The Secretary requested that the entity submit contemporaneous documentation showing that the entity had undertaken an investigation of the physician. Such documentation might have included findings of reviewers or directives of the executive committee or other professional review bodies in the hospital, or minutes from a professional review entity. The entity was unable or unwilling to provide any documentation that an investigation was occurring at the time the practitioner left. Since no contemporaneous documentation of an ongoing investigation was provided, the Secretary determined that the report should be voided.

**The Secretary also stated that the practitioner need not be aware of an ongoing investigation at the time of the resignation in order for the entity to report the resignation to the NPDB, since many investigations start without any formal allegation being made against the practitioner. The reason the practitioner gives for leaving an entity while under investigation is irrelevant to reportability of the resignation.**

## Privileges - Suspension and Hospital Motivation

**Example:** A practitioner disputed the report of a suspension of clinical privileges. The practitioner claimed that the motivation for the action was a personality conflict with the chairman of his department, a matter unrelated to professional competence.

**Outcome:** The Secretary determined that the dispute request was outside the scope of review since the motivation of the hospital or individuals involved in the case is not reviewed by the Secretary and made an entry to that effect in the report. The dispute notation was removed from the report.

## Professional Review - Alternative Employment Termination Procedure

**Example:** A practitioner disputed a report of the revocation of clinical privileges. The hospital has a system of professional review established under its bylaws and delivers health care services. The hospital also has an "employment termination procedure." The employment termination procedure was used by the hospital to end a practitioner's employment without use of the professional review process. The practitioner's privileges were revoked by the employment termination process, but no action was taken through the professional review process.

The practitioner was given no option in how the termination would occur.

**Outcome:** The Secretary directed that the report be voided from the NPDB since the professional review process had not been followed in terminating the practitioner's privileges. The termination was not a professional review action.

Some hospitals have stated that if they follow professional review procedures to remove the practitioner's privileges, they must then follow employment termination procedures in order to fire the practitioner. Hospitals have stated that by following the employment termination procedures, practitioners' privileges will automatically terminate. One hospital required all physicians on staff to waive their rights to the professional review process as a condition of employment. Health care entities are reminded that in order to be reportable to the NPDB, adverse actions must be the result of professional review.

## Residency Status

**Example:** A licensed medical resident disputed a Medical Malpractice Payment Report on the basis that she was in training at the time of the incident.

**Outcome:** The Secretary determined that the dispute request was outside the scope of review and made an entry to that effect in the report. The payment is reportable if the practitioner (regardless of resident status) is named in both the claim **and** settlement or judgement **and** a payment is made on his or her behalf. The dispute notation was removed from the report.

## Responsibility for Treatment

**Example:** A practitioner disputed a Medical Malpractice Payment Report because she saw the patient only once and was not responsible.

**Outcome**: The Secretary determined that the dispute request was outside the scope of review and made an entry to that effect in the report. The number of times a patient is seen by a practitioner or the level of responsibility is irrelevant to

Sworn Statement of Susan MacKenzie

August 12, 2015

Breda, 101879, August 12th, 2015. Mackenzie

7

1    competence to determine whether he should be reported to the National

2    Data Bank and State Licensing Board which he contends could negatively

3    affect his ability to earn a living as a physician. To your knowledge has

4    there been an investigation or hearing conducted into Dr. Breda's

5    professional competence?

6    A: So it wasn't an investigation or a hearing. It was a fact finding that was

7    conducted through the clinical chain of command and I did not review that

8    document. I don't know what the timeline was on that.

9    Q: Were you involved in deciding whether to conduct that fact finding?

10   A: No.

11   Q: Do you know who was?

12   A: Well, I'm assuming Dr. Curioso, his supervisor, would probably have

13   initiated that, but I don't know for sure.

14   Q: Well I'll ask Dr. Curioso about that when I interview him. Those are all

15   of the questions that I have for you Dr. Mackenzie. Is there anything else

16   that you would like to add to the record in connection with what we

17   discussed?

18   A: No, not at this time. If you have any questions that come up just feel

19   free to get in touch with me.

20   Q: Okay, thank you and that concludes my interview then and I want to

21   thank you again for taking the time to provide me with this statement. I'm

22   going to turn off the recording device now.

Initials _____                                    Page 7 of 7

Breda, 101879, August 12, 2015, Pirraglia                                    1

1    Q:  Dr. Pirraglia my name is John Nicholas.  I am a contract EEO

2    Investigator associated with Sierra Tahoe Investigations assigned to

3    investigate the claim of discrimination that was filed by Dr. Breda, on

4    March 25, 2015.  The date today is August 20, 2015.  The time is 10:08

5    AM Pacific time.  I'm going to take a statement from you today over the

6    phone.  I'll be recording this statement and then I'll have the recording

7    transcribed verbatim.  Do I have your permission to record this interview?

8    A:  Yes, you do.

9    Q:  Okay.  Now I can send the transcript to you in one of two ways.  I can

10   either send it to you through the mail as a hardcopy or I can send it to you

11   as a PDF file attachment to an encrypted email.  Which would you prefer?

12   A:  Email please.

13   Q:  Okay.  I'll be conducting this interview in a question answer format.  If

14   at any time I ask a question that you're not quite sure you understand, just

15   let me know and I'd be happy to explain the question to you or rephrase it

16   for you if necessary.  If you have a question for me that you'd like to

17   discuss off the record before responding to a question that I have posed,

18   just let me know that you want to go off record and I'll put my recording

19   device on pause to give us a chance to discuss your question.  Or if, for

20   example, there is a document that you'd like refer to that you don't happen

21   to have at hand and you need a chance to retrieve that document, again

22   let me know and I can pause the recording device to give you a chance to

Initials _____

1   do that.  Now I take these statements under oath or affirmation whichever

2   you're more comfortable with.  Which would you prefer?

3   A: Either is fine.

4   Q: Okay.  Any questions about the procedure?

5   A: No questions.

6   Q: Dr. Pirraglia, do you solemnly swear that the testimony that you're

7   about to give is the truth, the whole truth and nothing but the truth?

8   A: I do.

9   Q: Could you please state for the record your full name, your office mailing

10   address and telephone number please?

11   A: Yes my name is Paul Pirraglia.  My office is at the Providence VA

12   Medical Center, 830 Chalkstone Avenue, Providence, Rhode Island

13   02908 and my office phone number is 401-273-7100, extension 5844

14   which is a direct line.

15   Q: Thank you.  And in what city and state are you located right now?

16   A: Providence, Rhode Island.

17   Q: And are you currently employed by the US Department of Veterans

18   Affairs?

19   A: I am.

20   Q: In which VA facility are you employed?

21   A: Providence VA Medical Center.

22   Q: And what is your current position title?

Initials _____

Breda, 101879, August 12, 2015, Pirraglia                                    3

1    A: I'm the Chief of Primary Care.

2    Q: And how long have you been employed in that capacity?

3    A: It will be five years in October. I'm sorry, four years in October.

4    Q: In his complaint, Dr. Breda alleges that he was discriminated against in

5    part because of his age. Are you aware of Dr. Breda's age?

6    A: I am not.

7    Q: In what month and year were you born?

8    A: I was born in February 1967.

9    Q: Breda also alleges that he was subjected to reprisal for his having

10   previously filed a complaint of discrimination. Were you aware that Dr.

11   Breda had previously filed an EEO complaint?

12   A: No, I was not.

13   Q: He also alleges that he was discriminated against because of his

14   disability. Were you aware of Dr. Breda's disability?

15   A: No.

16   Q: Dr. Breda alleges that he was discriminated against based on age,

17   disability and reprisal for his prior EEO complaint when on February 3 of

18   2015, Susan Mackenzie, the hospital director, issued a letter terminating

19   his employment, but he claims his separation was processed as a

20   "resignation in lieu of involuntary action" on February 7, 2015. Were you

21   involved in any way in the decision to terminate Dr. Breda's employment?

Initials _____

1   A:  Marginally so.  As the Chief of Primary Care, I'm a member of the

2   Medical Executive Committee, and concerns regarding Dr. Breda had

3   been brought up in that committee.  I do not recall the particulars other

4   than there were concerns about his practice that were brought up there.

5   Action as to termination only, as I recall, came up as I was the Acting Chief

6   of Staff and was asked to sign the letter from Dr. Sharma, who is the Chief

7   of Staff, to sign on his behalf.

8   Q:  I see, so you were in an acting capacity, Acting Chief of Staff at the

9   time.

10  A:  Correct and it's not a long standing acting.  I periodically will act as

11  Chief of Staff while Dr. Sharma is away.  These usually range from a

12  couple of days to at some points a couple of weeks, but not longer than

13  that.

14  Q:  I see.  And what is the function of this committee that you referred to?

15  A:  The Medical Executive Committee is responsible for the privileging and

16  credentialing of our licensed independent practitioners.

17  Q:  And do you know who other than yourself sits on that committee?

18  A:  The clinical service chiefs sit on that committee so that would be the

19  chiefs of medicine, surgery, mental health, primary care.  There is a

20  handful of other folks from other clinical services and it's chaired by the

21  Chief of Staff.

Initials _____

1    Q: Do you recall who it was, that raised concerns about Dr. Breda's

2    practice?

3    A: It would have been Dr. Rounds who is the Chief of Medicine. The

4    Emergency Department where Dr. Breda worked falls under Medicine. So

5    these would have been raised possibly at the level of the ED up to her, but

6    she is the chief of that service.

7    Q: In Claim B of Dr. Breda's complaint, he alleges that he was subjected

8    to a hostile work environment based on his age, disability, and prior EEO

9    complaint as evidenced by a number of events and I want to ask you some

10   questions related to the events that he listed. In the first item, Dr. Breda

11   alleges that in November of 2014, Dr. Curioso expressed animosity toward

12   him and questioned him about his medical judgement in a review of his

13   patient files from a previous year without allowing him representation or

14   accepting explanations that care was not substandard. Do you recall

15   having discussions with either Dr. Breda or Dr. Curioso in November of

16   2014, about this?

17   A: No. I should say as an aside I actually don't recall ever talking to Dr.

18   Breda. For Dr. Curioso, Dr. Curioso is the Chief of the Emergency

19   Department and it would be appropriate if there were concerns that the

20   section chief, in this case Dr. Curioso, would be talking to any provider if

21   there were concerns and often times this is done periodically for things like

22   chart review.

Initials _____

Breda, 101879, August 12, 2015, Pirraglia                                        6

1   Q: And if he had concerns he would have brought those to Dr. Rounds'
2   attention?

3   A: Yes he would.

4   Q: In Item 4 of his hostile work environment claim, Dr. Breda alleges that
5   since on or about February 27, 2015, the Providence VA Medical Center
6   has subjected him to an investigation into his professional competence to
7   determine whether he should be reported to the National Databank and
8   State Licensing Board which he contends could negatively affect his ability
9   to earn a living as a physician. To your knowledge has there been an
10  investigation or hearing conducted into Dr. Breda's professional
11  competence?

12  A: That is in part what is covered in the Medical Executive Committee
13  meetings. You know if there are concerns about a provider's practice
14  that's where those concerns are raised and where they are discussed. I
15  don't recollect details regarding this, but I would expect that if concerns
16  were brought forward that usually what will happen is that there will be
17  some investigation. That investigation might be in a sense of, not in terms
18  of inquisition so much, but closer review of records or observations. So for
19  example if there was concerns about a providers practice, we may review
20  more charts for that particular person in a thing called a Focused Practice
21  and Performance Evaluation or FPPE. If it's determined by the Medical
22  Executive Committee that a provider is not performing in an adequate

Initials _____

1  fashion, that there are concerns about their practice to the extent that

2  patients may be endangered, the MEC does have the power to terminate

3  somebody's privileges and in turn termination of privileges, can result in

4  the reporting to the national practitioner databases and other entities. So it

5  is entirely possible that there was an investigation, I do not recall the

6  particulars. And it's also equally likely that if the committee had terminated

7  his privileges, that often does result in reporting to the national database.

8  Q: I see, but to your knowledge such a determination had not yet been

9  made?

10  A: I do not recollect, I don't recall one way or the other.

11  Q: Those are all of the questions that I have for you Dr. Pirraglia. Is there

12  anything else that you wish to add to the record in connection with what

13  we've discussed?

14  A: No, what we've discussed is basically the greatest extent to which I'm

15  aware of the situation.

16  Q: That concludes my interview sir, and I want to thank you for taking the

17  time to provide me with this statement. I'm going to turn off the recording

18  device now.

Find messages, documents, photos or people

Compose

← Back   ↩   ↩   ➡   ▦ Archive   ✉ Move   🗑 Delete   🚫 Spam   •••   ▲   ✕

Inbox   999+
Unread
Starred
Drafts   236
Sent
More

Views   Hide
Photos
Documents
Travel
Coupons
Tutorials

Folders   Hide
+ New Folder
Current   2
Job Search   4
Job Search 2014   8
Mooney
Notes
Sent to Hurn or Ca…

## RE: [EXTERNAL] Fw: Meeting

Yahoo/Inbox

Sartini, Rachel <Rachel.Sartini@va.gov>
To: johnabreda@yahoo.com
Cc: Tammy.Holt@va.gov, Kerry.Adams@va.gov,
Satish.SharmaMD@va.gov, Sharon.Rounds@va.gov,
Wilfredo.Curioso@va.gov and 2 more...

Aug 20, 2014 at 2:59 PM

Good Afternoon Dr. Breda:

As is customary with any fact finding, your presence is requested to discuss some concerns your department has and to solicit your side of the story. There is no action being taken at this time. Therefore, there is no evidence for you to review. The meeting that will be held, based on your availability, will be for you to answer any questions and provide your Service with information to take in consideration before any final decision is made.

Should you choose not to attend, your Service will make a decision based on the information available to them.

Regards,

Rachel Sartini

Assistant Chief, Human Resources

VA Medical Center- Providence

589 Atwells Ave.

Providence, RI 02909

(401) 459-4770, Extension 4711

**From:** Holt, Tambra
**Sent:** Wednesday, August 20, 2014 11:01 AM
**To:** Sartini, Rachel
**Subject:** FW: [EXTERNAL] Fw: Meeting

**From:** John Breda [mailto:johnabreda@yahoo.com]
**Sent:** Wednesday, August 20, 2014 10:48 AM
**To:** Rounds MD, Sharon; Adams, Kerry; Sharma, Satish (VISN1)
**Cc:** Holt, Tambra; Tague, Justine; Curioso, Wilfredo; wilfcur85@aol.com;
johnabreda@yahoo.con
**Subject:** [EXTERNAL] Fw: Meeting

I have asked for documentation regarding the issues at hand which I still have not received despite the passage of almost three months. I can not meet until I and my attorney have had the opportunity of review the documents previously requested. Please reference my prior e-mails for the specific requests. Please advise as to when I may receive the requested documentation.

LAW OFFICES OF PAUL H. MERRY, ESQ.
50 CONGRESS STREET - 10TH FLOOR
BOSTON, MASSACHUSETTS 02109
(617)-720-2400
FACSIMILE (617)-742-1887

PAUL H. MERRY, ESQ.                                                          PAUL.MERRY@FAIRWORKPLACE.NET
ANDREA L. HAAS, ESQ.                                                      ANDREA.HAAS@FAIRWORKPLACE.NET

August 27, 2015

BY FACSIMILE TRANSMISSION TO 401-457-1430
BY CERTIFIED MAIL RETURN RECEIPT REQUESTED NO. 7012 0470 0000 0016 6251
BY ELECTRONIC MAIL TO rachel.sartini@va.gov)

*CONFIDENTIAL*

Hearing Panel on John Breda, M.D.
United States Department of Veterans' Affairs Medical Center
830 Chalkstone Avenue
Providence, R.I. 02908

IN RE: John Breda, M.D.

Dear Panel Members:

As you may be aware, this office represents John Breda, M.D., formerly employed as an Emergency Department ("ED") physician with the Veterans Administration Medical Center, Providence ("Center".) You provided Dr. Breda with a package of documentation relating to the circumstances of his departure from employment with the Center, raising the issue whether he resigned during an investigation into allegations of medical errors; and asking for his response. You also extended time for his response to these accusations until April 14, 2015.

Please be advised Dr. Breda did not resign from his employment in the face of an investigation into allegations of professional errors. Dr. Breda is a highly trained, very experienced physician, who is dedicated to the practice of medicine and felt honored to have the opportunity to use his skills on behalf of men and women who have faced the ultimate risk on behalf of our nation. He regrets the loss of that opportunity. His separation, however, occurred at the instigation of staff members at the Center, who terminated him after he objected to a pattern of harassing complaints that had made practicing in the ED insupportable, as is further set out below.

We are confident that upon your review of this response you will find the provided

Hearing Panel on John Breda, M.D.
August 27, 2015  Page 2

explanation sufficient and conclude this matter should be promptly closed, as suggested under
department guidelines. However in the unlikely event that further questions arise Dr. Breda
directs your attention to the below[1]. Also, please be aware that neither Dr. Breda's participation
in the Center's process thus far, this response, nor any attendance at a future hearing implies or
equates to Dr. Breda's acceptance of this process as adequate due process to protect his legally
cognizable interest in continued employment with the Center.

I.    BACKGROUND

     The National Practitioners Data Bank ("NPDB") was created as part of the federal Health
Care Quality Improvement Act to serve as a central repository of serious adverse medical events
directly attributable to poor patient care by licensed medical professionals. Institutions such as
the Center are required to report egregious incidents of poor patient care. As a negative report in
the NPDB is all but certain to have a devastating effect on a licensed professional's career,
reporting is only permitted under a narrow range of circumstances. Institutions are bound by a set
of strict regulations designed to balance public safety with a medical professional's oath and
obligation to exercise independent medical judgment. One such requirement is that institutions
report professionals who resign either for the purposes of avoiding a formal investigation into
suspected incompetence or professional misconduct, or to avoid termination for the same.

II.   FACTS

     Dr. John Breda is a committed physician, board certified in internal medicine who
worked at the Center successfully for three or more years before one or more nurses chose to
raise spurious complaints about him. Indeed, he worked over this period with Dr. William
Curioso, again without significant difficulty or questions being raised, until Dr. Curioso chose to
find in the occasion of the nurse complaints a pretext to seek actions by Dr. Breda which he
could attempt to call into question.

     Dr. Breda's commitment to providing highest quality care to veterans at the Center is
demonstrated by his having deferred his own care on more than one occasion when demands in
the ED indicated his attendance there was a priority. He thereafter found treatment for his
condition (Hodgkins disease) and, once he had been successfully treated, promptly returned to his
duties with you. Moreover, he reports that on many of his assigned shifts, patient needs were
such that he chose to remain on duty until he was satisfied they were being cared for to the
highest standard, sometimes several hours after he was technically no longer working. He worked
tirelessly to improve the level of care provided to veterans requiring emergency treatment at the

---

[1]In the unlikely event that this matter is not resolved as result of this response Dr. Breda
also formally requests the opportunity to review any draft report to the National Practitioners
Data Bank before any report is submitted, as required in the Veterans Health Administration
Handbook, VHA Handbook 1100.17 paragraph 9(c)(2).

Hearing Panel on John Breda, M.D.
August 27, 2015  Page 3

Center.

Dr. Breda's record reflects continuing efforts to improve his own skills in particular. The Center was aware when he was hired that his experience in emergency care was limited; but he took steps to become trained in best ED practices and new techniques. Moreover, of course, none of the actions complained of resulted in an unsatisfactory patient outcome.

As soon as he learned the nurses had made complaints against him, Dr. Breda requested sufficient detail to permit him to understand and learn from the incidents; but he was repeatedly denied access to this information. Following these complaints, he became a target for additional criticism; and after months of undergoing this harassment he ultimately was constrained to take unpaid leave to protect himself. In November, 2014, despite still being without the background information he had sought on the charges against him, he attended a meeting with supervisory staff in the ED.  The meeting was essentially another opportunity to assault him and his abilities; and provided no additional insights to enable him to respond. At or about this time, he again complained of the difficulty of working in an environment so hostile to and critical of him, and raised the possibility of a resignation if the situation could not be resolved fairly through a mediation process. The harassment did not cease, and after the Center notified him in early February that he was being terminated, he tendered his resignation effective in December.

III.    DR. BREDA'S EMPLOYMENT WITH THE CENTER ENDED ON ACCOUNT OF A TERMINATION BY THE CENTER NOT ON ACCOUNT OF A RESIGNATION.

As noted, for a number of months starting in June, 2014, Dr. Breda had repeatedly reported and complained about a pattern of groundless petty complaints being made against him by nursing staff in the ED. (A prior instance of complaints being raised against him, in or about autumn 2010, ended with his being exhorted by the then-chief of staff to continue practicing medicine at what the reviewer found to be the high level he customarily worked at.) But spurious issues continued to be raised, and management failed to take effective action to put a stop to the harassment. Finally, in an effort to make plain the seriousness of the harassment, and the negative impact it was having on his ability to provide veterans with the highest level of care, on or about December 16, 2014, Dr. Breda requested that Alternative Dispute Resolution be initiated to address the problems. Tab 11, p. 1, 3. He also suggested that, in the absence of an amicable resolution of the problems, he could well feel constrained to resign. Tab 4.

The Center's actions in response to Dr. Breda all occurred days (most more than a week) after his letter of February 1, 2015, reiterating his proposal to resign and citing the agreement under which the resignation was to be effective in mid-December of the prior year. Tab 4, p. 4. In response, the Center notified him his resignation was not being accepted (despite his assertion that an agreement had been reached to accept it retroactively), but that rather he was being terminated from employment by letter of February 3, 2015. Indeed, the Center did not get around to responding to Dr. Breda's letter concerning possible resignation until February 10, 2015.

Hearing Panel on John Breda, M.D.
August 27, 2015  Page 4

In short, no resignation was ever accepted by the Center; to the contrary, the Center terminated Dr. Breda's employment and ended his clinical privileges before any investigation initiated by the Center commenced. In the absence of a resignation, then, no permissible ground exists on which the Center may make, or is required to make, a report to the NPDB in the present circumstances.

IV.   DR. BREDA PROPOSED RESIGNING IN NOVEMBER AND DECEMBER 2014 TO AVOID WORKING IN A HOSTILE WORK ENVIRONMENT, WELL IN ADVANCE OF ANY "INVESTIGATION" OR PROFESSIONAL REVIEW ACTION. THERFORE NO REPORTING IS PERMITTED BY STATUTE.

In May and June 2014, almost immediately after Dr. Breda learned an informal case review was being undertaken by Dr. Curioso, he realized that the action was not being conducted in a fair or open manner and that Dr. Curioso had no interest in uncovering any information about the actual patient care administered by Dr. Breda. Despite Dr. Breda's repeated written and oral requests for patient charts or physician notes Dr. Curioso and the Center refused to make those materials available. This refusal to provide specific information gives rise to the disturbing inference that this one-person informal review process was not intended to assist Dr. Breda in improving his skills; nor even to uncovering the truth; but rather to justify and perpetuate negative treatment of Dr. Breda.

Recognizing the situation he was experiencing, Dr. Breda appropriately identified the complaining nurse's conduct, and Dr. Curioso's actions, as creating a hostile work environment possibly based on his protected classes[2], and promptly notified the hospital that he did not feel safe continuing to work in an environment where his medical judgment was subject to second guessing and the nursing staff's petty and factually incorrect complaints were treated as unrebuttable truth. (Dr. Breda wrote "it is inappropriate that I work in a position where I do not feel safe").

Despite having his repeated requests to be provided with patient charts and physician notes for each of the alleged incidents denied, Dr. Breda participated in the November 13, 2014 meeting with Dr. Curioso and attempted to provide his off-the cuff explanation for each of the alleged incidents identified in Dr. Curioso's sparse list. Soon thereafter Dr. Breda also submitted a written explanation of his patient care in connection with each of the questions raised by Dr. Curios. This effort was obviously greatly hampered by the denial of access to patient charts and physician notes afforded Dr. Breda.. Reasonably not wishing to continue to subject himself to an unnecessarily hostile work environment Dr. Breda communicated his intention to resign as soon as some questions in connection with his benefits were resolved. In response the Center induced

---

[2]Dr. Breda has initiated two separate, presently pending, formal Equal Employment Opportunity complaints regarding the discrimination he experienced in connection with the present matter.

Hearing Panel on John Breda, M.D.
August 27, 2015 Page 5

Dr. Breda to remain an employee pending mediation of his EEO complaint, scheduled for late February 2015. After considerable persistence Dr. Breda was able to participate in a follow up meeting on December 11, 2014. Following this meeting without regard for the explanations provided by Dr. Breda, and still refusing to provide patient charts, Dr. Rounds unjustifiably moved to terminate Dr. Breda's employment, without having even initiated a formal performance inquiry or investigation under any established hospital committee or protocol.

### 1. Resignation for Personal Reasons Not Reportable to NPDB

Upon learning of the Center's egregious action to move for termination Dr. Breda formalized his previously promised resignation, effective December 16, 2014 to remove himself from the hostile work environment that the Center had become for him. Were this resignation deemed to underlie the separation from employment, it was effected for personal (and lawful) reasons well before any professional action (or investigation) by the Center occurred; and no reporting is permissible. NPDB Guidebook[3] ("Guidebook"), E-34 Q.26. ("(T)o be considered reportable a practitioner's resignation must be tendered "in order to prevent a professional review action")[4].

### 2. Termination Outside of a Formal Professional Review Action Not Reportable to NPDB

Furthermore, the actions of the Center to move to terminate Dr. Breda outside of any formal review process do not implicate reporting to the NPDB, as clearly explained in the Guidebook. When a hospital, such as the Center, has a system of professional review protocols established under its bylaws, yet chooses to ignore those protocols and instead simply moves for termination, and attendant revocations of privileges, without the use of the established professional review process, reporting to the NPDP is not appropriate because the termination was not in connection with a professional review action. NPDB Guidebook, F-9. (The Secretary overseeing the NPDB ordered an adverse physician report to be voided "since the professional review process had not been followed in terminating the practitioner's privileges. The termination was not a professional review action. ... Health care entities are reminded that in order to be reportable to NPDB, adverse actions must be the result of professional review").

---

[3]Citations herein are provided to the National Practitioner Data Bank Guidebook, published by U.S. Department of Health and Human Services, September 2001 edition, the edition available during the events in question.

[4] The wording of this sentence is consistent with the reporting requirement being imposed in circumstances where a physician resigns to avoid loss of privileges or other adverse actions. Where this kind of arrangement is made, without the reporting requirement it would appear possible that no information would be forwarded to the NPDP. The provision would appear inapplicable here, then, where no such bargain was struck and the Center did not cease its actions against Dr. Breda.

Hearing Panel on John Breda, M.D.
August 27, 2015  Page 6

V.    DR. BREDA DID NOT RESIGN IN THE FACE OF AN INVESTIGATION INTO
      PROFESSIONAL ERRORS BECAUSE NO SUCH INVESTIGATION WAS UNDER
      WAY AT THE TIME OF ANY RESIGNATION, OR IN THE MONTHS FOLLOWING
      IT.

In the present matter the Center alleges that Dr. Breda resigned during an "investigation"
into his professional competence as the term "investigation" is found in 42 U.S.C.S.
§11133(a)(1)(B)(I), which requires that "(e)ach health care entity which... (B) accepts the
surrender of clinical privileges of a physician (I) while the physician is under an investigation by
the entity relating to possible incompetence or improper professional conduct... report to the
Board of Medical Examiners". While the statute leaves the critical word "investigation"
undefined, the federal enforcing agency, the U.S. Department of Health and Human Services, has
published the NPDB Guidebook to provide guidance on the required level of formality a
investigation must maintain to trigger reporting. Doe v. Leavitt, 552 F. 3d 75, 81 (1st. Cir 2009).
Any review of Dr. Breda's patient care practices under taken by the Center fell far short in both
structure and quality, as is further described below, making reporting unsupportable.

1. The Center followed none of its established protocols in reviewing Dr. Breda's past
   patient charts and now improperly attempts to re-label an informal review a formal
   investigation.

The Center utilizes multiple formal protocols for performing reviews of a medical
professional's actions or privileges. The Center may, and frequently has, conducted various
formal investigations into either a professional's general competency or a specific incident,
including Peer to Peer Reviews, Ongoing Professional Practice Evaluations ("OPPE"), and
Focused Professional Performance Evaluations ("FPPE"). At the Center each of these types of
reviews presumably has associated forms, time frames, safeguards, and protocols, including by
no means at the least, a full and fair opportunity for the physician involved to examine the facts
of any incidents alleged and offer such explanation as may be appropriate to explain the
questioned act or decision.

In the present matter, none of the Center's established mechanisms was employed; and
Dr. Breda is at risk of suffering the consequences. To the contrary, a single supervisor apparently
undertook an ad hoc review which was even titled a "fact finding" rather than an investigation
(indeed the word investigation does not appear in Dr. Curioso's June 10, 2014 letter announcing
the "fact finding"); and which seemed to employ no formal reporting mechanisms or defined
process. See, Simpkins v. Shalala, 999 F. Supp. 106, 115 (D.D.C. 1998)(Hospital's practices and
bylaws may shed light on whether an institution has instituted an investigation within the
purview of the NPDB statute). With only the minimal formality of a short letter, Dr. Breda was
notified that Dr. Curioso had *personally* decided to supervise Dr. Breda more closely and
undertake a general review of Dr. Breda's charts for the past year, including a review of his

Hearing Panel on John Breda, M.D.
August 27, 2015 Page 7

bedside manner[5]. ("I have concerns...," "I will now be looking into issues more carefully," "I personally view ...") . This letter did not even hint of a formal investigation, and fell far shy of initiating any type of formal review process, but rather primarily informed Dr. Breda that Dr. Curioso wanted a work schedule change to permit greater observation[6]. Id.

According to the contemporaneous materials provided by the Center, Dr. Curioso's "fact finding" was not requested or initiated by either the facility's established Professional Standards Board ("PSB") or Medical Executive Committee ("MEC"). Any examination of Dr. Breda's patient care practices conducted solely by Dr. Curioso, or in any case not at the direction of an established hospital board, lacks the formality, structure, and safeguards required to fall within the definition of an "investigation" as previously employed by the either the Center or the governing statute. Simpkins, 999 F. Supp. 106, 115; or the NPDB's definition.

Furthermore, this putative notice of Dr. Curioso's fact finding offered no information concerning the consequences of the review: for example, no mention of potential for reporting to the NPDB or any state licencing board was included. Indeed, that necessary notice was first provided by letter on or about February 12, 2015, after Dr. Breda had been terminated (and had sought to instate his resignation.) Without this notice Dr. Curioso's review can hardly be deemed the sort of "investigation" authorizing a report to NPDB. Additionally, of course, the mere fact that the MEC acted on the informal review by Dr. Curioso in no way elevates that informal process to a formal investigation. Costa v Leavitt, 442 F Supp 2d 754, 773 (DC Neb. 2006) (No basis for hospital's assertion that minutes of certain hospital staff meeting were sufficient evidence of investigation into a particular practitioner in keeping with NPDB Guidebook requirements that reporting entity have contemporaneous documentation).

The specific facts surrounding Dr. Curioso's "fact finding," including its casual nature, the absence of the formal processes customarily employed by the Center in investigations, and the lack of notice concerning the potential risk of a report being sent to the NPDB, then, offer no basis for a conclusion that an investigation as envisioned by the Health Care Quality Improvement Act of 1986 was under way at the time of Dr. Breda's separation (whatever its nature may be found to have been) from employment at the Center. Accordingly, no basis exists on which to make any report to the NPDB.

---

[5] While concerns with a physician's bedside manner may warrant a supervisor's comment or constructive counseling the do not constitute an inquiry into professional competence or conduct. Any report to the NPDB for failures in bedside manner is readily voidable. NPDB Guidebook, F-8.

[6] Dr. Curioso requested simply that Dr. Breda schedule his shifts to coincide with Dr. Curioso's shifts. There was no suggestion that Dr. Curioso would be approving Dr. Breda's orders or otherwise strictly scrutinizing or proctoring Dr. Breda's future medical judgement. Tab 19.

Hearing Panel on John Breda, M.D.
August 27, 2015  Page 8

VI.    EVEN IF A REVIEWER FOUND THAT DR. BREDA RESIGNED IN FEBRUARY
       2015, THE INFORMAL REVIEW ACTIONS UNDERTAKEN BY THE CENTER DO
       NOT CONSTITUTE AN INVESTIGATION PERMITTING REPORTING UNDER THE
       NPDB GUIDEBOOK AND WILL NOT BE UPHELD BY A REVIEWING BODY

       For a myriad of distinct reasons the actions undertaken by the Center do not rise to the
formality of investigation as required by the federal statute. First, an informal review by Dr.
Curioso does not constitute a formal investigation by the Center. NPDB Guidebook E-19 ("An
investigation must be carried out by the health care entity, not an individual on the staff").
According to the complete records submitted by the Center (the "evidence file") Dr. Curioso's
actions were not requested by any hospital committee or board and accordingly can only be
classified as the investigation of one, not an investigation by the hospital permitting a report.
See, Costa, 442 F Supp 2d 754, 772 (finding it insufficient for a hospital to justify reporting to
the NPDB by simply stating that a doctor's competence and professionalism were under review
in committee minutes). The Guidebook is quite clear that the type of investigation contemplated
within the federal statute is a formal review by a committee designated by a hospital leadership
committee, a characteristic simply absent from the review undertaken by Dr. Curioso alone  in
connection with Dr. Breda. Id.

       Second the process undertaken with Dr. Breda, even if not formally requested by a
hospital board, did not have the formality required of a formal peer review process, including
following a formally adopted written procedure which provides adequate notice and opportunity
for meaningful response, and therefore this process does not qualify as a formal peer review
process into Dr. Breda's competence or skill. 45 CFR §60.3. Critically absent from the Center's
process was both adequate notice to Dr. Breda of the details of the allegations against him and a
meaningful opportunity to respond, informed by full access to patient charts.

       Third, to justify submitting an adverse action report, an institution must be able to submit
contemporaneous documentation that an investigation is underway. NPDB Guidebook E-19.
Costa, 442 F Supp 2d 754, 773. Unlike in the present matter, evidence must be available to
support the conclusion that the institution's formal investigation was initiated prior to Dr.
Breda's separation. As a fair reading of the evidence file indicates that no formal investigation
ever commenced, the Center will be unable to make this showing and any submitted report is
likely to be ultimately voided. Id., NPDB Guidebook F-8 (When an entity is unwilling or unable
to provide contemporaneous documentation that an investigation was occurring at the time of a
practitioners departure the report will be voided). Suitable evidence includes "orders from
hospital officials directing an investigation, and notices to practitioners of an investigation" both
items which are absent from the Center's evidence file. NPDB Guidebook E-19.  Costa, 442 F
Supp 2d 754, 773 (No basis for hospital's assertion that minutes of certain hospital staff meeting
were sufficient evidence of investigation into a particular practitioner in keeping with NPDB
Guidebook requirements that reporting entity have contemporaneous documentation). In the
present matter the Center now seeks to retroactively classify Dr. Curioso's chart review and fact

Hearing Panel on John Breda, M.D.
August 27, 2015 Page 9

finding as a formal investigation by a hospital board, a revision of history simply unsupported by the evidence.

Fourth, Dr. Breda was explicitly denied access to the very patient charts and his own physician notes necessary to review and explain the patient care decisions he made during the occurrences selected by Dr. Curioso. The Veterans Health Administration's own handbook, the VA Handbook 1100.18 Reporting and Responding to State Licensing Boards, mandates the required notice and necessary evidence to be provided to a practitioner before reporting an adverse action to a state licensing board. These published standards represent the minimum information that the VHA deems appropriate to adequately allow a practitioner to respond including lab results, patient charts, internally consistent anonymous patient identifiers, and prescription records organized and indexed by individual allegation against a provider. See VA Handbook 1100.1, Appendix B, Guidelines for Compiling, Organizing and Preparing the State Licencing Board Reporting File and Decision Memorandum. Given that Dr. Breda was provided with only a scant description of the incidents examined by Dr. Curioso and no accompanying records, the materials provided obviously fall well short of these established standards, id., and cannot form the basis of a report to the NPDB.

VII.    DR. BREDA DID NOT RESIGN IN THE FACE OF AN INVESTIGATION INTO ALLEGATIONS OF PROFESSIONAL ERRORS BECAUSE THE OCCURRENCES RAISED AGAINST HIM REPRESENTED AT BEST AN AGGLOMERATION OF COMMONPLACE, INCONSEQUENTIAL INCIDENTS WHICH ARISE FREQUENTLY IN ALL BUSY MEDICAL FACILITIES AND NEITHER CAUSED PATIENT HARM NOR CONSTITUTED BREACHES OF REASONABLE MEDICAL JUDGMENT WARRANTING A PROFESSIONAL REVIEW ACTION.

A total of fifteen allegations against Dr. Breda were garnered from a review of a year's service to the Department of Veterans' Affairs. The review, conducted by one individual, was initiated, surprisingly, within some months of a similar review which concluded that his care met or exceeded institutional standards, his privileges should be renewed, and he should be awarded a raise. Also of importance, the review was not precipitated by any poor patient outcomes. The fifteen questioned actions by Dr. Breda can be roughly grouped into three types: first are actions questioned on the basis of anecdotal reports but which were either not documented or documentation has not been forthcoming. Second were decisions of a more administrative rather than medical nature, which even if found to be errors would have resulted in minimal inconvenience rather than risk to patient health or an adverse outcome. And finally, the decisions were reasonable exercises of medical judgment, based on the limited information available to Dr. Breda at the time each decision was made.

Of the actions identified by Dr. Curioso fully two-thirds did not involve medical decisions or judgments; or were not accompanied by sufficient documentation to permit assessment of the correctness of the medical decision at issue. Of the remaining third which did

Hearing Panel on John Breda, M.D.
August 27, 2015 Page 10

involve medical judgments, the criticisms were factually in error or without basis in sound, compliant medical practice.

Dr. Breda has still not seen detailed records concerning these questioned actions, and therefore is not in a position to address many of them specifically. Without waiving his right to prepare and provide such a response in future, he offers herewith a brief discussion based on his memory of the incidents[7]; and responds as follows:

Turning to some of the alleged actions, one "action", allegation five, involved a "dispute" with another ED physician, Dr. Mourad, relating to signing in on a patient's case, where a single nurse (with a history of spurious complaints against physicians) alleged an argument had arisen, despite the fact that both physicians involved denied it had been an argument; and neither raised his voice. The second physician, Dr. Mourad, was emphatic with Dr. Curioso that no argument had occurred; and laid responsibility for the groundless complaint at the feet of the nurse involved. Another "action", allegation eight, arose from a wholly unsubstantiated allegation of "inappropriate" language. Even substantiated bedside manner concerns do not support filing an adverse action report with the NPDB. NPDB Guidebook, F-8.

Two other questioned actions, surprisingly, arise from decisions concerning optimal treatment locations for the two patients involved. The first, on May 3, 2014, allegation nine, involved a veteran with a presumably serious chain saw injury who was being transported to the Center by ambulance. When the ambulance staff questioned the Emergency Department whether they should divert to a nearby hospital with a specialized trauma care unit, Dr. Breda agreed and directed the patient to the better-equipped trauma center at a different Rhode Island hospital rather than admitting him to the (then very busy) Center ED. This decision appears (like most of Dr. Breda's actions) to have been in the best interest of the patient; and is difficult to fault, particularly considering the time pressure Dr. Breda was under when he had to make the choice, and the total inability to examine the patient still miles away from facility. Whatever Center administrators may think, it is hard to see this action justifying review beyond a refresher of ED policies concerning sending veterans to other institutions.

The second patient was being transported to the Center with stroke symptoms, allegation three; but was near the end of the four-hour optimal period for administering the best quality anti-stroke medications. Again Dr. Breda, in consultation with the Center's on-call neurologist, made the decision to redirect the patient to another hospital with a stroke team fully prepared to administer the anti-stroke treatment swiftly. In light of the dramatically different potential outcomes when the anti-stroke treatment is provided timely, this decision also was clearly in the patient's best interest. Even could one dispute this assertion, the decision again was made under serious time constraints; and Dr. Breda made optimizing the patient's well being and chances for

---

[7]This document has previously been submitted to the Center directly by Dr. Breda but it has been excluded from the evidence file.

Hearing Panel on John Breda, M.D.
August 27, 2015  Page 11

full recovery his highest priority. But again, to seek to characterize such a judgment call, after the fact, as an error requiring review strains credulity, particularly in light of the Veterans' Administration's policy of seeking to provide the best quality care possible to our country's military veterans.

As for delay of treatment and unavailability of Dr. Breda for ED patients, Dr. Breda more than once remained on duty in the ED for two hours, allegation 15, or longer following the agreed end point of his shift, to be certain particular patients were appropriately cared for and received the highest level of treatment. On one such occasion, allegation 13, he remained at the bedside of the patient for more than an hour, assuring that prescribed intravenous medications were flowing properly and were reaching the patient's blood stream.

As acknowledged in the Veterans Health Administration's own handbook, frequently, multiple charges taken together may warrant examination sufficient for an organization to consider an adverse report to the NPDB or a state licensing board. However, as in the present matter where many of the allegations are unsupported by medical evidence or otherwise are so minimal, the remaining allegations cannot support an adverse report. VHA Handbook 1100.18 paragraph 12(b) (The Decision Stage: "Where some, but not all, of the charges are dropped, the remaining charges may or may not be sufficient to warrant reporting.")

VIII.   CONCLUSION

A decision that Dr. Breda resigned to avoid an investigation and proceeding in the present matter with a report to the NPDB is likely to result in having the report ultimately voided after submission to the NPDB, considering 1) the lack of evidence for some of the allegations against Dr. Breda, 2) the lack of severity of others, 3) the lack of formal investigation initiated by any Center board, 4) and the informal nature of the chart review undertaken by Dr. Breda's supervisor. In addition to the unnecessary administrative burden of resolving a false NPDB report, proceeding may expose the Center to liability. In Williams v. University Medical Center of Southern Nevada, et. al defamation claims proceeded against a hospital for its decision to proceed with reporting of multiple incidents to the NPDB after alleged incidents had either been explained by the physician or shown not to have occurred. 688 F. Supp. 2d 1134, 1145 (D. NV 2010). In that case the court found that continued failure by a hospital to provide a physician with details about the alleged incident led to the inference by the court that incidents were unsupportable, that the hospital knew they were unsupportable, and therefore that the report to the NPDB was knowingly false and potentially defamatory. Id. Similarly, in the present matter despite having been provided with no more than a sentence or two about each of the alleged "incidents" and no medical records, Dr. Breda has explained the falsity of many of the "incidents" both orally and in writing. The Center's insistence on continuing to pursue each of the fifteen alleged "incidents," even after many have been demonstrated to be either false, non-events, or good faith judgment calls made based on the best interests of the involved patient both suggests defamatory motive and will provide ample grounds for voiding any report the Center

Hearing Panel on John Breda, M.D.
August 27, 2015  Page 12

submits to the NPDB.

Thank you very much for your attention to and consideration of this matter and Dr. Breda and I look forward to hearing from you.

Sincerely yours,

Paul H. Merry

cc: John Breda, M.D.

*CONFIDENTIAL*

Yahoo Mail - Re: Re: Meeting to Discuss ED issue

## Re: Re: Meeting to Discuss ED issue

From: John Breda (johnabreda@yahoo.com)

To: Justine.Tague@va.gov

Cc: johnabreda@yahoo.com

Date: Thursday, August 7, 2014 at 02:41 PM EDT

On such short notice, I can not be available during the daytime office hours (Mon - Fri) as I do have another position to which I have commitments.

Further, I have asked for documentation which I have not yet received. This is needed for my review before discussions are possible. I have asked for un-redacted copies of all complaints from nursing, information of the administrative meeting held in May (to which I was not invited) including the minutes of the meeting and attendees, the ER records from May 25th (including physicians and nurses scheduled, their hours, numbers of patients seen and by whom and times seen, patient flow data as well as other documentation requests delineated in my prior e-mails. To date, I have received no responses to these requests. There have been allegations made that are contrary to the facts as I personally know them. I must take this matter seriously and I do require this documentation for me to replay appropriately. Further, requests for Alternative Dispute Resolution and a formal EEO complaint have been filed. I have engaged an attorney in this matter and he would need to be involved as well. Please advise when I may receive the information pursuant to my previous requests.

Sincerely,
John Breda

On Thursday, August 7, 2014 1:41 PM, "Tague, Justine" <Justine.Tague@va.gov> wrote:

Hi Dr. Breda,

Are you available on the 25th also?

Justine

**From:** Curioso, Wilfredo
**Sent:** Thursday, August 07, 2014 12:24 PM
**To:** Tague, Justine
**Subject:** RE: Re: Meeting to Discuss ED issue

Yes, I'm available.

**From:** Tague, Justine
**Sent:** Thursday, August 07, 2014 7:24 AM
**To:** 'John Breda'; Holt, Tambra; Curioso, Wilfredo; Rounds MD, Sharon
**Subject:** RE: Re: Meeting to Discuss ED issue

Good Morning,

## Fw: [EXTERNAL] Fw: Meeting

From:   John Breda (johnabreda@yahoo.com)

To:     satish.sharmamd@va.gov; dreynolds@thenewlawcenter.com; johnabreda@yahoo.com

Date:   Wednesday, August 20, 2014 at 07:19 PM EDT

Dr Sharma:

I am forwarding a copy of this e-mail thread since I have not received any of the information and documentation I previously requested. Please advise when I may discuss this further with you.

John Breda

On , John Breda <johnabreda@yahoo.com> wrote:

There have been complaints filed, an administrative meeting held, and decisions made prematurely without my input. Per the VA's own comments such decisions were made without sufficient facts. In order for me to respond appropriately, I need the documentation which I have requested. I have been kept in the dark inappropriately. Please contact my attorney regarding this matter. His contact information is Douglas Reynolds at 617-492-4400.

Sincerely,
John Breda

On Wednesday, August 20, 2014 2:59 PM, "Sartini, Rachel" <Rachel.Sartini@va.gov> wrote:

Good Afternoon Dr. Breda:

As is customary with any fact finding, your presence is requested to discuss some concerns your department has and to solicit your side of the story. There is no action being taken at this time. Therefore, there is no evidence for you to review. The meeting that will be held, based on your availability, will be for you to answer any questions and provide your Service with information to take in consideration before any final decision is made.

Should you choose not to attend, your Service will make a decision based on the information available to them.

Regards,

Rachel Sartini
Assistant Chief, Human Resources
VA Medical Center- Providence
589 Atwells Ave.
Providence, RI 02909

(401) 459-4770, Extension 4711

---

**From:** Holt, Tambra
**Sent:** Wednesday, August 20, 2014 11:01 AM
**To:** Sartini, Rachel
**Subject:** FW: [EXTERNAL] Fw: Meeting

---

**From:** John Breda [mailto:johnabreda@yahoo.com]
**Sent:** Wednesday, August 20, 2014 10:48 AM
**To:** Rounds MD, Sharon; Adams, Kerry; Sharma, Satish (VISN1)
**Cc:** Holt, Tambra; Tague, Justine; Curioso, Wilfredo; wilfcur85@aol.com;
johnabreda@yahoo.con
**Subject:** [EXTERNAL] Fw: Meeting

I have asked for documentation regarding the issues at hand which I still have not received despite the passage of almost three months. I can not meet until I and my attorney have had the opportunity of review the documents previously requested. Please reference my prior e-mails for the specific requests. Please advise as to when I may receive the requested documentation.

John Breda

On Tuesday, August 19, 2014 1:53 PM, "Rounds MD, Sharon" <Sharon.Rounds@va.gov> wrote:

Dr. Breda, in order to provide adequate notice to accommodate your schedule, the following dates and times are available for our meeting:

**Monday** – 9/8 – 10am, 2pm or 3pm
**Wednesday** – 9/10 – 11am
**Thursday** – 9/11 – 9am or 11am
**Friday** – 9/12 – 11am

As previously communicated, a fact finding is being conducted. The purpose of the meeting is to review concerns and provide an opportunity for you to respond to the concerns. Documentation will not be provided prior to this meeting. While there is no entitlement to legal representation, your attorney may accompany you to the meeting. While you may consult with your attorney, you will be responsible for providing responses.

Sharon Rounds, MD

Re: [EXTERNAL] Fw: Meeting

From:  John Breda (johnabreda@yahoo.com)

To:    Rachel.Sartini@va.gov

Cc:    Tammy.Holt@va.gov; Kerry.Adams@va.gov; Satish.SharmaMD@va.gov; Sharon.Rounds@va.gov;
       Wilfredo.Curioso@va.gov; Justine.Tague@va.gov; wilfcur85@aol.com; johnabreda@yahoo.com;
       dreynolds@thenewlawcenter.com

Date:  Thursday, August 21, 2014 at 07:09 AM EDT


The VA apparently is investigating me and the nurses regarding certain complaints filed by
nursing against me.

I have not asked for "evidence" but rather the allegations against me which are the subject of
the VA's fact finding. I need to know the allegation so as to properly respond.

Pursuant to the freedom of information act, I am formally requesting the following documents
and information:
1) all nursing complaints filed against me.
2) the reasons for the current "fact finding" and investigations into my work.
3) documentation showing my work flow/patient care in the ER on May 25, 2014.
4) work flow data showing the timeliness of patient care in the ER on May 25, 2014.
5) any "fact finding" into the appropriateness of the nurses complaints against me.
6) results of previous reviews of my work, including the prior focused review.

Please advise if this request must also be filed with a specific freedom of information office or
officer.

Sincerely,
John Breda


On Wednesday, August 20, 2014 2:59 PM, "Sartini, Rachel" <Rachel.Sartini@va.gov> wrote:


Good Afternoon Dr. Breda:

As is customary with any fact finding, your presence is requested to discuss some concerns your
department has and to solicit your side of the story. There is no action being taken at this time.
Therefore, there is no evidence for you to review. The meeting that will be held, based on your
availability, will be for you to answer any questions and provide your Service with information to take in
consideration before any final decision is made.

Should you choose not to attend, your Service will make a decision based on the information available
to them.

Regards,

Rachel Sartini
Assistant Chief, Human Resources
VA Medical Center- Providence
589 Atwells Ave.
Providence, RI 02909
(401) 459-4770, Extension 4711

**From:** Holt, Tambra
**Sent:** Wednesday, August 20, 2014 11:01 AM
**To:** Sartini, Rachel
**Subject:** FW: [EXTERNAL] Fw: Meeting

**From:** John Breda [mailto:johnabreda@yahoo.com]
**Sent:** Wednesday, August 20, 2014 10:48 AM
**To:** Rounds MD, Sharon; Adams, Kerry; Sharma, Satish (VISN1)
**Cc:** Holt, Tambra; Tague, Justine; Curioso, Wilfredo; wilfcur85@aol.com; johnabreda@yahoo.con
**Subject:** [EXTERNAL] Fw: Meeting

I have asked for documentation regarding the issues at hand which I still have not received despite the passage of almost three months.  I can not meet until I and my attorney have had the opportunity of review the documents previously requested.  Please reference my prior e-mails for the specific requests.  Please advise as to when I may receive the requested documentation.

John Breda

On Tuesday, August 19, 2014 1:53 PM, "Rounds MD, Sharon" <Sharon.Rounds@va.gov> wrote:


Dr. Breda, in order to provide adequate notice to accommodate your schedule, the following dates and times are available for our meeting:

**Monday** – 9/8 – 10am, 2pm or 3pm
**Wednesday** – 9/10 – 11am
**Thursday** – 9/11 – 9am or 11am
**Friday** – 9/12 – 11am

As previously communicated,  a fact finding is being conducted.  The purpose of the meeting is to review concerns and provide an opportunity for you to respond to the concerns.  Documentation will not be provided prior to this meeting.  While there is no entitlement to legal representation, your attorney may accompany you to the meeting.   While you may consult with your attorney, you will be responsible for providing responses.

Sharon Rounds, MD

## Employee Benefits-At-A-Glance

The information below summarizes many of the benefits that are available to VA employees and eligible family members. Please contact your local Human Resources office with any questions you may have regarding the various employee benefit programs listed below.

➢ **Child Care Centers** - VA supports the national commitment to provide quality child care as an essential component of a quality work environment. VA has a number of Child Care Centers operating in 22 states and the District of Columbia. The child care program ensures that working families using child care in centers located in VA managed space receive quality care for their children. For more information go to: **http://vaww.va.gov/vachildcare/Centers.htm**

➢ **Child Care Subsidy Program** - Applies to employees whose children are under the age of 13, or disabled and under the age of 18, and are enrolled, or will be enrolled, in licensed family child care homes or center-based child care. The child care provider must be licensed and/or regulated by State and/or local authorities. For more information go to: **http://vaww.va.gov/vachildcare/index.htm**

➢ **Federal Employees Dental and Vision Insurance Program (FEDVIP)** - FEDVIP is a voluntary benefits program that provides supplemental dental and vision insurance coverage. You may enroll in dental insurance only, vision insurance only, neither, or both. For more information on the program go to: https://www.benefeds.com/Portal/jsp/LoginPage.jsp

➢ **Federal Employees Health Benefits (FEHB)** - FEHB is a voluntary health insurance program offered to permanent Federal employees and employees with appointments for more than one year. The program offers coverage under fee-for-service and health maintenance organizations (HMO) plans. For more information on the program go to: **http://www.opm.gov/insure/health/index.asp**

➢ **Federal Employees' Group Life Insurance (FEGLI)** - FEGLI is a voluntary term life insurance program offered to permanent Federal employees and employees with appointments for more than one year. The program offers Basic Life, Standard, Additional, and Family Option coverage. For more information on the program go to: **http://www.opm.gov/insure/life/index.asp**

➢ **Federal Long Term Care Insurance Program (FLTCIP)** - Provides services including home care, adult day care, and facility care. If you are newly employed in a position that conveys eligibility for FEHB coverage, you can apply for long term care insurance, even if you don't enroll in the FEHB Program. For more information on the program go to: **http://www.ltcfeds.com/**

➢ **Federal Retirement Systems** - The Federal Government has <u>two</u> different retirement systems: the Federal Employees Retirement System (FERS) and the Civil Service Retirement System (CSRS).  Your government retirement system is automatic and generally requires no elections from you.  For more information on the programs go to: **http://www.opm.gov/retire/index.asp**

➢ **Flexible Spending Accounts (FSA)** - Allows you to pay for certain health and dependent care expenses with pre-tax dollars.  For more information on the program go to: http://www.opm.gov/insure/flexible/index.asp

➢ **Professional Liability Insurance (PLI)** - Reimburses law enforcement officers, supervisors, and managers for up to one-half of the cost of professional liability insurance, protecting them from potential liability and attorney's fees for actions arising out of the conduct of official duties.  For more information on the program go to: **http://vaww1.va.gov/ohrm/Benefits/pli.htm**

➢ **Student Loan Repayment Program** - Under the VA Student Loan Repayment Program, you may be eligible for up to $10,000 per year, with a lifetime maximum of $60,000 to be used to repay student loans.  For more information on the program go to: **http://www.opm.gov/oca/pay/StudentLoan/**

➢ **Telework** - Telework is a work arrangement in which some or all of the work is performed at an off-site location, such as the home or in office space near home.  For more information on Telework go to: **http://vaww1.va.gov/ohrm/Telework/Telework.htm**

➢ **Thrift Savings Plan (TSP)** - TSP is a tax-deferred retirement savings account.  You can voluntarily contribute to TSP and may qualify for automatic and matching agency contributions.  For more information on the program go to: **www.tsp.gov**

➢ **Transit Subsidy** - If you regularly commute to and from work using mass transit, you may be eligible for a Transit Subsidy.  The amount of subsidy authorized is based on your monthly public transit commuting costs.  For more information about Transit Subsidy go to: http://vaww.va.gov/employee/employee-resources.html

➢ **Veterans Information** - Veterans who wish to contact the VA or need information about benefits or VA services can get help by going to: http://www.va.gov/ or by calling **1-800-827-1000**.

➢ **WorkLife4You** - Worklife4You is an employer paid benefit for employees of some VA organizations. This program is designed to assist employees and their family members in managing life events and daily responsibilities.  To find out if your organization participates in the WorkLife4You program please visit the WorkLife4you Web site at: **http://vaww1.va.gov/ohrm/WorkLife/Worklife4you.htm**

**Worklife and Benefits Service (058)**

# United States Senate

WASHINGTON, DC 20510

December 11, 2018

Ryan Lilly
Director, Veterans Integrated Service Network (VISN) 1
VA New England Healthcare System
Network Office, Building 61
200 Springs Road
Bedford, MA 01730

Dear Director Lilly,

We write to direct your attention to a matter involving Dr. John Breda, a constituent and a former clinician at the Providence VA Medical Center (VAMC).

Dr. Breda alleges that the Providence VAMC reported him to the National Practitioner Data Bank (NPDB) for resigning during an investigation, which has prevented him from obtaining another clinical position. Dr. Breda asserts that this NPDB report was inappropriate because the supervisor review conducted does not meet the criteria of an investigation which must occur before such a report is sent forward.

Our offices have previously referred Dr. Breda's allegations to the VA Office of the Inspector General (OIG), the VA Office of Accountability and Whistleblower Protection (OAWP), and the Office of Special Counsel (OSC). It is our understanding that none of these entities have found cause to investigate Dr. Breda's allegations.

As a general matter, we believe in the importance of NPDB referrals as a method for reporting appropriately conducted professional review actions against physicians and other practitioners who are credibly found to have committed malpractice. We do not take a position on the merit of Dr. Breda's allegations. However, in the interests of fairness and due process, we request that you determine whether it was appropriate for the Providence VAMC to report Dr. Breda to the National Practitioner Data Bank on the basis of the review conducted. In your response, we request that you include a brief, general explanation of when NPDB referrals are appropriate and how they serve the best interest of patients.

We request a written response by January 11, 2018. Thank you for your attention to this matter.

Sincerely,

Elizabeth Warren
United States Senator

Edward J. Markey
United States Senator

Department of
Veterans Affairs

# Memorandum

Date: DEC 1 5 2010

From: Deputy Under Secretary for Health for Operations and Management (10N)

Subj: Resignation or Retirement While Under Investigation

To: Medical Center Directors (00)
VISN Directors (10N1-23)

1. The purpose of this memorandum is to provide direction to all Veterans Health Administration (VHA) organizational entities for immediate implementation when the clinical competency of a privileged physician or dentist is under <u>investigation</u>. The process begins with the notification to the provider, and is not considered complete until the due process and appeal process have been exhausted. Over the past several years, VHA in partnership with the Office of General Counsel and the Office of Human Resources, Employee Relations and Performance Management Service disseminated tools to medical facilities' staff, providing consultation and training related to summary suspension of clinical privileges, opportunity for improvement, and when necessary, reduction and revocation of clinical privileges with or without separation and other human resource actions. The tools to guide you through the process of taking adverse actions on employees with privileges may be found on the <u>OHRM Intranet site</u>.

2. The attention to questions and concerns related to provider practice, competency, and conduct by VA leadership, is excellent and indicative of our efforts to assure only quality care is delivered to our Nation's Veterans. VA has broad authority to report to National Practitioner Data Bank (NPDB) and State Licensing Boards (SLB) those practitioners whose behavior or clinical practice meet the reporting requirements defined in VHA Handbook 1100.17, *National Practitioner Data Bank (NPDB) Reports* and VHA Handbook 1100.18, *Reporting and Responding to State Licensing Boards.*

3. In accordance with VHA Handbook 1100.17, VA is required to report the following actions to the NPDB:

   a. A final action by a Director that, for a period longer than 30 days, adversely affects (by reducing, restricting, suspending, revoking, or failing to renew) the clinical privileges of a physician or dentist relating to possible incompetence or improper professional conduct;

   b. Acceptance of the surrender of clinical privileges, including the surrender of clinical privileges inherent in resignation or retirement, or any restriction of such privileges by a physician or dentist either while under investigation by

VA FORM
MAR 1989   2105

Page 2

Subj:  Retirement or Resignation While Under Investigation

the health care entity relating to possible incompetence or improper professional conduct, or in return for not conducting such an investigation or proceeding whether or not the individual remains in VA service; and

c.  Any payment for the benefit of a physician, dentist, or other licensed health care practitioner, which was made as the result of a settlement or judgment of a claim of medical malpractice, in accordance with the procedure outlined in 38 CFR Part 46.3.  It is important to note that malpractice payment reporting applies to all licensed health care professionals.  Adverse action reporting applies only to physicians and dentists.

4.  In accordance with VHA Handbook 1100.18, VA also is required to report to SLBs a licensed practitioner whose clinical practice during VA employment so significantly failed to meet generally accepted standards of clinical practice, as to raise reasonable concern for the safety of patients.

5.  VHA Handbook 1100.17 states that "At the time a physician or dentist surrenders, or voluntarily accepts restriction of clinical privileges, resigns, or retires from the medical position in VA while under investigation for possible professional incompetence or improper professional conduct, the physician or dentist must be formally notified that reporting to the NPDB is required."  This is a critical factor that must be met if VA is to meet its reporting obligation.  Therefore, all notification letters to a physician or dentist must contain language indicating the potential for reporting of both types of adverse privileging actions to the NPDB.  In addition, all notification letters for any licensed practitioner with privileges must advise of the potential for reporting to the SLBs.  Some general considerations for the development of notification letters are as follows:

a.  If there is sufficient concern to take a privileged provider out of clinical care, a summary suspension of clinical privileges should be imposed.  This allows the leadership at the facility to investigate any clinical care concerns that may exist.  If the privileged provider is a physician or dentist, the notice of the summary suspension should include the language advising of the potential for reporting to the NPDB and SLB.  If an adverse privileging action is taken, the practitioner will be provided with the appropriate fair hearing and appeal rights.  Remember, VA does not report a summary suspension of clinical privileges to the NPDB until such time as there is a definitive, final action.

VA FORM
MAR 1989

Page 3

Subj: Retirement or Resignation While Under Investigation

b. If the privileged provider is not a physician or dentist, the notice of the summary suspension should advise that if an adverse privileging action is taken, the practitioner will be provided with appropriate fair hearing and appeal rights. The notice letter also should advise of the potential for reporting to SLBs.

c. At the time a physician or dentist surrenders or voluntarily accepts restriction of clinical privileges, resigns, or retires while under investigation, or in return for not conducting an investigation, for possible professional incompetence or improper professional conduct, the physician or dentist must be provided formal notice that reporting to the NPDB is required.

d. These notification requirements apply regardless of the appointment or contracting authority under which the privileged clinician is practicing. Sample advisement letters are available in VHA Handbook 1100.19 to use as a template.

6. These activities and actions occur infrequently and as such it is strongly recommended that consultation concerning provider notification and appropriate process be sought with Kathryn Enchelmayer at (919) 474-3905, Marianne Chick at (919) 474-3937, or Dr. William Duncan at (202) 443-5353, Office of Quality and Safety as well as consultation with staff in the Office of Human Resources, Employee Relations and Regional Counsel or General Counsel. Questions concerning provider notification should be directed to local Employee Relations staff and Regional Counsel.

William Schoenhard, FACHE

LAW OFFICES OF PAUL H. MERRY, ESQ.
50 CONGRESS STREET - 10TH FLOOR
BOSTON, MASSACHUSETTS 02109
(617)-720-2400
FACSIMILE (617)-742-1887

PAUL H. MERRY, ESQ.                                    PAUL.MERRY@FAIRWORKPLACE.NET

ANDREA L. HAAS, ESQ.                                  ANDREA.HAAS@FAIRWORKPLACE.NET


December 18, 2015


BY CERTIFIED MAIL RETURN RECEIPT REQUESTED NO.


Susan A. MacKenzie, Ph.D.
Medical Center Director
Department of Veterans Affairs
Medical Center Providence
830 Chalkstone Avenue
Providence, RI 02908-4799


RE: JOHN BREDA, M.D.

Dear Dr. MacKenzie:

     As you may recall, this office represents John Breda, M.D.,
a physician formerly employed part-time at the Veterans
Administration Medical Center Providence Emergency Department.

     You may also recall that your institution filed a report
with the National Practitioner Data Bank ("N.P.D.B.")following a
review by a single staff member of a number of Dr. Breda's cases
which produced no indication of significant medical errors or
harm to any patient.  As we have written in the past, Dr. Breda
contests the accuracy of this report; and contends that, because
the review of his cases failed to satisfy the N.P.D.B. definition
of an investigation requiring such a report, the report was filed
in error and must be voided and withdrawn.

     This letter[1] represents the invitation to a discussion
between your institution and Dr. Breda with the objective of
resolving the disagreement over this report, as contemplated by
45 C.F.R. §60.21(b)(3).  While we continue to believe this report

_____

     [1] I write based on authorization from V.A. counsel by
electronic mail November 23, 2015.

Susan A. MacKenzie, Ph.D., Medical Center Director
December 18, 2015    Page 2

was filed in error, and stand ready at your convenience to
discuss the matter, we also recognize that, given the history of
this matter, your institution may not be prepared to join us for
this purpose.  Should the latter be your decision, kindly notify
us promptly so we may proceed with our appeal of the report as
further provided under the regulation.  Thank you in advance for
your anticipated cooperation.

    Please also be advised that Dr. Breda reports he has
encountered significant impediments to re-employment on account
of the noted actions by the V.A. Medical Center Providence.  Most
recently, his disclosure of the N.P.D.B. report to a new employer
in another state is leading to a (predicted) months-long delay in
credentialing, which will cost many thousands of dollars in
anticipated income.  This delay, in turn, has constrained him to
accept employment elsewhere at a significantly lower rate of
compensation, at an estimated loss of some forty thousand
($40,000) dollars on an annualized basis.  And this alternative
employment has, in turn, meant that a second position he has
occupied (part-time) for many years will be untenable in the near
future, leading to the loss of approximately seventy-thousand
($70,000) dollars in annualized income.  This last position was
known to the officers of the V.A. Medical Center Providence at
the time they initiated his termination from his position with
you and the subsequent report to the N.P.D.B.  At least one
comment by a supervising physician also made plain her awareness
of the devastation the (erroneous) N.P.D.B. report would likely
wreak on Dr. Breda's medical career.  Dr. Breda is anticipating
that, should his conviction concerning the filing of that report
be vindicated, he will recoup many of these losses, along with
expenses and costs.

    Our awareness of the position of the V.A. Medical Center
Providence respecting Dr. Breda notwithstanding, we will hope to
hear back from you promptly that we may move ahead with efforts
to resolve whatever issues underlie the N.P.D.B. report; and
expeditiously take necessary steps towards its withdrawal or
whatever alternative measures we are able mutually to agree on.

Susan A. MacKenzie, Ph.D., Medical Center Director
December 18, 2015    Page 3


                        Sincerely yours,


                        Paul H. Merry


cc: John Breda, M.D.
    Christine Wichers, Esq.

 Gmail

John Breda <john.breda@gmail.com>

---

## RE: [EXTERNAL] Documents associated with VA matter
1 message

---

**Cox, Gerard R. VHACO** <Gerard.Cox@va.gov>                                    Fri, Dec 23, 2016 at 5:05 PM
To: John Breda <john.breda@gmail.com>

Dear Dr. Breda,

I have reviewed all the documents you sent via email and fax, as well as related documents that I obtained from the Providence VA Medical Center. I'd like to reiterate that I neither have the authority to review personnel decisions nor responsibility for medical staff affairs. With that said, I have gathered this information and held these discussions in an attempt to address your concerns about fairness and due process.

It appears that your main objective is to have the report to the National Practitioner Data Bank (NPDB) rescinded or removed. Although you indicate in several of the documents you sent (e.g., your letter to the Rhode Island Board of Medical Licensure and Discipline) that VA submitted the NPDB report based on conclusions it made about your professional competence or conduct, the report merely indicates that you resigned from the medical staff while under investigation. The agreement between the VA and NPDB requires reports in such circumstances.

You have also indicated that you did not resign because you were being investigated, and that you do not believe that a bona fide investigation was ongoing at that time. As you know, however, the Medical Center Director convened a separate inquiry to address that specific, narrow question. The result of that inquiry confirmed that you had been informed by letter in June 2014 that your clinical practice was being reviewed; that there was an ongoing review of your clinical practice at the time you submitted your resignation; and that you were later informed in another letter dated February 3, 2015 that resigning from the medical staff under those circumstances would limit your fair hearing and appeal rights.

You asked me whether there is an official here at the Veterans Health Administration Central Office who has the authority to overrule the Providence VA Medical Center Director's decision to submit that report, which was subsequently upheld by the VISN 1 Director. In light of the Memorandum of Understanding between VA and the NPDB, there is no process in place for doing that as far as I can determine. The authority to review disputed Data Bank reports resides solely with the Secretary of Health and Human Services (HHS), to whom you have already appealed. As HHS indicated in its March 24, 2016 response to your appeal, even the Secretary cannot overturn the Providence VA's decision in this matter. I understand that you have already explored several other avenues, including an appeal to the Merit Systems Protection Board and an equal employment opportunity complaint that resulted in your filing a claim against the Department of Veterans Affairs, although you recently directed your attorney to withdraw that claim.

Thus all I can advise you at this juncture is that you may contact the Secretary of Veterans Affairs or the Under Secretary for Health to request another review of your case. Should you decide to do so, I will retain copies of all the documents related to your situation so you won't have to send them again.

While I know this isn't what you were hoping to hear, I hope this information is helpful.

Best regards,

Gerard R. Cox, MD, MHA

Assistant Deputy Under Secretary for Health for Integrity (10E1)

Veterans Health Administration

810 Vermont Avenue, NW

Room 638

Washington, DC 20420

(202) 461-7571

Gerard.cox@va.gov

Executive Assistant: Ms. Sharice Smith-Lewis (sharice.smith-lewis@va.gov or (202) 461-1758)

**The Office of Integrity's mission is to strengthen trust and confidence in Veterans health care by fostering an ethical and just culture and by integrating information from oversight activities.**

**From:** John Breda [mailto:john.breda@gmail.com]
**Sent:** Monday, December 19, 2016 9:49 AM
**To:** Cox, Gerard R. VHACO; John Breda
**Subject:** Re: [EXTERNAL] Documents associated with VA matter

Dr. Cox:

Thank you for your reply. I will try to fax some documents, however for others it may be more practical to put the electronic files on CD and mail them.

I will try to get the mailing out to you in the next few days as I am working 13 hour shifts daily this week and next.

Thanks,

John Breda

On Mon, Dec 19, 2016 at 7:48 AM, Cox, Gerard R. VHACO <Gerard.Cox@va.gov> wrote:

Good morning Dr. Breda,

Thank you. I will review these documents and get back to you later this week.

The fax number here is (202) 495-5167.

Kind regards,

Gerard R. Cox, MD, MHA

Assistant Deputy Under Secretary for Health for Integrity (10E1)

Veterans Health Administration

810 Vermont Avenue, NW

Room 638

Washington, DC 20420

(202) 461-7571

Gerard.cox@va.gov

Executive Assistant: Ms. Sharice Smith-Lewis (sharice.smith-lewis@va.gov or (202) 461-1758)

**The Office of Integrity's mission is to strengthen trust and confidence in Veterans health care by fostering an ethical and just culture and by integrating information from oversight activities.**

**From:** John Breda [mailto:john.breda@gmail.com]
**Sent:** Monday, December 19, 2016 6:08 AM
**To:** Cox, Gerard R. VHACO; John Breda
**Subject:** [EXTERNAL] Documents associated with VA matter

Dr. Cox:

Thank you for your attention to this matter.  I am sending some documents as I initially stated I would however I will send them in several e-mails as you e-mail does not accept larger size files.

1) Letters from the RI Board of Medical Licensure and Discipline who asked me to explain my care of each patient involved.  They responded after 9 months of investigation of me and found no un-professional conduct.

2) Letter from Dr. Gregory Gillette, retired formed Chief of Staff at the Providence VA.  He reviewed the allegations made by the VA and believed the VA to be looking for fault with me without justification.

3) Affidavit from Francis Sullivan who made similar comments.

I have other documents which will help establish facts and my position in this matter.  Some of them are:

1) My explanation to the RI Board of Medicine regarding my care of patients in each of the 15 allegations.

2) My complaint to the RI Board of Medicine regarding the VA physicians involved.

3) My filing with the MSPB.

I have many documents showing that the VA's position has been without merit.  I am happy to share what I have with you.   I am willing to be as transparent as I need to be as I have done nothing wrong and have been falsely accused without due process. This sort of behavior should not be tolerated in medicine and I do hope that you can assist in bringing this matter to a reasonable conclusion.

There are other problems that need to be address which Providence will not correct:

1) I was terminated 1 day before my deferred pension was to take effect.  This was not a coincidence and needs to be corrected so that I receive my pension (This was not a voluntary resignation).

2) The VA has attached $688.63 from my 2015 Federal tax refund claiming money is owed to them.  Their claim is for a n employee health insurance policy which I no benefit from due to the actions taken by the VA.  This policy was only taken out at the recommendation of the retirement benefits office to start the clock towards my retirement health care benefit. I was initially given incorrect information in writing when hired regarding this retirement benefit.

3) Problems with my retirement health benefit.

I will try to attach documents to separate e-mails.  Perhaps you could also send me your mailing address so other documents could be sent by mail.

Thanks,

John Breda

Sincerely,

John Breda



**US DEPARTMENT OF VETERANS AFFAIRS**
**Office of Resolution Management, Diversity & Inclusion**
**William S. Moorhead Federal Building**
**1000 Liberty Avenue, Suite 1801**
**Pittsburgh, PA 15222**

**Investigative Report**
**In the Matter of the EEO Complaint of Discrimination of:**

John Breda                                    )
                                              )
        v.                                    )        ORM No. 200H-0650-2020102929
                                              )
Secretary                                     )
Department of Veterans Affairs                )
810 Vermont Avenue NW                         )
Washington, DC 20420                          )
Respondent                                    )

Facility:        VA Medical Center
                 830 Chalkston Avenue
                 Providence, RI 02908

Allen Miller
EEO Investigator
Office of Resolution Management
1000 Liberty Avenue, Suite 1801
Pittsburgh, PA 15222

16. After my termination, the VA attached my IRS tax refund claiming that I owed about $680.00 for medical insurance payments. I enrolled in VA health insurance only to correct for the false information given to me at orientation. The VA negated any benefit of carrying VA medical insurance by failing to credit me for my years of service, terminating me one day before the 5-year vesting period ended and attached money which was not owed. The matter has never been resolved.

17. In early 2020, I accepted an offer of employment as a physician at the Veterans Administration in Fargo, ND (the "Fargo VA"). Within hours of contacting the Providence VA, the Fargo VA rescinded its offer, citing a conversation with the Providence VA's human resources department but declining to provide me with more detail. I believe that the Providence VA made false statements about me, interfering with the job offer with the Fargo VA that caused the latter to rescind its offer of employment. The Providence VA set out to retaliate against me and see that I never worked for any VA facility again. Six years later, the Providence VA has persisted in its retaliation.

### Harassment and Hostile Work Environment

1. The Providence VA and VISN-I have shown a persistent, pervasive and severe pattern of retaliation, denial of due process, and hostility, making it impossible for me to continue in my job at the Providence VA. The retaliation and hostility was clear when Dr. Rounds stated to me "You have no idea what I can do to you," terminated my employment during the pendency of an EEO mediation thus derailing the EEO process, terminating my employment one day before my five year pension was to vest to ensure that I was not paid the pension I had earned, and conducting a sham peer review process during which none of the related VA policies and procedures were followed. There were willful misrepresentations made, policies fraudulently misstated, attempted cover-ups, and an outright refusal to follow federal law. Dr. Rounds fully intended to improperly report me to the National Practitioner Data Bank as her desire was to see that my professional reputation and career within the VA and private sectors were destroyed. Her retaliation for filing a prior EEO complaint and abuse of power are unmistakable. Six years later, the Providence VA continued its retaliation and desire to see that I am never hired within the VA system when it, without cause or legitimate reason, interfered significantly with a job offer at the Fargo VA to ensure that I was not hired. The Providence VA has stolen the value of my medical education and over 20-years of successful and productive work experience as a physician. The false and illegal NPDB report has caused me to be unemployable.

2. The harassment and hostility I have endured as outlined above were sufficiently onerous, damaging and unnecessary that a reasonable person would consider them to be threatening, retaliatory and purposefully planned to be maximally destructive.

3. Dr. Rounds' termination of my employment and commencement of the above outlined sham processes during the pendency of an EEO mediation was deliberately intended to derail the EEO process and deter me from continuing my search for resolution of the matters at hand.

4. By it misrepresentations, cover-ups, failures to follow policies, procedures, regulations, and law, the VA has tried to ensure that I am never again hired by a VA facility where I may tell my story and/or be allowed to regain my reputation as a productive competent physician. By filing the

**O'Neal, Ida L. (ORMDI)**

| | |
|---|---|
| **From:** | O'Neal, Ida L. (ORMDI) |
| **Sent:** | Sunday, November 29, 2020 11:22 AM |
| **To:** | O'Neal, Ida L. (ORMDI) |
| **Subject:** | FW: EEO Investigation |
| **Attachments:** | Breda EEO signed questions.pdf |

**From:** Burns, Joseph T. <Joseph.Burns3@va.gov>
**Sent:** Wednesday, November 25, 2020 1:55 PM
**To:** O'Neal, Ida L. (ORMDI) <Ida.ONeal@va.gov>
**Subject:** RE: EEO Investigation

Ms. O'Neal:

Please see attached document. Contact me with any questions.

JTB

Joseph T. Burns, M.D.
Chief, Emergency Department
Fargo VA Health Care System
2101 Elm Street North
Fargo, ND 58102
7012393700, ext. 2882 or 3136

**From:** O'Neal, Ida L. (ORMDI) <Ida.ONeal@va.gov>
**Sent:** Friday, November 13, 2020 11:28 AM
**To:** Burns, Joseph T. <Joseph.Burns3@va.gov>
**Subject:** EEO Investigation

Dr. Burns, I have attached questions for you to respond to regarding he complaint of Dr. Breda......please respond within 5 days of receipt......if you have questions or concerns, please call me at 708.334.5560....thank you

Ida O'Neal
Assistant District Manager (Investigations)
Office of Resolution Management, Diversity & Inclusion (ORMDI) – Midwest District
2255 Enterprise Drive, Suite 5506
Westchester, IL 60154
Email:  Ida.oneal@va.gov
Phone:  708.236.2808
Fax:       708.236.2898

## O'Neal, Ida L. (ORMDI)

| | |
|---|---|
| **From:** | Burns, Joseph T. |
| **Sent:** | Wednesday, January 13, 2021 7:55 AM |
| **To:** | O'Neal, Ida L. (ORMDI) |
| **Subject:** | RE: EEO Investigation |

This conversation occurred while driving in February of last year. I did not take any notes while driving. I initially contacted the E.D. Chief at Rhode Island who referred me to the HR Director who I believe was Mr. McLeod. He (McLeod) stated that he had recently assumed the position of HR Director and was looking at notes in his file (apparently.) I believe he said that there were notes referring to intimidating behavior by Dr. Breda and that he was terminated from the facility. He stated to me that litigation by Dr. Breda against Provincetown was still ongoing. It was a brief conversation.

Joseph T. Burns, M.D.
Chief, Emergency Department
Fargo VA Health Care System
2101 Elm Street North
Fargo, ND 58102
7012393700, ext. 2882 or 3136

**From:** O'Neal, Ida L. (ORMDI) <Ida.ONeal@va.gov>
**Sent:** Wednesday, January 13, 2021 7:27 AM
**To:** Burns, Joseph T. <Joseph.Burns3@va.gov>
**Subject:** RE: EEO Investigation

Dr. Burns,

Just for clarification, what were the comments in your own words that McLeod shared with you?

As McLeod, stated he told you that he could not and did not provide a reference check on Dr. Breda and was firm in stating that...he stated he did not say what you indicated..... he said that he said nothing..... is this correct?

Also was McLeod the only person you contacted for a reference check, if not, names of others you called for a reference check and what they said?

Thank you in advance for your cooperation......

**From:** Burns, Joseph T. <Joseph.Burns3@va.gov>
**Sent:** Tuesday, January 12, 2021 10:34 PM
**To:** O'Neal, Ida L. (ORMDI) <Ida.ONeal@va.gov>
**Subject:** RE: EEO Investigation

It was Doug McLeod who I talked with and got the comments. That is correct.

JTB

Joseph T. Burns, M.D.
Chief, Emergency Department
Fargo VA Health Care System

2101 Elm Street North
Fargo, ND 58102
7012393700, ext. 2882 or 3136

From: O'Neal, Ida L. (ORMDI) <Ida.ONeal@va.gov>
Sent: Tuesday, January 12, 2021 12:13 PM
To: Burns, Joseph T. <Joseph.Burns3@va.gov>
Subject: EEO Investigation

Dr. Burns, in communication with Dr. Rondeau, he indicated that information regarding Dr. Breda ( Dr. Breda's instances of belittling and intimidation of staff with subsequent termination) was shared with you by Providence HR Director, Doug McLeod.....is this correct?
If not, who shared this information with you about Dr. Breda and when?
Was it during a reference check after the offer of the position?  Explain?

Please note, you are still under Oath.....

Thank you in advance for your response...

Ida O'Neal
**Assistant District Manager (Investigations)**
**Office of Resolution Management, Diversity & Inclusion (ORMDI) – Midwest District**
**2255 Enterprise Drive, Suite 5506**
**Westchester, IL 60154**
Email:  Ida.oneal@va.gov
Phone:  708.236.2808
Fax:      708.236.2898



*NOTICE: ORM-DI is operating in a 100% telework environment. ORM-DI does not have the capability to send and/or receive hardcopy documents at this time.  In order to be more responsive, we ask that if you have previously sent documents to us via U.S. Mail or other delivery services, please resend those documents to us electronically.  All meetings, interviews, and mediation sessions will be conducted in a virtual capacity (i.e. telephonic, skype, video conference etc.). Your patience is appreciated during the COVID-19 Pandemic.*

*VA Core Values:* Integrity Commitment Advocacy Respect Excellence
*VA Core Characteristics:* Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*NOTE:  If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law.  If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*

*Please take a moment to* complete a very brief survey *to let us know how my service was today.*

Claim:

**Whether complainant was subjected to discrimination based on Age, Disability, and Reprisal, when on February 25, 2020, his offer for the position of Emergency Medicine Physician (EMP) was rescinded.**

Dr. Burns, Responding Management Official (RMO) questions

Do you solemnly swear or affirm that your responses to the questions are true and complete to the best of your knowledge and belief?

**I do.**

Write your legal name for the record?

**Joseph T. Burns**

What is your current position?

**Chief, Emergency Department, Fargo VA Health Care System.**

What was your position in February 2020?

**Chief, Emergency Department, Fargo VA Health Care System.**

What is your age, month and year only?

**December 1955.**

Have you been involved in prior EEO activity? If so, did it involve the complainant and how were you involved?

**In 2019, an EEO complaint was filed by another prospective applicant but it was not Dr. Breda. I was (and am now) the department chief at that time and responded to the complaint. No further action occurred as a result of that complaint.**

If not, were you aware of the complainant's prior EEO/protected activity, if so, how and when did you become aware?

**I was not aware of any prior EEO/protected activity history at the time of our interviews. Sometime after the rescission of his offer, I was informed that he was going to file an EEO complaint by our Human Resource department.**

How did you treat the complainant prior to his involvement in EEO/protected activity as opposed to after?

The initial phone interviews were cordial and informative and were conducted in the same manner that I would with any prospective applicant. After he was notified of the job offer rescission, he called me on my cell phone in February 2020 and was extremely angry. He told me angrily that "This would not be the end of this!" My wife was present when that phone call came in.

Were you aware of the complainant's age, if so, how and when did you become aware?

I was not aware of his age however by looking at an applicant's employment history, one can get a rough idea of an applicant's age. He was never asked his age during our interviews.

Were you aware the complainant had a disability, if so, how and when did you become aware?

I was not aware of any disability.

What are you aware of his disability to be?

I was not aware of any disability.

Was the complainant offered the position of EMP?

I assume that the term EMP refers to Emergency Medicine Physician. He was sent a tentative offer to be hired as an Emergency Medicine Physician.

Who made the offer to the complainant and why?

The offer would have come from our Human Resource department.

Was he told the offer was tentative pending a reference, background, etc. check, if so, who told him and when?

All prospective physician employees are told that the offer is tentative pending other investigations. I don't know precisely who contacted him with the tentative offer. Human Resources would have that information.

When and who informed complainant the position was rescinded?

Human Resources would have that exact information but it was in February of 2020.

Did complainant inquire as to why the position was rescinded?

As noted above, he contacted me after notification of rescission. I directed him to Human Resources with any additional questions. I did not discuss any specific reasons for the decision in that call.

What was he told as to why the position was rescinded, and who provided him that information?

**Human Resources would have the specifics of that notification.**

Who decided to rescind the position and why? Explain?

**I discussed his additional background information with our Chief of Staff. Human Resource Director at the Rhode Island VA told me Dr. Breda had been terminated from his position at their facility. When I informed our Chief of Staff of that information, he was not willing to proceed further with his employment.**

Was it a collaborative decision or just yours?

**As noted previously.**

If collaborative, who were the other parties involved in the decision to rescind?

**Facility Chief of Staff, Dr. Jeffrey Rondeau.**

Did you call for a reference check on the complainant for the position in question, if so, who did you contact for the reference check(s) and when did you make the contact?

**I do not have my reference interview sheets in his file but he provided me with 3 individuals to contact. They were contacted in the month of February, 2020. I don't recall any significant negative comments and that was part of the basis for his tentative offer.**

Did you discriminate against the complainant based on his age, disability and involvement in EEO/Protected activity when the position was rescinded?

**The complainant was not discriminated against based on age, disability or EEO activity. The average age of physicians in this department when he applied was 63 years old. The individual hired later in the year for the position was 66 years old.**

Did anyone make any comments about the complainant age, disability or EEO activity regarding the position being rescinded? If so, what was said and by whom?

**No one that I am aware of made comments about age, disability or EEO activity.**

Was the complainant's age, disability or involvement in EEO/protected activity a factor in the position being rescinded? Explain?

**Age, disability, EEO/protected activity was not a factor in the rescission decision.**

Is there anything else you want to add that is relevant to the claim that was accepted for investigation, if so, do so here: **I have nothing to add.**

_25 NOV 2020_

**Joseph T. Burns, RMO**

## O'Neal, Ida L. (ORMDI)

| | |
|---|---|
| **From:** | Mcleod, Douglas |
| **Sent:** | Tuesday, January 12, 2021 12:14 PM |
| **To:** | O'Neal, Ida L. (ORMDI) |
| **Subject:** | RE: EEO Investigation |
| **Attachments:** | Breda_ Provider complaint.pdf |

Ida

I have provided my responses in blue. I have attached emails associated with this request. I swear that my answers are true and complete

Doug

Douglas McLeod
Sr HR Strategic Business Partner
Providence VA Healthcare System

**From:** O'Neal, Ida L. (ORMDI) <Ida.ONeal@va.gov>
**Sent:** Tuesday, January 12, 2021 12:55 PM
**To:** Mcleod, Douglas <Douglas.Mcleod2@va.gov>
**Subject:** EEO Investigation

Mr. Mcleod, as you know I am investigating the Dr. Breda case regarding the rescinding of the position with Fargo VA…..you were identified as someone who may have knowledge of the matter regarding the reference check….please respond to the following questions:

1. Do you solemnly swear that your responses to the questions are true and complete to the best of your knowledge and belief?
I do.

2. Write your name for the record?
Douglas McLeod

3. What is your position and work site?
Senior HR Strategic Business Partner at Station 650 Providence

4. What is your age, month and year only?
July 1956

5. Have you been involved in prior EEO activity, specifically EEO activity of Dr. Breda?
Yes, See attached

6. If not, were you aware of Dr. Breda's prior EEO activity? If so, how and when did you become aware?
I was notified by our VISN that we had an EEO inquiry regarding Dr Breda

7. How did you treat Dr. Breda prior to his EEO involvement as opposed to after?
I had no knowledge of Dr Breda or any EEO activity associated with Dr Breda until contacted by VISN 1 HRO Rachel Sartini

8. Are you aware of anyone providing a job reference on Dr. Breda for the position he was offered at Fargo VA?
I am not aware of anyone providing a job reference for Dr Breda

9. If so, who was contacted at your VA and provided a reference check for Dr. Breda to your knowledge? Explain?
No one in Providence provided a reference to or for Dr Breda to my knowledge

10. Specifically, did you or anyone talk to Dr. Joseph Burns regarding a reference check on Dr. Breda for the position offered at Fargo VA? If so, what was said?

See attached, Dr Burns was told by me that we could not provide a reference. I apologized but was firm in my statement to him.

11. Is there anything else you want to add that you believe to be relevant, if so, do so here:

To my knowledge the record reflected Dr Breda resigned in lieu of discipline and was referred to the National Practitioner Data Base known as NPDB. The VA does not comment as to personnel actions on employees or actions regarding the NPDB. Dr Curioso was the supervisor of record and he declined to provide a response to Dr Burns. I supported his decision and confirmed to Dr Burns we would not provide a reference.


Thank you in advance for your response.....if you have questions or concerns, don't hesitate to email me.....


Ida O'Neal
Assistant District Manager (Investigations)
Office of Resolution Management, Diversity & Inclusion (ORMDI) – Midwest District
2255 Enterprise Drive, Suite 5506
Westchester, IL 60154
Email: Ida.oneal@va.gov
Phone: 708.236.2808
Fax:     708.236.2898




*NOTICE: ORM-DI is operating in a 100% telework environment. ORM-DI does not have the capability to send and/or receive hardcopy documents at this time. In order to be more responsive, we ask that if you have previously sent documents to us via U.S. Mail or other delivery services, please resend those documents to us electronically. All meetings, interviews, and mediation sessions will be conducted in a virtual capacity (i.e. telephonic, skype, video conference etc.). Your patience is appreciated during the COVID-19 Pandemic.*

*VA Core Values:* Integrity Commitment Advocacy Respect Excellence
*VA Core Characteristics:* Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*NOTE: If you are not the intended recipient, any dissemination or duplication of this e-mail is prohibited by law. If you received this e-mail in error, please permanently delete it and contact the sender by e-mail.*


*Please take a moment to* complete a very brief survey *to let us know how my service was today.*

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT, DIVERSITY & INCLUSION

**In the matter of the EEO Complaint of Discrimination of:**

**Dr. John Breda (Complainant) vs. Secretary, U.S. Department of Veterans Affairs – Fargo Medical Center, Fargo, ND**
**Case No. 200J-0437-2020102714**

This matter was assigned for investigation in July 2020. The investigation into this matter was conducted between July 2020 to January 2021 and submitted to the District Manager on January 29, 2021.

**The accepted claim investigated:  Whether Complainant was discriminated against based on Age, Disability, and Reprisal, when on February 25, 2020, his offer for the position of Emergency Medicine Physician (EMP) was rescinded.  (1-1 thru 3-2)**

Complainant's extension requests.  (7-7)

Letter dated 2/13/20, to complainant regarding job offer for the position in question.  Letter signed by Jason Wells, Director of Human Resources.  (1-1)

Email dated 2/18/20, to complainant from Josh Layfield, Physician Recruiter, acknowledging receipt of complainant's signed offer letter.  (1-1)

Letter dated 2/25/20, to complainant rescinding the job offer for the position in question.  Letter signed by Jason Wells.  (1-1)

Document regarding hiring history of Fargo VA within 2 years of complainant's offer.  The four physicians hired were around the complainant's age and/or older.  (7-8)

Personnel Action regarding complainant's resignation in lieu of termination as indicated by management.  (7-6)

Complainant's prior and current EEO activity.  (7-10 thru 7-14)
**Investigator Note:**  Complainant currently has another case open being investigated by another Investigator/District, case #: 102929 against the Providence VA, claim as follows:

**"Whether complainant was subjected to a hostile work environment (harassment) based on age, reprisal and disability as evidenced by the following event:**

**On February 25, 2020, the complainant became aware that after he accepted a job offer for a physician's position from the VA Medical Center, Fargo, ND, agency officials provided a negative job reference to hiring officials resulting in a rescission of the offer." (7-14)**

**Complainant, applicant, age (66), disability (identified in affidavit), and prior EEO activity (identified in detail in affidavit beginning in 2014/2015 against the Providence VA),** essentially stated the position in question was offered to him, by the ER Director, Dr. Joseph Burns, and later rescinded because of Providence VA officials retaliation against him for filing EEO and other

complaints and because of a long history of repeated unjustified actions taken against him after he filed his first EEO complaint against Providence VA in 2014. See affidavit for details. Complainant states the Fargo VA simply took the VA's (Providence) comments at face value, and without further investigation rescinded the job offer based on Providence VA's unsubstantiated comments. (7-1)

**Investigator Note:** Witness Josh Layfield, Physician Recruiter, indicated the following, "I'm sorry I will not be of any help with this applicant. I'm an MD recruiter and he emailed his application to me and I forwarded to the manager. I have no involvement in the hiring process. As an HR Specialist/MD recruiter all I do is post positions and when candidates apply I forward their resumes to the manager to contact." (7-5)

**RMO Joseph Burns, Chief, Emergency Department, Fargo VA, age (65) was involved in prior EEO activity that did not involve complainant,** stated he was not aware of complainant's age until he reviewed his application. He also was not aware of complainant's disability or EEO involvement. RMO Burns identifies the complainant was tentatively offered the position pending other investigations. Burns stated the position was rescinded because the Human Resources Director at the Rhode Island VA told him that Dr. Breda had been terminated from his position at their facility. RMO Burns informed his Chief of Staff (Dr. Rondeau) so they were not willing to proceed further with complainant's employment at Fargo VA. RMO Burns stated he did not discriminate against the complainant and the decision had nothing to do with complainant's age, disability or EEO activity. (7-2)

**RMO Dr. Jeffrey Rondeau, Chief of Staff at the Fargo VA, age (57), was not aware of the complainant's prior EEO activity, disability or age.** RMO Rondeau stated he believed a tentative offer for the position in question was made to complainant, but was rescinded because they came to learn (thru Dr. Burns from Mr. McLeod from Providence VA) that complainant had apparently been involved in instances of belittling or staff and intimidation with subsequent termination by the Providence VA. He said the complainant's age, disability and prior EEO activity were not factors when the position was rescinded. (7-3)

**Witness Jason Wells, Regional HR Manager for Fargo VA, age (46), was not aware of complainant's prior EEO activity until after the job offer was rescinded, but at no time was he aware complainant had a disability.** Wells said complainant was offered the position prior to credentialing and reference checks. Wells said Dr. Burns would have been the selecting official. He also said rescinding of the position offer was Dr. Burns' decision, but he and the Chief of Staff (Rondeau) were both in concurrence. He said he did not discriminate against the complainant regarding this matter. (7-4)

**RMO Douglas McLeod, Senior HR Strategic Business at the Providence VA, age 64, involved in prior EEO activity,** stated he became aware of complainant's current EEO activity when he was notified of this complaint. He had no knowledge of complainant or his EEO complaint until notified by the VISN HRO. He was not aware of anyone providing a job reference for the complainant from Providence. RMO McLeod stated, "During the call Dr Burns was told that Providence could not provide a reference for Dr Breda. He asked why and I informed Dr Burns that our records reflected Dr Breda resigned in lieu of what the SF 50 says is "Resigned in Lieu of Invol Action." That this would mean in lieu of a negative action. Dr Burns asked and I remember that I informed Dr Burns we could not comment. I could say that records showed Dr Breda Resigned in lieu of Termination and that he had been reported to the National Practitioner Data Base. My recall is that I asked Dr Burns to check with credentialing as to the result of that action and was not in a position to comment or make a recommendation about Dr Breda's service in Providence. Adverse actions are not discussed and the reasons are not reflected in the Providence files. Dr Burns asked if adverse actions against physicians occurred often. I informed him that Dr Curioso the Providence ER Doctor would not comment or make any reference pro or con regarding Dr Breda. I advised Dr Burns to check with his credentialing

team. Dr Burns told me he found it very unusual that a Physician from the Northeast would be looking to come to North Dakota when it seemed they always stayed on the east coast and it seemed out of place. I remember stating do your homework and that we all learn new things every day. I remember we both laughed and parted amicably."

RMO McLeod further added the record reflected the complainant resigned in lieu of discipline and was referred to the National Practitioner Data Base known as NPDB. He said the VA does not comment as to personnel actions on employees or actions regarding the NPDB. He said Dr. Curioso was the supervisor of record and declined to provide a response to Dr. Burns, and McLeod supported that decision.   (7-6)

Complainant maintains no one has articulated a valid legitimate reason for the rescission of the job offer. Additionally, see complainant's full rebuttal for more information. (7-9)

**The information in this report was obtained from witness testimonies, affidavits and documentation provided by the complainant and/or the Agency.**

*Ida O'Neal*
EEO Specialist (Investigator)
Office of Resolution Management, Diversity & Inclusion
Midwest District

*Feb 9, 2015*

# MEDICAL EXECUTIVE COMMITTEE

February 9, 2015
Meeting Start: 11:15 AM
Meeting End: 12 Noon

Attendance:

| Member | J | F | F | M | A | M | J | J | A | S | O | N | N | N | D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Satish Sharma, MD — Chief of Staff (Acting) | P | P | P | | | | | | | | P | P | P | P | P |
| Laura Bassi, CRNA — CRNA Representative | E | P | E | | | | | | | | P | P | P | P | E |
| Clyde Belgrave, MD — Chief, Pathology | P | P | A | | | | | | | | E | E | E | E | E |
| Stephen Bessette, NP — APN Representative | P | P | E | | | | | | | | P | P | P | P | P |
| Bradley Borlase, MD — Director, Comp & Pen | A | P | A | | | | | | | | P | P | P | E | E |
| Frederick Burgess, MD — Chief, Anesthesiology | P | P | E | | | | | | | | A | A | A | A | E |
| Gaurav Choudhary, MD — ACOS/Research (Acting) | P | P | P | | | | | | | | P | P | A | A | A |
| Annmarie Dunican, MD — Chief, Surgery (Acting) | P | P | P | | | | | | | | D | P | P | P | P |
| Peter Latham, DDS — Chief, Dental Service | E | E | E | | | | | | | | P | P | P | E | A |
| Gary Lundstrom, MD — Chief, DIS (Acting) | P | P | P | | | | | | | | E | A | E | E | E |
| Gregory Gillette, MD — Chief, MHBSS | -- | - | - | - | - | - | - | - | - | - | P | P | P | P | E |
| radley Peterson, — Chief, Pharmacy (Acting) | P | E | E | | | | | | | | D | P | P | P | A |
| Paul Pirraglia, MD — Chief, Primary Care | P | P | P | | | | | | | | E | P | A | A | E |
| Sharon Rounds, MD — Chief, Medicine | P | P | P | | | | | | | | P | P | P | P | P |
| Alan Sirota, Ph.D. — Chief, Psychology | A | D | A | | | | | | | | P | D | D | P | D |
| Robert Swift, MD — Chief, MHBSS (Acting) | P | P | A | | | | | | | | D | D | D | P | E |
| Tim Fowler — Human Resources | E | -- | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Osbourne Easter — Human Resources | E | - | - | - | - | - | - | - | - | - | A | E | E | E | A |
| Danielle Cannon — Human Resources | - | A | A | | | | | | | | - | - | - | - | - |
| Denver Audyatis — Human Resources | E | A | A | | | | | | | | A | E | E | E | A |
| Mary Whiting — Human Resources | E | A | A | | | | | | | | A | E | P | P | A |
| Jennifer Smith — Human Resources | P | A | A | | | | | | | | A | P | E | E | A |
| Ronald Rodriguez — Human Resources | E | A | A | | | | | | | | A | E | E | E | A |
| Beatrice Lincoln — Human Resources | E | A | A | | | | | | | | - | - | P | E | A |
| Deborah Burrows — Medical Affairs Officer | P | P | P | | | | | | | | P | P | P | P | P |
| **DESIGNEES:** | | | | | | | | | | | | | | | |
| Robert Johnston, MD — Mental Health | -- | | | | | | | | | | P | | | | |
| Tracy O'Leary-Tevyaw, PhD | | P | | | | | | | | | P | P | P | | |

2. Medical Executive Committee – February 9, 2015      VAMC 650

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...lental Health | | | | | | | | | | | | | | | | | | | | | | | |
| Michelle Lally, MD Assoc. Chief, Medicine | | | | | | | | | | | | | | | | | | | | P | P | | P |
| GUESTS: | | | | | | | | | | | | | | | | | | | | | | | |
| Thomas Mock, LICSW Chief, Social Work & GEC | P | | P | | | | | | | | | | | | | | | | | | P | | |
| Madeleine Thibeault, RN Quality Management | P | | P | | | | | | | | | | | | | | | | | | P | P | |

P=present, A=absent, E=excused, D=designee present

| Issues/Topic | Discussion/Decision | Follow-up Actions (with Target Date and Responsibility and Status) |
|---|---|---|
| I. Medical Staff Issue<br>  John Breda, MD | Dr. Rounds presented a provider concerning issues which have been raised over the past several months. She has been working in conjunction with Human Resources to investigate the issues. At this time, Dr. Breda has been sent a separation of duty letter from Human Resources to be effective February 13, 2015. Based upon this action, the Medical Executive Committee must decide whether to revoke the privileges based upon the separation letter.<br><br>On November 13, 2014 Dr. Rounds and Dr. Curioso met with Dr. Breda to discuss complaints concerning his practice that were brought to their attention. Dr. Rounds then reviewed all of the concerns received, the medical record reviews done by Dr. Curioso on each incident and the verbal responses from Dr. Breda. These concerns were also considered with regard to the core competencies of physicians used to assess staff privileges at the PVAMC. It was determined that Dr. Breda demonstrated deficient patient care on 6 separate occasions; deficient medical knowledge on two separate occasions; deficient systems based practice on six separate occasions, deficient professionalism on two separate occasions and deficient interpersonal skills and communication on three patients in one day. Dr. Breda did state that he would resign but had not resigned as of the date of the Medical Executive Committee meeting. | The members of the Medical Executive Committee reviewed the documentation as presented by Dr. Rounds. Based upon the information presented, the members of the Medical Executive Committee voted unanimously to revoke the staff privileges for John Breda, MD.<br><br>It is the requirement of the VHA to report to the National Practitioner Data Bank, any adverse action to privileges if it has been determined that the adverse action (in this case, revocation), was the result of substandard care, professional misconduct or professional incompetence. The members of the Medical Executive Committee felt that these issues did in fact demonstrate substandard care, professional misconduct and professional incompetence. It is also the VHA requirement to report to the National Practitioner Data Bank if a provider resigns while under investigation. Dr. Breda will be sent a letter informing him of the Medical Executive Committee decision to revoke his privileges and the review process which he is afforded. |

SATISH SHARMA, MD
Chairperson, Chief of Staff (Acting)

SUSAN MACKENZIE, PH.D.
Medical Center Director

Holt, Tambra

| | |
|---|---|
| **From:** | John Breda <johnabreda@yahoo.com> |
| **Sent:** | Saturday, February 07, 2015 8:58 AM |
| **To:** | Holt, Tambra; Sharma, Satish  (VISN1); Doug Reynolds |
| **Subject:** | [EXTERNAL] Resignation |
| **Attachments:** | VA Resignation.doc |

Please see the attachment to this e-mail.  The signed original has been placed in the mail.

John Breda

John Breda, M.D.
253 Greendale Ave
Needham, MA 02494

Tammy Holt
Human Resource Specialist
Department of Veterans Affairs
Medical Center
830 Chalkstone Ave
Providence, RI 02908-4799

February 1, 2015

Dear Ms. Holt:

During our conversation in November and December, 2014 I conveyed my intent to you that I would resign from the Providence VA if an amicable resolution was not forthcoming.  I memorialized my intent to resign by e-mail on December 16, 2015 to yourself and Dr. Sharma and we agreed that if a resolution could not be reached, my resignation would be accepted as of December 16, 2014.  In that same e-mail I indicated that I had requested ADR in an additional attempt to bring about a resolution.  The VA agreed to schedule the mediation on February 24, 2015 which is still pending.

Dr. Rounds and Dr. Curioso have continued to exhibit animosity words me, have acted in bad faith and have tainted the workplace to such a degree that it would be difficult for me to work for them.  I am hereby formalizing my resignation to be effective December 16, 2014 as per our prior discussions and agreements.

Sincerely,


John Breda



**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
830 Chalkstone Avenue
Providence RI 02908-4799

February 3, 2015

In Reply Refer To:
650/05

John Breda, MD
253 Greendale Avenue
Needham, MA 02494

SUBJ:   Termination of Excepted Appointment

1. In accordance with VA Handbook 5021, Part VI, your appointment as a Physician with a part-time appointment under the authority of 38 USC 7405 is being terminated effective February 13, 2015.

2. In accordance with regulations, you are not entitled to have your involuntary termination reviewed.

3. IMPACT OF DECISION REGARDING CLINICAL PRIVILEGES: If an initial determination is made that the reason(s) for your termination and subsequent revocation of privileges resulted from substandard care, professional misconduct or professional incompetence, you will receive information via a separate notice regarding your opportunity for a fair hearing and appeal to determine whether or not the reason(s) for the revocation of your privileges should be reported to the National Practitioner Data Bank (NPDB) in accordance with VHA Handbook 1100.19 and VHA Handbook 1100.17. If a final determination is made that the revocation did result from substandard care, professional misconduct or professional incompetence, the revocation (and the summary suspension of your privileges, if applicable) will be reported to the National Practitioner Data Bank (NPDB) with a copy to the State Licensing Board (SLB) in all states in which you are licensed. If the physician or dentist's clinical privileges were summarily suspended greater than 30 days in accordance with VHA Handbook 1100.19, the physician or dentist should be notified that both the revocation of clinical privileges and summary suspension of privileges will be reported to the NPDB. It is also important to remember that it is only after the fair hearing and appeal process outlined in VHA Handbook 1100.19 is completed that the summary suspension of privileges and subsequent revocation of clinical privileges are reported to the NPDB.

4. The fair hearing and appeal in regards to the reasons for the revocation of your privileges resulting from your termination will not result in your reinstatement to federal

service but will merely determine whether or not the revocation was a result of substandard care, professional incompetence or professional misconduct.

5. IMPACT OF VOLUNTARY SURRENDER OF PRIVILEGES: Should you surrender or voluntarily accept a restriction of your clinical privileges, or resign or retire from your medical staff position with the Department of Veterans Affairs prior to the effective date of your termination, your fair hearing and appeal rights regarding privileges will be limited to a hearing on whether you took such action while under investigation for professional incompetence, professional misconduct or substandard care.

6. REPORTING TO STATE LICENSING BOARDS: It is the policy of VA to report to State Licensing Boards those licensed health care professionals, whether currently employed or separated, voluntarily or otherwise, whose clinical practice during VA employment so significantly failed to meet generally accepted standards of clinical practice as to raise reasonable concern for the safety of patients. In the event you are found to not meet standards of care, consideration will be given whether, under these criteria, you should be reported to the appropriate State Licensing Board(s).

7. If you feel this termination is based on discrimination on the basis of race, color, religion, sex, national origin, age, or disabling condition, you may file a complaint of discrimination with this agency. Your complaint will be processed in accordance with EEOC regulations at 20 C.F.R., Part 1614, Subpart 105. If you elect to file a complaint of discrimination, you may do so only after contacting the office of Resolution Management (ORM) at 1-888-737-3361. Your initial contact with the ORM office must be done within 45 calendar days of the date of occurrence.

8. Clearance from the medical center is necessary to obtain your final paycheck. This can be accomplished by contacting Robert Niebauer, Health Systems Specialist, at (401) 273-7100, extension 3467. If you have questions concerning this matter, or the rights described above, or if you are in need of assistance of additional information, you may contact Tammy Holt, Human Resources Specialist, (401) 459-4770, extension 4772.

SUSAN A. MACKENZIE, PhD
Medical Center Director



**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
830 Chalkstone Avenue
Providence, RI 02908-4799

In Reply Refer To: 650/00

February 9, 2015

John Breda, MD
253 Greendale Avenue
Needham, Massachusetts 02494

Dear Dr. Breda:

This is to notify you that your separation of employment from the Providence VA Medical Center results in a revocation of your clinical privileges.

The Medical Executive Committee has reviewed the case and made the determination that your separation and subsequent revocation of privileges is in fact due to substandard care, professional misconduct and professional incompetence. As such, you are entitled to a fair hearing and appeal to determine if you should be reported to the NPDB (National Practitioner Data Bank).

The fair hearing and appeal in regard to the reasons for the revocation of your privileges resulting from your separation will not result in your reinstatement to federal service but will merely determine whether or not the revocation should be reported to the National Practitioner Data Bank.

Should you surrender or voluntarily accept a restriction of your clinical privileges, including by resignation or retirement while your professional competence or professional conduct is under investigation during these proceedings or to avoid investigation, you forfeit the right a fair hearing and appeal process and the VA is required to file a report to the NPDB, with a copy to the appropriate state licensing boards , pursuant to VA regulations in title 38 Code of Federal Regulations (CFR) part 46 and VHA Handbook 1100.17, National Practitioner Data Bank Reports.

Under the Fair Hearing and Appellate Review process you have 10 days from the date of this letter to respond to the Medical Center Director requesting a hearing to determine whether or not your revocation of privileges should be reported to the National Practitioner Data Bank.

It is the policy of the VA to report to State licensing Board those licensed heal care professionals, whether currently employed or separated, voluntarily or otherwise, whose clinical practice during VA employment so significantly failed to meet generally accepted standards of clinical practice as to raise reasonable concern for the safety of patients. In the event you are found to not meet standards of care, consideration will be given whether, under these criteria, you should be reported to the appropriate State Licensing Boards.

1

If you have questions concerning this matter or require additional information, you may contact Satish Sharma, MD, Acting Chief of Staff at (401) 457-3040.

SUSAN A. MACKENZIE, Ph.D.
Medical Center Director

2



DEPARTMENT OF VETERANS AFFAIRS
Medical Center
830 Chalkstone Avenue
Providence RI 02908-4799

In Reply Refer To: 650/05

February 12, 2015

John Breda, MD
253 Greendale Avenue
Needham, MA 02494

Dear Dr. Breda:

In the enclosed letter dated June 10, 2014, you were notified of an investigation regarding your clinical competency. You were subsequently notified of the termination of your Excepted Appointment by letter dated February 3, 2015. In that same letter, you were notified of the following:

> *IMPACT OF VOLUNTARY SURRENDER OF PRIVILEGES: Should you surrender or voluntarily accept a restriction of your clinical privileges, or resign or retire from your medical staff position with the Department of Veterans Affairs prior to the effective date of your termination, your fair hearing and appeal rights regarding privileges will be limited to a hearing on whether you took such action while under investigation for professional incompetence, professional misconduct or substandard care.*

In an e-mail dated February 7, 2015, you submitted a letter of resignation. In response to your e-mail, Tambra Holt, Human Resources Specialist, stated your resignation would be effected on February 7, 2015.

As you were informed in the Agency's letters of February 3, 2015 and February 9, 2015, your decision to voluntarily resign during the pendency of an investigation impacts upon your appeal rights. A physician who resigns during an investigation relating to possible professional incompetence or improper professional conduct must be reported to the NPDB. Due process under these circumstances is limited to a hearing to determine whether the physician's resignation occurred during such an investigation. If the practitioner does not request this limited hearing, the practitioner waives the right to further due process for the NPDB report and will be reported immediately.

Should you wish to appeal the Agency's decision to report you to the NPDB, you must contact the Medical Center Director within ten days of the date of this letter and request a hearing.

2. Mr. Breda

If you have any questions, you may contact Ms. Holt at (401) 459-4770, extension 4772.


Sincerely,


Susan A. MacKenzie, PhD
Medical Center Director

LAW OFFICES OF PAUL H. MERRY, ESQ.
50 CONGRESS STREET - 10ᵀᴴ FLOOR
BOSTON, MASSACHUSETTS 02109
(617)-720-2400
FACSIMILE (617)-742-1887

PAUL H. MERRY, ESQ.                                              PAUL.MERRY@FAIRWORKPLACE.NET
ANDREA L. HAAS, ESQ.                                            ANDREA.HAAS@FAIRWORKPLACE.NET

February 12, 2016

BY FIRST CLASS MAIL

Susan A. MacKenzie, Ph.D.
Medical Center Director
Department of Veterans Affairs
Medical Center Providence
830 Chalkstone Avenue
Providence, RI 02908-4799

IN RE: John Breda, M.D.

Dear Medical Center Director MacKenzie:

As you are aware this office represents John Breda, M.D., formerly employed as an
Emergency Department ("ED") physician with the Veterans Administration Medical Center,
Providence ("Center"). On December 28, 2015 this office received a request from you inviting a
written submission as to why the Center's report of Dr. Breda to the National Practitioner's Data
Bank ("NPDB") was in error. With this letter Dr. Breda respectfully requests that the Center
reconsider its filing and void its report to the NPDB.

You may also recall that your institution filed a report with the NPDB on or around
October 27, 2015 following a review by a single staff member of a number of Dr. Breda's cases
which produced no indication of significant medical errors or harm to any patient. As we have
written in the past, Dr. Breda contests the accuracy of this report; and contends that, because the
review of his cases failed to satisfy the NPDB definition of an investigation under 42 U.S.C.
§11133(a)(1)(b)(i) requiring such a report, the report was filed in error and must be voided and
withdrawn. You have further acknowledged in sworn statements that it was not an investigation
or a hearing, but simply an informal fact finding. See Ex. 1, p. 7 li.6 (Excerpts from Statement of
Dr. Susan MacKenzie).

Please be advised Dr. Breda did not resign from his employment in the face of an
investigation into allegations of professional errors. Rather his separation was initiated only after
he objected to a pattern of harassing complaints that had made practicing in the ED

Susan MacKenzie, Ph.D.
February 12, 2016, Page 2

insupportable, as is further set out below.

We are confident that upon your review of this submission you will find the provided explanation sufficient and conclude this matter should be promptly closed, as suggested under department guidelines. Also, please be aware that neither Dr. Breda's participation in the Center's process thus far, this response, nor any attendance at a future hearing implies or equates to Dr. Breda's acceptance of this process as adequate due process to protect his legally cognizable interest in continued employment with the Center.

I.      BACKGROUND

The National Practitioners Data Bank ("NPDB") was created as part of the federal Health Care Quality Improvement Act to serve as a central repository of serious adverse medical events directly attributable to poor patient care by licensed medical professionals. Institutions such as the Center are required to report egregious incidents of poor patient care. As a negative report in the NPDB is all but certain to have a devastating effect on a licensed professional's career, reporting is only permitted under a narrow range of circumstances. Institutions are bound by a set of strict regulations designed to balance public safety with a medical professional's oath and obligation to exercise independent medical judgment. One such requirement is that institutions report professionals who resign either for the purposes of avoiding a formal investigation into suspected incompetence or professional misconduct, or to avoid termination for the same.

II.     FACTS

Dr. Breda received his medical training at the UMass Medical School in Worcester, Massachusetts. He successfully completed his residency in internal medicine at Brown University Medical Center in Providence, R.I. after completing his internship at Metrowest Medical Center in Framingham, Massachusetts. He has practiced medicine successfully for more than fifteen years in a variety of capacities, including internal and emergency medicine, since completing his training and licensure in 1997.

Between March, 2010, and February 13, 2015, Dr. Breda was employed as a part-time emergency room physician by the Center. Although contractually obligated to work four one- day shifts per month for the Department of Veterans' Affairs, he usually worked additional shifts beyond those to which he was regularly assigned as requested by the Center; as well as serving four or so shifts per month as a hospitalist, again at the Center's request. His supervisors formally evaluated his job performance annually for the years 2010, 2011, 2012, and 2013, finding his performance satisfactory or better for each of those years; and awarding him bonuses. Dr. Breda's record also reflects continuing efforts to improve both his own skills and the delivery of care at the Center's Emergency Department, such as attending trainings in the best ED practices and in new care techniques.

Susan MacKenzie, Ph.D.
February 12, 2016, Page 3

The Center has a handbook establishing procedures for addressing physician performance issues, which includes a requirement that such physicians be notified about those questions, and reviewed under a "Focused Practitioner Performance Evaluation" ("F.P.P.E.") to determine whether they are practicing consistently with prescribed standards. The handbook also sets out a different process, called the "Ongoing Practitioner Performance Evaluation" or "O.P.P.E.", governing process for evaluating and addressing practice issues for physicians whose practice is considered generally at a satisfactory level. Although his performance was evaluated as satisfactory or better in that year, on or about March 10, 2011, the Center embarked upon a Focused Practitioner Performance Evaluation review of Dr. Breda's performance. At the conclusion, in or about May, 2011, the Center concluded that Dr. Breda's performance of his duties was satisfactory or better.

In or about May, 2014, two nurses employed by the Center made complaints concerning Dr. Breda's performance. Though these complaints were without merit or substance, after they came in, Dr. Breda's supervisor, Dr. Wilfred Curioso, initiated a review of treatment provided by Dr. Breda in certain of his cases; and identified some fifteen occasions of alleged shortcomings on Dr. Breda's part. None of the fifteen allegations of practice shortcomings involved or resulted in any unsuccessful outcome for any patient as a direct result of Dr. Breda's care; and they included some allegations that were unsupported by evidence; some allegations that involved simply redirecting patients to more appropriate and qualified alternative hospitals; and some alleged minor administrative or interpersonal issues that were inconsequential or without substance.

Following these complaints, Dr. Breda became a target for additional criticism; and after months of undergoing this harassment he felt constrained to take (unpaid) leave. Dr. Curioso declined Dr. Breda's request for details of the incidents underlying the complaints against him to permit him to review the cases to understand the basis of the complaints and take corrective measures if needed. Moreover, the Center issued no written guidance or list of performance issues for Dr. Breda in connection with the nurse(s)' complaints. They also initiated no Focused Physician Performance Evaluation for Dr. Breda in connection with the complaints raised in May; nor in connection with cases alleged by Dr. Curioso to warrant review and correction.

Dr. Breda met with Dr. Curioso and Dr. Rounds in or about November, 2014, and (as best he could without specific information) stated that the alleged practice shortcomings were insubstantial, or were easily corrected, and had in some cases been corrected immediately. He felt the meeting was a continuation of the harassment; and provided no additional insights to enable him to respond. At or about this time, he again complained of the difficulty of practicing in an environment so hostile to him. At a subsequent meeting, in or about December, 2014, Dr. Breda raised the possibility of a resignation if the situation could not be resolved fairly through a mediation process. Although the Center agreed to mediation, they terminated him before the date scheduled for that process.

Susan MacKenzie, Ph.D.
February 12, 2016, Page 4

Despite the omission to engage in the Center's Focused Practitioner Performance Evaluation process, and the omission to provide Dr. Breda with details concerning the allegations against him, and his suggestion that he would resign, on or about January 9, 2015, Dr. Rounds recommended to a meeting of the Center's Medical Executive Committee that Dr. Breda's employment be terminated and that he be reported to the National Practitioner Data Bank and relevant state licensing boards for the practice issues alleged by Dr. Curioso. The committee accepted Dr. Rounds' recommendation and notified Dr. Breda by letter on or about February 3, 2015, that he was being terminated from his employment effective on or about February 13, 2015.

Dr. Breda's commitment to providing highest quality care to veterans at the Center is demonstrated by his having deferred his own care on more than one occasion when demands in the ED indicated his attendance there was a priority. He thereafter found treatment for his condition (Hodgkins disease) and, once he had been successfully treated, promptly returned to his duties with the Center. Moreover, he reports that on many of his assigned shifts, patient needs were such that he chose to remain on duty until he was satisfied they were being cared for to the highest standard, sometimes several hours after his assigned shift had ended. He worked tirelessly to improve the level of care provided to veterans requiring emergency treatment at the Center.

In response to the hostility he experienced in the Emergency Department, Dr. Breda had made a complaint through the Center's equal employment opportunity process. When he learned the Center had reported him to the National Practitioners Data Bank ("NPDB"), he reluctantly sought relief in federal court, a time consuming process for both the Center and Dr. Breda which continues at present.

The NPDB was created as part of the federal Health Care Quality Improvement Act as a central repository of serious adverse medical events directly attributable to poor patient care by licensed medical professionals. Institutions such as the Center are required to report egregious incidents of poor patient care. As a negative report in the NPDB is all but certain to have a negative effect on a licensed professional's career, reporting is only permitted under a narrow range of circumstances. Institutions are bound by a set of strict regulations designed to balance public safety with a medical professional's oath and obligation to exercise independent medical judgment. One such requirement is that institutions report professionals who resign either for the purposes of avoiding a formal investigation into suspected incompetence or professional misconduct; or to avoid termination for the same.

## III.  THE DECISION THAT DR. BREDA RESIGNED WHILE UNDER INVESTIGATION WAS IN ERROR BECAUSE THERE WAS NO INVESTIGATION

The NPDB statute requires reporting of physicians who resign, in essence, to avoid an investigation into their professional competence. Here, however, the Center announced Dr.

Susan MacKenzie, Ph.D.
February 12, 2016, Page 5

Breda's termination before he offered his resignation.  Rather, despite their failure to follow
established procedures, the Center terminated him effective within ten days.  This classic "You
can't fire me, I quit" scenario means that any purported resignation was in reality a hollow
gesture, effectively superseded by the termination.  In the absence of a meaningful resignation,
then, the facts were insufficient to trigger the Center's obligation to report Dr. Breda to the
NPDB.  This absence of a basis for a report would support voiding the report.

    a)   **The review of Dr. Breda's cases was conducted by a single individual who
didn't characterize his review as an investigation**.

    The NPDB's established standards for what action by a hospital constitutes an
investigation expressly stipulates that a simple case review by a single supervisor does not meet
that definition. Rather, it must incorporate separate steps. The Center has a well developed and
highly articulated program for dealing with physician performance issues, designed to help
professionals address and correct problems so neither the V.A.M.C. nor the physician will suffer
significant loss as a result.  It is a two-level process, the first level of which is called "Focused
Professional Practice Evaluation, or "F.P.P.E". and the second level is called Ongoing
Professional Practice Evaluation,  or "O.P.P.E."   The Center is quite familiar with the process
and how it operates as required by V.A. rules; but all the evidence, including statements by both
you and and Dr. Curioso, makes clear that this process was not followed in the series of events
leading up to the present dispute.

    This knowing failure to comply with existing procedure and institutional rules not only
demonstrates the absence of any "investigation" requiring a report to the NPDB, but raises
serious questions concerning the Center's motivation in acting against Dr. Breda.

    b)   **As the Center's Medical Director you stated on oath that there was no
investigation conducted into Dr. Breda's conduct.**

    As the Medical Director of the Center you have stated on oath that no investigation
requiring reporting to the NPDB was conducted with relation to Dr. Breda.  See Ex. 1.  As you
are aware in connection with Dr. Breda's discrimination charge, you granted a telephone
interview, on oath, to an Equal Employment Opportunity Commission investigator.  During that
interview, the investigator asked point-blank whether an investigation had been conducted into
the accusations against Dr. Breda.  The response was unequivocally that no investigation or
hearing had been conducted.

    Testimony of this nature, on oath, in the record, renders indisputable Dr. Breda's
likelihood of success on the merits of his claim that the Center's decision that he resigned to
avoid an investigation is without merit.

    c)   **The review of Dr. Breda's cases undertaken by the single supervisor does not**

Susan MacKenzie, Ph.D.
February 12, 2016, Page 6

**satisfy the NPDB guideline as an investigation requiring reporting**.

The NPDB has provided guidelines covering investigations which trigger a requirement for reporting to it, and it is clear from the record that Dr. Breda's conduct does not satisfy those criteria.  For example, NPDB guidance provides: "An investigation must be carried out by the health care entity, not an individual on the staff."  In Dr. Breda's case, the only activity relating to his performance was a review of cases conducted by his supervisor, an individual on the staff.

And in that same regard, the guidance explicitly states that a routine or general review of cases is not an investigation.  Particularly in light of the fact that no one initiated the clearly established and well known process for raising and addressing professional performance issues, the unavoidable inference is that Dr. Breda's supervisor's review was nothing more than a routine or general review of cases.  As such, it is expressly excluded as a basis for making a filing with the NPDB.  Accordingly, the facts make clear that no basis for reporting Dr. Breda to the NPDB under its guidelines existed and the report must be voided.

**d) Termination outside of a formal professional review action is not reportable to the NPDB.**

The actions of the Center to move to terminate Dr. Breda outside of any formal review process do not implicate reporting to the NPDB, as clearly explained in the Guidebook. When a hospital, such as the Center, has a system of professional review protocols established under its bylaws, yet chooses to ignore those protocols and instead simply moves for termination, and attendant revocations of privileges, without the use of the established professional review process, reporting to the NPDP is not appropriate because the termination was not in connection with a professional review action. NPDB Guidebook, F-9. (The Secretary overseeing the NPDB ordered an adverse physician report to be voided "since the professional review process had not been followed in terminating the practitioner's privileges. The termination was not a professional review action. ... Health care entities are reminded that in order to be reportable to NPDB, adverse actions must be the result of professional review").  This provides yet another grounds for voiding the erroneous NPDB report.

**e)   Reading of the NPDB Guidance in full context makes clear that intent was to require reporting physicians who explicitly resigned to avoid being investigated, and this is clearly not what Dr. Breda did**.

As common sense suggests, allowing a challenged physician to avoid an unfavorable outcome from an investigation, and a report to the NPDB, by the simple expedient of resigning, would defeat the purpose of the data bank statute.  So it is not surprising that the statute requires a report to the data bank where a physician has appeared to be doing this.  But the facts of Dr. Breda's case do not support an inference that he was in this category.  For one thing, he announced his intention to resign (barring resolution of the disputes) earlier than he in fact

Susan MacKenzie, Ph.D.
February 12, 2016, Page 7

resigned.  Rather, he made a good faith effort to resolve any issues with the Center by mediation.
Had he wished to try to avoid a report to the NPDB by resigning, he logically would have
resigned much earlier, indeed at or close to the time in June, 2014, when he discovered that his
cases were under review.   His decision to defer resigning in itself undermines any argument that
he was to resigning to avoid an unfavorable result.  To the contrary, he raised his possible
resignation for reasons unrelated to the Center's review of his cases.

He first raised possible resignation during the course of a meeting with supervisors at the
Center in connection with his allegations of a hostile work environment late in 2014.  He had
been feeling pressured since May, when two nurses filed (groundless) complaints against him
alleging practice shortcomings, which he believed had already been corrected or were without
merit.  Since the complaints were first made, he had been under increased scrutiny sufficient to
prompt him to make an equal employment opportunity complaint.  It is clear his raising of a
possible resignation was related not to the case review but to what he felt were hostile working
conditions.  No basis for reporting him exists and the relief must be granted.

**f)  Contemporaneous documentation that an investigation was underway is
unavailable.**

To justify submitting an adverse action report, an institution must be able to submit
contemporaneous documentation that an investigation is underway. NPDB Guidebook E-19.
Costa, 442 F Supp 2d 754, 773. Unlike in the present matter, evidence must be available to
support the conclusion that the institution's formal investigation was initiated prior to Dr.
Breda's separation. As a fair reading of the record indicates that no formal investigation ever
commenced, the Center will be unable to make this showing and any submitted report is likely to
be ultimately voided. Id., NPDB Guidebook F-8 (When an entity is unwilling or unable to
provide contemporaneous documentation that an investigation was occurring at the time of a
practitioners departure the report will be voided). Suitable evidence includes "orders from
hospital officials directing an investigation, and notices to practitioners of an investigation" both
items which are absent from the Center's evidence file. NPDB Guidebook E-19.  Costa, 442 F
Supp 2d 754, 773 (No basis for hospital's assertion that minutes of certain hospital staff meeting
were sufficient evidence of investigation into a particular practitioner in keeping with NPDB
Guidebook requirements that reporting entity have contemporaneous documentation). In the
present matter the Center retroactively classified Dr. Curioso's chart review and fact finding as a
formal investigation by a hospital board, a revision of history simply unsupported by the record.


IV.     DR. BREDA DID NOT RESIGN IN THE FACE OF AN INVESTIGATION INTO
        ALLEGATIONS OF PROFESSIONAL ERRORS BECAUSE THE OCCURRENCES
        RAISED AGAINST HIM REPRESENTED AT BEST AN AGGLOMERATION OF
        COMMONPLACE, INCONSEQUENTIAL INCIDENTS AND NEITHER CAUSED

Susan MacKenzie, Ph.D.
February 12, 2016, Page 8

PATIENT HARM NOR CONSTITUTED BREACHES OF REASONABLE MEDICAL
JUDGMENT WARRANTING A PROFESSIONAL REVIEW ACTION.

A total of fifteen allegations against Dr. Breda were garnered from a review of a year's
service to the Department of Veterans' Affairs. The review, conducted by one individual, was
initiated, surprisingly, within some months of a similar review which concluded that his care met
or exceeded institutional standards, his privileges should be renewed, and he should be awarded a
raise. Also of importance, the review was not precipitated by <u>any</u> poor patient outcomes. The
fifteen questioned actions by Dr. Breda can be roughly grouped into three types: first are actions
questioned on the basis of anecdotal reports but which were either not documented or
documentation has not been forthcoming. Second were decisions of a more administrative rather
than medical nature, which even if found to be errors would have resulted in minimal
inconvenience rather than risk to patient health or an adverse outcome. And finally, the decisions
were reasonable exercises of medical judgment, based on the limited information available to Dr.
Breda at the time each decision was made.

Of the actions identified by Dr. Curioso fully two-thirds did not involve medical
decisions or judgments; or were not accompanied by sufficient documentation to permit
assessment of the correctness of the medical decision at issue. Of the remaining third which did
involve medical judgments, the criticisms were factually in error or without basis in sound,
compliant medical practice.

Dr. Breda has still not seen detailed records concerning these questioned actions, and
therefore is not in a position to address many of them specifically. Without waiving his right to
prepare and provide such a response in future, he offers herewith a brief discussion based on his
memory of the incidents, Ex. 3[1]; and responds as follows:

Turning to some of the alleged actions, one "action", allegation five, involved a "dispute"
with another ED physician, Dr. Mourad, relating to signing in on a patient's case, where a single
nurse (with a history of spurious complaints against physicians) alleged an argument had arisen,
despite the fact that both physicians involved denied it had been an argument; and neither raised
his voice. The second physician, Dr. Mourad, was emphatic with Dr. Curioso that no argument
had occurred; and laid responsibility for the groundless complaint at the feet of the nurse
involved. Another "action", allegation eight, arose from a wholly unsubstantiated allegation of
"inappropriate" language. Even substantiated bedside manner concerns do not support filing an
adverse action report with the NPDB. NPDB Guidebook, F-8.

Two other questioned actions, surprisingly, arise from decisions concerning optimal
treatment locations for the two patients involved. The first, on May 3, 2014, allegation nine,

_____

[1]This document has previously been submitted to the Center directly by Dr. Breda but it
has been excluded from the evidence file.

Susan MacKenzie, Ph.D.
February 12, 2016, Page 9

involved a veteran with a presumably serious chain saw injury who was being transported to the Center by ambulance. When the ambulance staff questioned the Emergency Department whether they should divert to a nearby hospital with a specialized trauma care unit, Dr. Breda agreed and directed the patient to the better-equipped trauma center at a different Rhode Island hospital rather than admitting him to the (then very busy) Center ED. This decision appears (like most of Dr. Breda's actions) to have been in the best interest of the patient; and is difficult to fault, particularly considering the time pressure Dr. Breda was under when he had to make the choice, and the total inability to examine the patient still miles away from facility. Whatever Center administrators may think, it is hard to see this action justifying review beyond a refresher of ED policies concerning sending veterans to other institutions.

The second patient was being transported to the Center with stroke symptoms, allegation three; but was near the end of the four-hour optimal period for administering the best quality anti-stroke medications. Again Dr. Breda, in consultation with the Center's on-call neurologist, made the decision to redirect the patient to another hospital with a stroke team fully prepared to administer the anti-stroke treatment swiftly. In light of the dramatically different potential outcomes when the anti-stroke treatment is provided timely, this decision also was clearly in the patient's best interest. Even could one dispute this assertion, the decision again was made under serious time constraints; and Dr. Breda made optimizing the patient's well being and chances for full recovery his highest priority. But again, to seek to characterize such a judgment call, after the fact, as an error requiring review strains credulity, particularly in light of the Veterans' Administration's policy of seeking to provide the best quality care possible to our country's military veterans.

As for delay of treatment and unavailability of Dr. Breda for ED patients, Dr. Breda more than once remained on duty in the ED for two hours, allegation 15, or longer following the agreed end point of his shift, to be certain particular patients were appropriately cared for and received the highest level of treatment. On one such occasion, allegation 13, he remained at the bedside of the patient for more than an hour, assuring that prescribed intravenous medications were flowing properly and were reaching the patient's blood stream.

As acknowledged in the Veterans Health Administration's own handbook, frequently, multiple charges taken together may warrant examination sufficient for an organization to consider an adverse report to the NPDB or a state licensing board. However, as in the present matter where many of the allegations are unsupported by medical evidence or otherwise are so minimal, the remaining allegations cannot support an adverse report. VHA Handbook 1100.18 paragraph 12(b) (The Decision Stage: "Where some, but not all, of the charges are dropped, the remaining charges may or may not be sufficient to warrant reporting.")

V.      THE CENTER'S ERRONEOUS REPORT IS LIKELY TO ULTIMATELY BE VOIDED

The Center's decision to report Dr. Breda to the NPDB is likely to result in having the

Susan MacKenzie, Ph.D.
February 12, 2016, Page 10

report ultimately voided, considering 1) the lack of evidence for some of the allegations against Dr. Breda, 2) the lack of severity of others, 3) the lack of formal investigation initiated by any Center board, 4) hospital's personnel (including your own) explicit acknowledgment that no investigation occurred, Ex. 1, and 5) the informal nature of the chart review undertaken by Dr. Breda's supervisor.

Unfortunately, Dr. Breda's is not the only case in which a hospital has sought to report physicians to the NPDB under improper circumstances; and federal courts have at least twice acted on behalf of physicians opposing such mistaken reports.

**a)** *Costa v. Leavitt*, **442 F. Supp. 2d 754 (D.C.D. Neb. 2006)**
A hospital reported a physician to the NPDB on account of some alleged practice shortcomings, including some patient injuries (membrane tearing) and failure to oversee his assistant adequately. The physician challenged the report in court on several bases, including that the hospital had not conducted an investigation meeting the NPDB definition of an investigation requiring a report. The hospital had questioned the deliveries of three babies Dr. Costa and his assistant were responsible for. Similarly to Dr. Breda, Dr. Costa resigned from the staff within an hour or two of a vote by the hospital staff to reject his application to renew his privileges. The hospital director and Executive Committee asserted a need to inquire into the deliveries; but in its report to NPDB made no reference to any investigation it had conducted .

Although the defendant secretary of health and human services responded to Dr. Costa's appeal of the report by upholding the reporting, the court overturned his decision, noting that the hospital failed to provide documentary evidence of any investigation conducted, in the form of committee meeting minutes, or orders directing an investigation. Relying in part on the NPDB Guidance on investigations requiring reporting, 442 F. Supp 2d at 769-70, and on the failure to show an "investigation" had been conducted by the hospital, see id. at 771, the court also noted the NPDB Guidance' rejection of complaints based on "bedside manner" as being grounds for reporting, id. at 772. Here, Dr. Curioso stated he would "review" Dr. Breda's cases; at no point did he characterize that review (by a single staff person) as an "investigation.

**b)** *Simpkins v. Shalala*, **999 F. Supp. 106 (D.D.C. 1998)**
Plaintiff here sued the Department of Health and Human Services ("HHS") and several individuals seeking review of an administrative determination that his resignation from hospital staff constituted a reportable event. Dr. Simpkins alleged violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501 et seq., including failure to accord due process; as well as of the District of Columbia General Hospital's own bylaws; breach of contract and violations of the statutes underlying the NPDB.

Similarly to Dr. Breda's circumstances, defendants had concluded questions existed about Dr. Simpkins' level of practice; and the chief of surgery instructed another physician to review his cases. Thereafter, the hospital made an Adverse Action Report to the NPDB. Dr. Simpkins,

Susan MacKenzie, Ph.D.
February 12, 2016, Page 11

who had resigned in the meantime, challenged the filing, on the grounds that he had not resigned in the face of an investigation into his competence.   In response, the court held that the defendant secretary of Health and Human Services acted arbitrarily and capriciously, finding facts similar to those in Dr. Breda's situation, where the case review  was in essence a routine review; and had been conducted by a single individual, disqualifying it from reporting under the NPDB guidance.


VIII.   CONCLUSION

Thank you very much for your attention to and consideration of this matter and Dr. Breda and I look forward to hearing from you.

Sincerely yours,



Paul H. Merry

cc: John Breda, M.D.

## EXPLANATION OF THE VA's FIFTEEN ALLEGATIONS

Below please find each of the VA's 15 allegations made against me. The RI Board of Medical has asked that I provide an explanation of the medical care and treatment I provided in each case. For each of the 15 allegations, I have quoted the VA's allegation involving the case, Dr. Sharon Rounds' decision, my reply in a paragraph titled "What I did and what the medical record shows:" and my Conclusion. Because of the voluminous nature of the medical record, for simplicity I have quoted pertinent information and the chronology of events from the medical record. The medical record, as I was able to obtain from the VA by FOIA request, is attached.

Of the fifteen allegations, four alleged events that did not occur, eight showed no error at all and three showed administrative matters that were immediately corrected.

The VA has reported to the NPDB that there was an "investigation into my professional competency and conduct." No such administrative investigation took place as required for NPDB reporting (See my attached January 16, 2016 letter to the Division of Practitioner Databanks). Further, the allegations themselves do not rise to the substandard care or conduct addressed in the Health Care Quality and Improvement Act necessitating reporting to "restrict the ability of incompetent doctors and dentists to move from state to state and thereby evade discovery or disclosure of their damaging or incompetent performance" (42 U.S.C. § 11101(2)). As such, there was no actual or pending "investigation relating to professional competence or conduct." Dr. Rounds, Dr. Curioso and the VA have made unsubstantiated allegations which taken singly or together, are without merit.

Although Dr. Curioso claimed to have conducted a fact finding, he thoroughly failed to follow the VA protocols describing a fact finding and his erroneous decisions have gone unchallenged as there was never an administrative investigation into the alleged "errors." Dr. Curioso went on a six month witch hunt collecting unsubstantiated complaints (mostly from nurses). Dr. Sharon Rounds, without any validation of Dr. Curioso's data, further embellished the false allegations turning them into something they were not. I was never given a forum where I could make my side of the story known. This matter is now in litigation and the merits of the VA's allegations of errors are in dispute. The VA's improper report to the NPDB is in dispute resolution status.

Each patient received a timely and proper work-up which resulted in a proper diagnosis and disposition in keeping with what is expected of the ordinary prudent ER physician.

### Allegation #1

**VA allegation** –

> On April 2 (April 6 per Dr. Rounds), 2014, concern about an incident regarding an ED patient prescription written to a wrong patient. Dr. Breda was informed and corrected the progress note and the prescription on the wrong patient. A note and one antibiotic

Amoxicillin was written on an ETOH withdrawal patient G.A. when it was intended for patient J.P. a patient here with upper respiratory infection.

**Dr. Rounds' allegation:** Dr. Breda was informed and corrected the progress note and prescription on the wrong patient. A note and one antibiotic [Amoxicillin] was written on an ETOH withdrawal patient when it was intended for a patient here with upper respiratory infection symptoms.

The key to establishing a dangerous pattern of writing prescriptions on the incorrect patient is that more than one reliable nurse with a good record needs to record the same. Unless the patient error is recorded and signed there is not a reliable record to track these errors.

**What I did and what the medical record shows:** The nurse complained that I had written a prescription in a wrong patient chart. As part of a FOIA request, I obtained documentation showing I cancelled a note and an order for amoxicillin. The incorrect prescription was never signed, filled or given to the patient and was cancelled by me. The Pt was treated for a mild left sinusitis and the discharge instructions indicate that "Amoxicillin 500mg Tid X 7 days" was prescribed for this patient. The patient was given the proper prescription and there was no error.

Contrary to Dr. Rounds' allegation, only one nurse reported this (she states "more than one reliable nurse" is required to establish a pattern) and the prescription was never signed nor printed. Despite this, Dr. Rounds continues to allege that I committed an error.

ER physicians routinely work-up patients piece-mail and work-up several patients concurrently requiring constant logging in to different patient records. The ER presents repeated distractions and ER physicians often are called away in the middle of one task to do another. Administrative errors such as alleged here can and do occur. In fact, this is why the VA has an individual to whom reports of erroneous EMR entries are sent for their removal. Given that such errors do occur, there is a presumption here of disparate treatment. I routinely review printer prescriptions for accuracy once they are printed and before they are given to the patient. This "wrong" prescription was never even printed.

**Conclusion:** There was no error here and this case is not supportive of a report to the NPDB. The patient was given the proper prescription upon discharge from the ER. Any allegation of error by the nurse was premature as the prescription was not completed, not printed and not signed.

Allegation #2

VA allegation:

> On May 17, 2014, patient C.C. was transferred from Morgan Health nursing home with fever and reported low BP (although his BP was normal on arrival to the emergency room). After his arrival, there was a sudden change in his condition while he was in the emergency room and his systolic blood pressure dropped to the 70's and he became tachycardic to the 140's. Concern regarding delay in stabilization and resuscitation.

Dr. Rounds' allegation:
1. Non-informative H & P written by Dr. Breda – only 2 lines for H & P
2. Missing pertinent examination of lungs, heart, extremities and skin.
3. Veteran was hypotensive due to severely dehydrated (sic), sepsis, probable HCAP with hypernatremia. Resuscitation with IV fluid ideally should be immediate rather then after return of lab result.

What I actually did and what the medical record shows: This allegation grew out of a nurse's false accusation claiming she had to ask another physician for IV orders suggesting I was unavailable. I was within 20 feet of this patient and the nurse for the entire time the patient was in the ER. I knew there was no good reason for the nurse to ask anyone besides myself for orders and stated so to Dr. Curioso as soon as he told me of this complaint.

I received sign-out immediately upon the patient's arrival. I examined the patient and ordered labs as soon as the nurses completed their triage. When I initially saw the patient heart rate and blood pressure were stable. Approximately one hour later I was told the patient's heart rate went up. I had already been concerned about early sepsis evidenced by my initial orders for blood cultures. I went directly to the patient's bedside, where my concern for early sepsis was verified by the clinical picture. I immediately ordered IV fluids and a broad spectrum antibiotic (cefepime). The clinical presentation was sufficient to diagnose early sepsis.

My physical exam documented in the medical record shows:
Lungs: Clear
Heart: Regular, S1S2

Dr. Rounds in incorrect in that a lung and heart exam were documented.

Skin: Normal (initially upon admission, the patient was not turned over as there was a more important need to treat sepsis. The decubitus ulcer did not change the resuscitation plan of IVF and Cefepime in the ER. At 6:26 nursing documented "Pt repositioned several times to be off his coccyx which has a stage 2 decubitus noted in gluteal fold and bruising around that. Medicine aware of decub and did see this.

Upon my hand-off to the ICU team, I asked that they give one dose of Vancomycin upon admission to the ICU to cover the possibility of an MRSA skin infection.

**The chronology of events from the medical record reveals:**

Pt arrival time 3:44pm
(The medical record is inconsistent regarding time and vital signs upon presentation)

Nurse's Admission Assessment states: HR 120-130, Respiratory: "Lungs diminished throughout with RR of 26-26 noted but not in distress. Pt is on 1L N/C for comfort and is pulse Ox 100%. No cough, wheezes or crackles noted."

There is a set of Vital signs with a time of 3:20pm
Arrival time of 3:44pm ER – Pt had BP 106/68, HR 74, R 44 (when I saw Pt the respiratory rate was in the 30's and HR normal), Temp 98, O2 Sat 98%

Pt was admitted to the ER at 3:59pm (Triage note time)
Pt was initially seen by me at 4:15pm
Blood cultures and Lactic Acid level were ordered by me upon Pt's admission given my suspicion of early sepsis and poor perfusion .
Lactic Acid level was also ordered by me upon admission due to my initial concern for sepsis and poor perfusion.
1st set of blood cultures sent 4:25pm and 2nd send of blood cultures completed by 4:45pm
Lactate level was drawn and sent to lab at 4:45pm.

Times from medical record of when IV fluids and Cefepime  given:
Pt noted to be tachycardic at 5:07pm
Vital signs at 5:07pm   88/73, HR 135, RR 32, O2 Sat 99%
At 5:10 IV NS started
"IV lines: IV Fluids NS at w/o bolus started at 5:15pm"
At 5:16  IV Cepefime started.
At 5:17pm I advised nurses that Pt was to be admitted to ICU for sepsis.
At 5:30 ABG done
By 5:50 Pt's BP up to 109/56
At 5:55 BP 110/81 and HR 128-131 and 2nd L IV NS started
At 6:44 BP 113/86 and HR 130
At 6:55 Pt was admitted to ICU

**LABS:**
Troponin collected at 4:20, resulted at 5:11pm elevated = 0.24 and suggestive of myocardial necrosis.
>   ASA suppository 300mg given at 5:50pm given immediately when I first learned of Troponin results as I was with patient during resuscitation from sepsis.

Lactate collected at 4:45pm and resulted as positive at 5:09pm = 2.7
WBC ordered on admission, collected at 4:20pm and resulted at 4:53 = 14.4
BNP collected at 4:25pm and resulted at 5:11pm = 231.8
Blood Gas collected at 5:33pm, resulted at 5:38pm showing:

    pH 7.470, PCO2 32.0, PO2 92.0, O2 Sat % 98.0, HCO3 23.3
U/Acollected at 5:15, resulted at 5:53pm = Trace leukocyte esterase, WBC/HPF = 7

**My concluding notes in the medical record state:**

Pt referred with incomplete and inconsistent sign-out per nursing from outside facility.

Specific reasons for referral are fever, probable early sepsis. Being treated for
pneumonia on Levaquin (last dose unknown) UTI (per documentation 100,000 CFU e-
coli, fever 100.8, Hypotension (95/60), lethargy, BUN 98 – Creatinine not given at sign
out by outside facility.

Studies: CXR, KUB, Labs ordered.
Cefepime 1g IV X 1 started in ER which will provide coverage for nosocomial
pneumonia (along with Vanco) as well as a urinary source **while studies pending**.

> (Of note: The nurse complained and Dr. Rounds persisted in alleging that I was
> waiting for a BNP before ordering fluids. As shown in my contemporaneous note
> in the medical record stating "while studies pending", the nurse and Dr. Rounds
> are both incorrect. IVF started at 5:10, BNP resulted at 5:11pm, Cefepime given
> at 5:16pm).

Subsequently:
Pt found to be hypotensive in ER and tachycardia – IVF started in ER with NS.

Pt found to have elevated Na  – Normal saline remained as IVF of choice due to need to
support BP and recognition that NS still hypotonic to Pt's current state. Care will be
given to not alter Na too rapidly.

Gap = 15
ABG with pH = 7.47
Lactate 2.7

Discussed with Pulmonary Fellow who agrees that Pt should be admitted to ICU.
Pt is DNR/DNI

Despite my explanation, my supervisors have continued to charge me with alleged "delays" in patient care which did not occur. The lack of delays in patient care is substantiated from the times cited herein taken from the medical record. At the first sign of sepsis (tachycardia and decrease in BP) IVF and broad spectrum antibiotics were given.  I did not wait for a BNP result to give IVF or Cepepime as shown by the times above. IVF were started by me 3-8 minutes after the patient became tachycardia and Cefepime was started 9 minutes after the patient became tachycardia. Although the nurse wrongly alleges that had to ask another physician for IVF orders, no one except me has claimed that he/she ordered Cefepime. The fact that both were given with 6 minutes of each other suggests that I ordered both.

Once IV fluids were started, I stayed at the patient's bedside (with my hand on the IV bag acting as a pressure bag) until the IV fluids and antibiotics were given and remained there for an additional 1 ¾ hours until the HR and BP had improved.  The patient was subsequently admitted to the ICU at 6:55 and signed off appropriately to the ICU team.

My supervisors alleged that I did an "incomplete physical exam" by not documenting a right heel ulcer that was documented after the patient was admitted to the ICU. My supervisors were well aware, this patient's primary problem was sepsis which I recognized in the ER, and for which I gave timely orders for fluids and a broad spectrum antibiotic. My responsibility was to start initial treatment and arrange for proper admission and hand-off to the ICU physicians, which was done appropriately. The antibiotic given covered a skin infection. To cover a possible MRSA, Vancomycin was given per my recommendations to the ICU team once the Cefepime was completed and the patient was admitted directly to the ICU from the ER.

**Conclusion:** There was no error here and this case is not supportive of a report to the NPDB. The patient was seen immediately by me when he was admitted to the ER. All orders were initiated by me and I was with the patient during his full time of stay in the ER.   The patient was admitted to the ER three hours and eleven minutes after he first arrived in the ER (or approximately two hours and thirty-six minutes from the time I examined him after the nursing triage). He was given his first dose of antibiotics and IVF ordered by me in the ER.

Allegation #3

VA allegations:

> On April 6, 2014, patient W.H. was brought to the ED by rescue with stroke symptoms. Concern regarding untimely CT scan of the head and labs in patient presenting with stroke symptoms.

**Dr Rounds' Allegation:** Evaluation of stroke patient includes immediate bedside evaluation with NIH assessment, CT and neuro consult if warranted.

> Inadequate physical exam on a stroke patient

> Lack of knowledge about indications for clot lysis in stroke

**What I actually did and what the medical record shows:**

This patient came into the ER after a call from rescue when the ambulance was already close to the hospital. The patient was brought to the ER very close to the end of the four hour time period allowing for an intervention for embolic stroke which was suggested by the patient's presentation and history. Before his arrival to the ER I notified the stroke team at RI Hospital about a possible embolic stroke patient coming into the ER at the Providence VA. I examined the patient immediately upon his arrival in the ER (contrary to Dr. Rounds' allegation, a proper bedside assessment was made by me). I called the VA neurologist on call reviewed what I had seen. He agreed with me that given the time frame, and the availability of other interventional radiology techniques available at RI Hospital (and not available at the VA), the patient needed to be sent out immediately to RI Hospital.

The nurse made a complaint that I "transferred him to RIH without obtaining a head CT, even after (she) requested one STAT multiple times." Dr. Rounds, despite the recommendation made by the VA neurologist, continues to allege that I made an error by not ordering a CT scan of the head.

The patient had symptoms of facial numbness the night before which resolved. This was his TIA and harbinger of his stroke to come. On the morning of presentation (3 ½ hours before coming to ER) the patient had signs, symptoms and history of acute embolic stroke. This patient had a known history of TIA's.

**The medical record reveals:**

On admission to ER: Pt with unequal pupils, Rgt facial weakness and on exam – rgt facial droop, "muffled" speech per triage, lip numbness, + Dizziness
EKG aflutter
T 97.2, HR 53, RR 20, BP 108/69
On Coumadin, Plavix, ASA

The Stroke team at RI Hospital was notified by me before patient was transferred.
I initially saw Pt upon his arrival to ER at 12:39, My note was signed at 1:12pm

Apparently the nurse complained because I did not order a head CT that she requested. The nurse does not have a license to diagnose, nor order tests. It is inappropriate for a nurse to simply expect a physician to order what she requests. In this case, the nurse's complaint was inappropriate and she acted outside of the scope of her position.

**Conclusion:** There was no error here and this case is not supportive of a report to the NPDB. The nurse's complaint based on her belief that a head CT should have been done is inappropriate. My Dr. Rounds has continued to accuse me wrongly of a "Lack of knowledge about indications for clot lysis in stroke" when she herself apparently is unaware of interventional radiology treatments that were available for this patient at RI Hospital. In reality, I took better care of this patient than apparently the Chief of Medicine, Dr. Rounds, would have herself. I, in consultation with neurology, referred the patient to RI Hospital where a higher level of care could be provided.

## Allegation #4

**VA allegation -** On April 8, 2014   Concern on April 6, 2014 regarding delay of treatment of alcohol withdrawal symptoms. Patient G.A.

**Dr. Rounds' Allegation:** Delay in treatment of alcohol withdrawal

## What I actually did and what the medical record shows:

The medical record shows that the patient was tremulous and diaphoretic" at 1:05pm. At 2:00pm a CIWA assessment was done by nursing with a result of 20. 1mg of Ativan was ordered by me and given by the nurses at 2:15. There was no delay in treatment.

The medical record indicates:

Patient was admitted to the ER at 9:40am.
10:05 Banana Bag infusing
Vitals at 11:00am: T 98, HR 94, R 16, BP 143/80, O2 Sat 96%
At 1:05pm nurses noted Pt tremulous and diaphoretic.
At 2pm nurses did CIWA scale: 20
At 2:15pm Pt given 1mg Ativan IV.
By 3pm Pt was ambulating easily with decreased hip pain.

I also spoke with patient and convinced him to be admitted for treatment of Etoh withdrawal.
At 3:00pm – Pt now resting quietly.

At 3:40pm – Pt admitted and being examined by medical team.

Expect for positive alcohol level, toxicology screen otherwise negative.
Labs AST > ALT as would be the case with Etoh Hx.
Blood alcohol level initially 309 at 9:35am, 215 at 2:15pm and 180 before admission.

**Conclusion:** There was no error or delay in treatment here and this case is not supportive of a report to the NPDB. Ativan was ordered 15 minutes after the nurse completed a CIWA scale. I subsequently convinced the patient to be admitted.

My supervisors continued to accuse me of substandard patient care when there was none.

### Allegation #5

**VA Allegation** – On May 25, 2014, concerns regarding delay of care of patients who waited in the ED in excess of 3 hrs., I was informed of an argument between you with (sic) the in-coming physician Dr. Mourad. Dr. Breda was asked by Dr. Mourad to start ED notes on patients unseen in the ED. Dr. Breda confronted RN in the triage room, reportedly verbally abusive and loud enough for everyone to hear it.

**Dr. Rounds' Allegation:** "At the very least this is conduct unbecoming of a physician, with professional ethics violations which could be reported to his board of licensure. At the emergency department level, totally unacceptable that the patient is not at least "eyed" and assessed in a timely manner especially with chest pain. His first obligation is to his patients."

Complaint submitted by nursing that there was a "delay in care…in excess of three hours."

**What I actually did and what the medical record shows:**

I worked consistently seeing patients in a busy ER from the time I met with my supervisor on May 25th until leaving at 9pm (2 hours after my end of shift at 7pm). I was the only physician in the ER in the afternoon which is usually covered by two physicians (Dr. Curioso allowed the other physician go home early without providing for a replacement). Although Dr. Curioso (ER director) was in the building and knew the ER was busy and understaffed, he failed to offer assistance by working himself to replace the physician he allowed to go home.

Dr Mourad came in at 6:30pm and I attempted to sign out a patient that I had not yet seen in the ER. Dr. Mourad refused to take sign-out (which is his responsibility as the relieving physician starting his shift). I did not argue with Dr. Mourad at all. Dr. Mourad wanted me to "start a note on this patient first." This made no sense given that it was at the end of my shift and I would not

be the person continuing the work-up. Further, it was Dr. Mourad's responsibility to accept sign out and begin his work.

At that point, given that Dr. Mourad refused to accept his responsibilities as the physician scheduled to relieve me, I made the decision to stay and take care of this patient myself. The medical record on this incident will show that I was the only person who acted appropriately in that I stayed two hours beyond the end of my shift to see that this patient was cared for, and in doing so completed Dr. Mourad's work for which he was hired and paid as well as my own.

Dr. Rounds continues to allege that my conduct was "unbecoming of a physician" and that there were "delays" in treating the patient.

**The chronology as shown by the medical record shows:**

Pt triaged by nursing at 5:13pm
First set of vital signs done by nurses: 5:31pm
Triage note signed by nursing: 5:57pm
Labs were ordered by me, collection time was 5:50pm, and labs resulted at 6:23pm.
Troponin = 0.01, BNP = 14
CXR ordered showing borderline heart size, linear nodular densities and/or non-specific lung nodules, prominent interstitial lung nodules unchanged, cannot exclude mild congestion. (BNP=14), PE showed clear lungs and PE and ROS showed anterior chest wall tenderness to palpation.
Toradol 60mg IM X 1 given in ER

**My medical record notes indicate:**
Dx: Atypical chest pain with resolution of Pt's after Toradol given.
Pt discharged by me to home.
Discharge instructions given: 1) F/U with PCP Tuesday
                                              2) F/U with PCP to reassess DM Tx
F/U with PCP for F/U studies, chest CT of pulmonary nodules
My clinic note was started at 8:28pm and signed at 8:41pm, after Pt was discharged home.

Contrary to Dr. Rounds' allegations, this patient was seen twenty minutes after triage was completed, labs ordered, and Pt was discharged home by me in stable and improved condition with 2 ½ hours after triage was completed.

**Conclusion:** There was no "delay" in treatment or error and the patient was treated within or above the usual expected standard of care. There was no error here and this case is not supportive of a report to the NPDB.

Allegation #6

VA allegation -

> On March 3/2014, concern regarding patient who fell with severe hip, thigh and back pain. There was no written order by Dr. Breda to indicate an IV at that point. Dr. Breda mumbled loud enough to be heard - when do you need an order for IV?

**Dr. Rounds' Allegation:** Concern submitted by nurse that there was no written order by Dr. Breda to indicate that an IV...Dr. Bread mumbled loud enough to be heard "since when do you need an order for an IV?"

Any invasive procedures including saline lock, NGT, foley catheter placement etc. need an order from the physician.

**What I actually did and what the medical record and VA documents show:**

A review of documentation I received via my FOIA request shows a complaint written by the nurse stating that I asked whether the patient had an IV in place so as to determine what route of pain medication I may choose to order. She then goes on to state, "An IV would be placed when the orders written by him indicated need for an IV. " Dilaudid was ordered by me IV. "An IV was placed, patient got medication of Dilaudid 2mg IV."

With my FOIA request, the VA produced its own educational document which states:

> In most medical facilities, practitioners do not write an order to" initiate VA peripheral access" or "perform venipuncture." The statement "start IV" may be written followed by the exact IV therapy order. The order to perform the venipuncture is implied. If the order is confusing or in question, clarify with the practitioner before proceeding. (Exhibit A)

Despite this clear language in the VA's own documentation that an IV placement is implied by ordering an IV medication, Dr. Rounds continues to accuse me of an error where no error exists. In her decision she contradicts VA policy by stating that "Any invasive procedures including saline lock...need(s) an order from a physician."

> **Conclusion:** There was no error here and this case is not supportive of a report to the NPDB. The nurse indicated "an IV would be placed when the orders written by him indicated need for an IV." An IV medication was ordered and the nurse placed the IV according to VA's own policy. Further, the VA's own documents indicate "practitioners do not write an order to initiate peripheral access." The nurse's complaint was not justified and Dr. Rounds' continued allegation is not supported by the VA documentation.

Allegation #7

VA allegation – Incorrect order for Unasyn

> On May 25, 2014, RN was informed by our pharmacist regarding a wrong Unasyn dose order for patient Pt. Pharmacist called Dr. Breda to correct dose.

**Dr Rounds' Allegation:** Prescription error

**What I actually did and what the medical record and VA documents show:**

Unasyn is a combination of ampicillin and sulbactam. The IV preparation comes in two strengths relative to the ratio of ampicillin/sulbactam, either 1g/0.5g or 2g/1g.

My order of 2 grams is not an improper order. Unasyn 2g implies the 2g/1g preparation and is based on the ampicillin component of the drug preparation. (similarly, Augmentin, the pill form of Unasyn is amoxicillin/sulbactam is available in a number of strengths and is routinely ordered based on the amoxicillin component of the drug).

I advised Dr. Curioso and Dr.Rounds of this fact and my reason for writing the order in this way. Despite my explanation and my confirmation with the pharmacy, they continue to charge me with this matter.

The complaining nurse in her July 25, 2014 e-mail complaint to Dr. Curioso simply wrote one sentence,

> "He just ordered Unasyn 2gm on a patient, he stated it was a typo.....Pharmacy had to call and get a correct order."

Her one line e-mail, without an introduction, suggests that she has made routine complaints against me. This nurse has in fact made numerous untrue allegations against me.

This order was confirmed with the pharmacy and her suggestion of a "typo" was not correct. The patient received the intended and correct dose.

My addendum in the medical record states "Given Unasyn 3g IV in ER"

> The nursing note states Unasyn 3g (iv) hung."

**Conclusion:** There was no error and this case is not supportive of a report to the NPDB.

Allegation #8

VA allegation – Patient complained that Dr. Breda was discussing his personal issues and using inappropriate language in patient care area.

**Dr. Rounds' Allegation:** Inappropriate language is never acceptable, again speaks to his lack of professionalism and disregard for his patients and his profession.

**What I actually did and what the VA documents shows:**

> As a result of a FOIA request, I reviewed the nurse's complaint (a nurse known to be a troublemaker and who filed several false complaints against me).
> The subject of her complaint was: "2 doctors sitting at front desk, on patient side talking with 5 patients checked in and not seen. One doctor using untoward language."
>
> The "untoward" language apparently was discussion about a lawsuit. There was no "inappropriate" language used or documented in the nurse's complaint. The complaint seems to have been made purely to cause problems which was true of this nurse's other "complaints."

**Conclusion:** There was no error in the management of this patient and there was no "untoward language." The patient was signed-out and appropriately cared for with a diagnosis based on X-ray findings. She was stabilized with a knee immobilizer, given Toradol for pain, and referred to orthopedics. There was no improper language used at the time nor documented in the VA records. Dr. Rounds has persisted in alleging "conduct issues" that never occurred and states unsupported generalizations,

> Speaks to his lack of professionalism and disregard for his patients and his profession" in her attempts to create an issue where none exists:

This case does not support a report to the NPDB

Allegation #9

**VA allegation** - On May 3, 2014, report of contact submitted by RN regarding a diversion of West Greenwich rescue to RIH ER. Patient J.T. coming in to the ED with leg laceration from a chainsaw injury.

**Dr. Rounds' Allegation:** Diverted patient to RIH for repair of laceration, despite information indicating that patient could be cared for at PVAMC.

**What I actually did and what the medical record shows:**

A nurse in the ER received a call from rescue stating that they had a "chain saw injury" in transport and asked if they should go to the VA or RI Hospital which has a trauma unit. The nurse called to me across the ER while I was seeing another patient, and provided me with no further information except "we have a chainsaw injury, should we send the patient to RI Hospital?"

Formulating a mental image of what a chain saw injury might look like, I made a judgment call to protect the patient by deferring the patient to the hospital that had a higher level of services available and had a trauma unit. I made a decision not knowing the full extent of the injuries, but knowing that a chainsaw injury could easily have required more resources that available at the VA.

**Conclusion:** There is no error here. I made a decision baseed on the little information. I acted to insure that the patient's needs were met. Dr. Rounds continued to again make allegations of error when there was none. In this case, I insured the best care for the patient. This is not a case which supports a report to the NPDB.

### Allegation #10

**VA allegation** – Delay of 3 hours in checking hemoglobin

On May 25, 2014, patient S.P. 84 y/o male with a low hgb and hct who arrived in the ED at 14:25. Patient was given blood transfusion on 5/24/14. Blood was drawn by ED tech, result came back at 15:20. From 17:00 to 18:30 report on nurses note of "awaiting MD. Evaluation." Dr. Breda at bedside at 18:45 and discharged from the ED at 19:00. 3 and ½ hrs. delay to discharge a patient for a repeat CBC.

**Dr. Rounds' Allegation:** There was a delay in checking the result of CBC and discharge. 2:25 pm to 7:00pm.

**What I actually did and what the medical record shows:**

My note in the medical record states:
Pt returns for post-transfusion CBC

Brief focused history: Pt seen yesterday, now s/p transfusion of PRBC's – 2 units 5/23 and 1 unit 5/24. Labs drawn today in F/U of transfusion in ER.

84 year old man with transfusion-dependent CLL and Waldenstrom's Macroglobulinemia recently transfused due to anemia with Hgb 7.7. He has been transfused about every 3 weeks. After yesterday's transfusion he remained

hemodynamically stable, however he typically refused to stay in the hospital post transfusion and comes back the next day for labs.

CBC collected at 3:30pm
This patient's hemoglobin result was 7.9.   BP 119/71  HR 75  R 18

Given that his history was to require transfusion every 3 weeks, I did not feel this patient needed an additional transfusion on May 25th. He had been given 3 units over the two prior days.

The nursing complaint (written by a nurse that has filed several false claims against me) suggests that she felt the patient needed another transfusion. Her complaint states:

> When I approached Dr. Breda I held the chart in my hand and asked him if he was going to order the blood, he replied, "I am not ordering blood his Hgb is usually 8 anyway." I stated "so this poor man just spent three hours waiting for nothing?"

The nurse seemingly made her complaint as she expected me to transfuse the patient. She disagreed with my plan not to transfuse and filed this complaint.   It is not the nurse's position to demand orders she believes to be needed and complain when the doctor disagrees. To do so undermines the practice of medicine by the physician and places the nurse in a position of insisting to be allowed to make medical decisions regarding treatment for which she is not licensed.

If the nurse wished the patient to have been discharged earlier, she could have brought the lab results to my attention when they were resulted at 3:20pm.  I was busy caring for other acutely ill patients in the ER. This patient was my most stable patient.

**Conclusion:** Dr. Rounds continues to misstate and embellish the record claiming errors where no error exists. She claims a "delay" from 2:24pm – 7:00pm when in fact the CBC was not even collected until 3:30pm.  I appropriately focused my attention in a busy ER on the acutely ill patients first.  This patient was stable. There was no error in this case and this case does not support reporting to the NPDB.

### Allegation #11

**VA allegation** – On May 24, 2014, a report of contact from RN regarding blood transfusion consent for a patient S.P.  On 2 occasions, Dr. Breda used the computer that the orthopedic physician had used for a consent earlier on another patient.

**Dr. Rounds' Allegation:** Used a computer already logged on by another physician to obtain a consent for blood transfusion

**What I actually did and what the medical record shows:**

This was a simple computer error which occurs from time to time and was easily and immediately corrected. Such situations occur commonly and it is for that reason the VA has an individual to which erroneous errors in the medical record are directed for their removal. The fact that my supervisors have pursed this complaint suggests disparate treatment and bad faith. There was no risk to the patient. This intended action was for the completion of a consent for blood transfusion, not an order to give a transfusion. It was not actionable without an actual order. I corrected the problem immediately. There was no harm to the patient. This nurse has filed several unsubstantiated complaints against me, and the filing of yet another complaint suggests a hostile work environment.

**Conclusion:** This issue is purely administrative and was recognized, immediately corrected and is not of a nature to support a report to the NPDB.

**Allegation #12**

**VA allegation** – On May 3, 2014, patient R.B., there was no consent and time out from you to do an elective central line placement (no IV access), Dr. Kusupati was notified by the RN. There was no standard procedure note written for the elective placing a central line in the internal jugular vein (attempted) and femoral vein.

**Dr. Rounds' Allegation:** Did not obtain consent, do time out, or write procedure note for central line placement.

**What I actually did and what the medical record shows:**

I was working with Dr. Kussapati to place a central line. She entered a consent and time out for placement of one line.

My entry into the medical record indicated:
> Nursing was unable to obtain peripheral line. Initial plan was to obtain rgt IJ, however X-ray was unavailable. Rgt femoral line placed with good blood return after prepping Pt in sterile fashion.

Despite my supervisor's allegations, there was a note placed by me into the medical record documenting the placement of a rgt femoral line.

Given that an IJ central line was attempted and aborted due to lack of immediate chest X-ray, an X-ray was still done and which was normal with no pneumothorax.

Dr. Kussapati entered a consent for "central line placement." The consent the patient signed addresses consent for central lines inserted in the neck AND for central lines inserted in the groin.

The consent that was completed states:

> 7. Treatment/procedure: A central intravenous (IV) line is inserted through the large vein in the neck or upper shoulder area so that the intravenous line extends into the heart or upper chest. Also, a central intravenous (IV) line is inserted through the large vein in the groin (where the leg meets the abdomen) so that the intravenous line extends to the heart. (Cental Line Placement) (Exhibit B).

(Of note, Dr. Kusipati was kind enough to have assisted me in entering the consent. To the best of my knowledge, no one has raised any concern with her regarding the consent on this patient.)

**Conclusion:** The consent form that was completed and placed into the medical record states that the patient is advised that a central line placement can be either placement into the neck or groin. From the language of the VA consent form, it is not clear that a second consent is needed. A note of the line which was placed (groin) was included in my medical note on this patient. This allegation does not support a report to the NPDB.

**Allegation #13**

**VA allegation** – Unchaperoned examination of female patient with chest pain, Failure to interpret EKG on patient with chest pain.

> Patient C.C. seen on May 25, 2014. Triage time in at 17:13, c/o chest pain. Bay #7 at 17:29 with EKG obtained in the ED at 17:29. RN gave EKG to Dr. Breda for review. Verbal order given RN for ASA 81 mg 3 tablets given to patient at 18:00. Dr Breda was made aware of "cramping CP" at 18:50, Verbal order of Toradol given at 18:55. 20:25 Dr. Breda at bedside per RN note.

**Dr. Rounds' Allegation:** Verbal orders are only allowed in emergency situations when you are at the bedside of unstable patient.

Dr. Rounds made a claim that "Dr. Curioso reviewed 4 hours of video which conformed that Dr. Breda did not go to the patient's bedside until 20:25."

**What I actually did and what the VA documents and medical record shows:**

This patient came into the ER with a complaint of chest discomfort X 1 day. My work-up of this patient started at 5:29pm with an EKG which was normal. The patient gave a history of positional chest discomfort and initial exam showed anterior chest wall tenderness to palpation. After taking a history, exam, labs, CXR and EKG an appropriate diagnosis of atypical chest pain was made by me. I discharged the patient to home two hours and forty minutes (when my note was signed) after the patient was first admitted to the ER and one hour and forty minutes past the end of my shift. I specifically stayed to take care of this patient from start to discharge given the Dr. Mourad, who was the physician who was to relieve me at 6:30pm refused to accept sign-out for this patient. At the time, I was force to perform the work of three physicians, myself, Dr. Pond who was allowed to go home several hours early and Dr. Mourad who refused to accept sign-out and perform the work for which he was hired and paid. Dr. Curioso (ER Director), despite being in the building, and despite knowing that the ER was busy and understaffed, failed to offer assistance by working himself. Despite Dr. Curioso's failure to staff the ER properly (the ER is usually staffed with two physicians), he and Dr. Rounds persist in charging me with a "delay" in patient care when there was none.

Dr. Rounds alleged that there was "inadequate treatment" by me and goes so far as to suggest "fraud" stating:

> This is inappropriate as billing Medicare for an exam that was not performed can be considered fraud. This practitioner began a course of treatment without conducting an (sic) thorough exam and obtaining a good history and then committed a malpractice by changing the course of treatment by ordering a second treatment all before examination of the patient some 3 hours later.

> The differential diagnosis was inadequate since GI etiology, surgical etiology and pulmonary etiology all could have had a negative outcome from the use of NSAIDS.

My exam and finding are documented in the medical record. Dr. Rounds' suggestion that "an examination was not performed" is incorrect. This statement is particularly hard to understand when, at the same time, she accuses me of conducting an "Unchaperoned examination of female patient with chest pain." Additionally, Dr. Rounds alleges "malpractice by changing the course of treatment by ordering a second treatment all before examination of the patient some 3 hours later. These comments are not supported anywhere in the medical record and are representative of the many unsupported allegations made by Dr. Rounds against me.

This patient had anterior chest wall tenderness suggesting a musculoskeletal, chest wall origin of her pain. Palpable and reproducible chest wall tenderness is not the presentation of either a GI etiology or pulmonary etiology. A GI, pulmonary or surgical etiology was not suggested by this patient's history or exam. The patient's work-up was consistent and supportive of a musculoskeletal etiology. She was treated appropriately with Toradol and sent home when her labs, EKG and CXR were negative (except for pulmonary nodules previously seen on prior CXR) and after her symptoms resolved. The patient was given Toradol which was an appropriate treatment given the patient's findings and diagnosis.

Dr. Rounds complained that "there should be complete interpretation of the EKG in the chart if there is there (sic) evidence of cardiac ischemia or acute injury."

First of all, there was no evidence of "cardiac ischemia or acute injury." Secondly, the EKG was normal and the original EKG was scanned into the medical record. My indication of NSR (normal sinus rhythm) with no further suggestion of abnormality was written as there were no further abnormalities. The actual EKG scanned into the medical record speaks for itself.


Per the medical record:
Vital signs stable at 5:31pm
Pt admitted to ER ay 5:49pm
Labs ordered by me and collected at 5:50pm
Pt given ASA 81mg X 3 at 6:00pm

Labs results released at 6:23pm

      BNP = 14.4
      Cr = 1.0
      Troponin I = 0.01

At 6:50pm patient reported Left sided "cramping" chest pain
Ar 6:55pm patient reported "pain lasted 5 minutes"
Toradol given at 6:55pm after negative cardiac labs resulted
At 7:35pm patient reported "I feel much better"

My medical note was started 6:45pm and was completed at 8:41pm.
I documented "positional chest pain" with anterior chest wall tenderness.
Pt was observed in ER until her chest pain resolved.
Pt discharged to home after resolution of her musculoskeletal anterior chest wall pain with Dx of atypical chest pain.

EKG: NSR

CXR:  Borderline heart size and/or positional, linear nodular densities in rgt lung again visualized, consider pneumonitis and/or nonspecific lung nodules, prominent interstitial lung markings unchanged, probably positional with lower lung volume, cannot exclude mild congestion (But on clinical CHF and BNP 14.4)

There was no "delay in treatment" as suggested by Dr. Curioso and Dr. Rounds. Pt was discharged from the ER 2 hours and 52 minutes after being admitted to the ER with a proper diagnosis of atypical chest pain, supported by her exam, EKG and labs.

Dr. Rounds suggested that I examined the patient without a chaperone.  A patient with a complaint of chest pain expects that the physician listen to their heart and lungs with a stethoscope.  This can be done wearing a hospital gown.  There has been no complaint by the patient of any sort of impropriety.  The ER is an open ER without individual patient room but rather stretchers with curtains between them.

Given that the ER was busy, I was conducting several patient work-ups concurrently.  It is expected that the ER physician in such a situation, work up and treat patients as the information and labs come in.  My interview, exam, treatment and disposition were appropriate for this patient.

In order to investigate the veracity of Dr. Round's claims, I called the VA Chief of Police on 2/17/2016 to inquire about obtaining the surveillance camera data that Dr. Curioso purportedly viewed.  The chief of police advised me that a surveillance video is initially recorded on DVR and automatically overwritten ten days later.  As part of a Freedom of Information Act document request, I asked for a copy of the tape Dr. Curioso reviewed. The FOIA request returned information that there was no disk available as Dr. Curioso claimed the disk was "broken."  Also as part of the FOIA request, it was confirmed that the original data was erased after ten days and that the original data is no longer available to be reviewed.

**Conclusion:**  There was no error or delay.  The patient was seen by me, examined, labs, EKG and CXR all supported the diagnosis made.  All of this was completed in two hours and forty minutes.  The patient was sent home by me after her symptoms had resolved and with a proper diagnosis.  This record case does not support reporting to the NPDB.

**Allegation #14**

**VA allegation** – Patient R.J. seen on May 25, 2014. Triage time 17:02 h/o kidney stones with right flank pain. Patient was in bay #5 at 16:09. RN claimed that she did not see Dr. Breda evaluate patient in bay #5, verbal order for labs and Toradol, Flomax, Dilaudid, and Hydralazine. Case signed out to Dr. Mourad but Dr. Dolan took the case and he was at bedside per RN note.

**Dr. Rounds' Allegation:** Dr. Breda did not examine the patient prior to giving verbal orders for testing and treatment.

**What I actually did and what the medical record shows:**

In the case of this patient, I interviewed the patient and did a brief exam sufficient to confirm a working diagnosis of kidney stones and to order appropriate labs. Pt gave a history of 92 kidney stones in his lifetime and three days of hematuria. I would not have known this had I not met with and interviewed the patient. He stated that the pain he was having was similar to the pain and symptoms which he associates with kidney stones. He stated these symptoms were well known to him. When the U/A result returned, the only positive finding was blood in his urine, a result consistent with kidney stones. Pt was given IV fluids, Flomax and Toradol which is the usual initial treatment for kidney stones used by Urology at the VA and hydromorphone as an additional pain medication. A review of his prior record and interview with the patient showed the patient had no contraindication for any of these medications. This was done to treat the patient while he was waiting for his CT scan.

The chronology of treatment in the ER shows:

> Pt admitted to the ER 3:50pm
> 4:48 IV fluids started
> U/A ordered by me and resulted at 5:11 showing small amount of blood
> 5:36pm Flomax 0.4mg given and 60mg Toradol IM given
> 6:41 1mg hydromorphone IV given
> Pt signed out to Dr. Mourad when he came in at 6:30pm however Dr. Mourad never saw the patient.    (My shift was due to end at 7:00pm).
> 7:28pm – Pt transferred to CT scan (which I previously ordered) to evaluate for kidney stone.
> 7:49pm – New orders - Hydralazine 10mg IV and 1mg hydromorphone given (ordered by me).
> BP decreased to 165/97 after medications for pain and BP control
> 9:03pm – I signed my note (2 hrs after the end of my shift) and signed the patient out to Dr. Dolan. My documented working diagnosis was "Probable kidney stone, HTN - ? secondary to pain" (Dr. Mourad refused to accept sign-out when he came in at 6:30. Dr. Mourad failed to perform the job for which he was paid, namely accept sign-out and relieve the out-going physician at the end of his shift.

9:06pm – I wrote an addendum to my signed note when the CT scan returned.  CT scan showed:

CT scan result – 9:05PM
Solid organ evaluation limited without IV contrast.  Bilateral nonobstructing renal stones.  Small indeterminate hypodense right renal lesion.  Bladder distended with wall thickening.  2. Hepatomegaly with fatty liver.  Colonic diverticulosis without divertilulitis.  Degenerative spine.  3. Basal lung nodules grossly unchanged, follow-up to insure continued stability.

9:20pm – Dr. Dolan at bedside –
9:46pm 2nd liter of IVF given and Dilaudid 1mg given – Ordered by Dr. Dolan
Labs ordered by Brian Dolan collected at 9:28pm and resulted at 9:49pm.

Dr. Curioso that claims he watched "several hours" of video data from the surveillance cameras mounted in the ER and based on the videos he allegedly watched, he believed I did not see the patient.  I called the Chief of Police on 2/17/2015 to inquire about obtaining the surveillance camera data and was told that the system has an automatic overwrite feature.  The chief of police advised me that a surveillance video is initially recorded on DVR and automatically overwritten ten days later.  By the time my supervisor claims to have watched the tape, it had already been erased.

As part of a Freedom of Information Act document request, I asked for a copy of the tape Dr. Curioso claimed to have reviewed.  The FOIA request returned information that there was no disk available and Dr. Curioso claimed the disk was "broken."  Also as part of the FOIA request, it was confirmed that the original data was erased after ten days and that the original data is no longer available to be reviewed.

**Conclusion:**  This patient was treated appropriately and was signed out to another physician who was able to send the patient home shortly after the result of the CT scan was available.  Given that the patient was able to be sent home shortly after my sign-out to Dr. Dolan indicates that my work-up and treatment were appropriate.  There was no error in this case.  This case does not support reporting to the NPDB.

**Allegation #15**

**VA Allegation** – in response to a nursing complaint – Verbal order for aspirin 81 mg X 4 tablets but Dr. Breda entered into CPRS Aspirin 324mg 1 tablet.

> Patient J.C. seen on May 25, 2014. Triage 17:41. ED at 17:50. EKG done. EKG given to Dr. Breda for review. Verbal order for Aspirin 81mg 4 tablets but Dr. Breda entered in CPRS Aspirin 324mg 1 tablet at 18:38. EKG: Inc RBBB, Q's inf, Dr. Breda at bedside at 21:00. Patient discharged to home at 21:20.

**Dr. Rounds' Allegation:** Dr. Breda gave verbal order for treatment prior to seeing the patient.

**What I actually did and what the medical record shows:**

The dose of four 81mg aspirin tablets (equaling 324mg) was written in my note as "ASA 324mg PO X 1." I do not have access to my electronic order to determine whether it shows 81mg X 4 or 324mg X 1. The end result is the same as to milligram dosing.

This was written in my medical record note in follow-up of a previously given order on a patient with chest pain. The patient was seen, examined, history obtained and labs ordered. I then went on to other patients at a time when the ER was busy and I was the only physician on duty.

The chronology of care in the ER is shown in the medical record:

Arrival time in ER:  5:50pm
Labs ordered due to chest pain Hx.
Chief Complaint:  Chest discomfort X 1 week, Present with exertion and not present at rest, some assoc. L hand numbness.

Troponin = 0.00  collected at 6:01pm  negative result
EKG: Inc RBBB, inferior Q's

Pt discharged home with the following note made by me at time of discharge:

Pt's Sx spontaneously resolved in ER.  CXR – neg, Trop – neg, labs otherwise unrevealing.
Pt referred to PCP for further assessment, ? benefit of ETT for further assessment given Hx of inferior MI seen on EKG.
Pt to return to ER if Sx return.
Rec ASA 81mg daily.
F/U with PCP this week.
Note signed at 8:54pm

My noted indicates:
    List medications given in the ER:  ASA 324mg PO X 1

The discharge nursing note states the patient lifted an amplifier tonight that weighed 75 lbs.

There was no error in patient management and the dosing as written in my note corresponds to the total mg dosing that was given to the patient.

When the labs and EKG were available, I went back to the patient, made a diagnosis of atypical, non-cardiac chest pain and sent the patient home. Just before I sent the patient home, I documented in the chart.

Again we have an example again Dr. Rounds' exaggerated complaint despite patient an appropriate treatment plan and diagnosis.

I discharged the patient to home 2 hours after the end of my shift. I specifically stayed an extra two hours given that Dr. Mourad was unwilling to accept sign-out and refused to do the job he was paid to do. Despite my attentiveness to the patients, and despite I was working as the only physician in the ER where there are usually two physicians for each afternoon and evening shift, Dr. Curioso and Dr. Rounds continue to allege delays in patient care which did not occur. I took complete ownership of this patient's ER stay myself without signing this patient out to anyone else and performed the work of three physicians across two shifts.

**Conclusion:** There was no error in this case. The diagnosis, treatment and disposition were appropriate. This case does not support reporting to the NPDB.

John Breda, M.D.

Date:  2/6/16

Exhibit A

## ALERT

In most medical facilities, practitioners do not write an order to "initiate peripheral access" or "perform venipuncture." The statement "start IV" may be written followed by the exact IV therapy order. The order to perform the venipuncture is implied. If the order is confusing or in question, clarify with the practitioner before proceeding.

Gloves are not necessary to locate a vein but must be applied before preparing the site.

Be sure to calculate flow rate so as not to infuse IV solution too rapidly or too slowly.

## OVERVIEW

The goal of IV fluid administration is correction or prevention of fluid and electrolyte disturbances in patients. For example, a patient who is NPO (nothing by mouth) after surgery routinely receives IV fluid replacement to prevent fluid and electrolyte imbalances. Another reason for IV access is to administer intermittent or emergency medication.

IV administration often occurs through the use of an injection port (e.g., saline lock), which is an IV catheter attached to an injection cap to maintain a closed system. The saline lock should be flushed with normal saline solution at regularly scheduled intervals and after each administration of medication to maintain patency of the IV catheter.

Peripherally placed catheters are for short-term use (e.g., postoperative fluid restoration and short-term antibiotic administration). Central venous access devices (CVADs), which include nontunneled and tunneled catheters, peripherally inserted central catheters (PICCs), and implanted ports are for long-term use. PICCs may be used for short-term therapy when a peripheral site is not possible. These devices are more effective than peripherally placed catheters for administering medications and solutions that are irritating to veins. Increased use of CVADs requires education in the care of these devices.

Guidelines established by The Joint Commission and the CDC should be followed to prevent IV complications.[5,6]

## SUPPLIES

Click here for a list of supplies.

## PATIENT AND FAMILY EDUCATION

1. Provide clear and concise terms for all aspects of IV therapy and individualized training that includes self-care practices.[2,6]
2. Teach the patient and family the rationale for IV fluids and medications, the procedure for initiating IV therapy, proper hand hygiene, proper site care, and signs and symptoms of complications.
3. Instruct the patient regarding the potential side effects of the medication.

Exhibit B

Redacted under FOIA exemption 6 information protected under privacy - that if released could consitute an unwarented invasion of personal privacy, such as - Names - possition titles - SSN - DOB -

---

MEDICAL RECORD | Progress Notes

---

N. . DATED: 05/03/2014 13:00          Author : ▓▓▓▓▓▓

LOCAL TITLE: CONSENTS

STANDARD TITLE: PROCEDURE CONSENT

ADMITTED: 05/03/2014 12:19 5BGMO

  Signature Informed Consent for

  VEIN - CENTRAL LINE PLACEMENT

1. Anatomical Location: right internal jugular vein

2. Informed consent was obtained at 1:00 PM on May 03, 2014.
   The full consent document can be accessed through Vista Imaging.

3. Patient name: B▓▓▓▓ R▓▓▓▓▓▓▓

4. The patient HAS decision-making capacity.

5. Surrogate (if applicable):

6. Reason for the treatment (diagnosis, condition, or indication):
Need for intravenous line to directly measure pressures in heart
and/or for intravenous feeding.

7. Treatment/procedure: A central intravenous (IV) line is inserted
through the large vein in the neck or upper shoulder area so that the
intravenous line extends into the heart or upper chest. Also, a
central intravenous (IV) line is inserted through the large vein in
the groin (where the leg meets the abdomen) so that the intravenous
line extends to the heart. (Central Line Placement)

8. Neither anesthesia nor moderate sedation will be used.
   Consent to Blood Products (if applicable):
It is not expected that blood products will be used in this
treatment/procedure.

10. Practitioner obtaining consent:  Breda,John A

11. Supervising practitioner:

12. Practitioner(s) performing or supervising treatment/procedure (if
    not listed above):

13. Witness Name(s):

14. Comments:

*** SCANNED DOCUMENT ***
SIGNATURE NOT REQUIRED

** THIS NOTE CONTINUED ON NEXT PAGE **

---

B▓▓▓▓.▓▓▓          PROVIDENCE VAMC        Printed:08/25/2014 06:39
▓▓▓▓▓▓▓▓▓▓▓        Pt Loc: OUTPATIENT      Vice SF 509

---

Redacted under FOIA exemption 6 information protected under privacy - that if released could consitute an unwarented invasion of personal privacy, such as - Names - possition titles - SSN - DOB -

```
----------------------------------------------------------------------
'  'AL RECORD                                  Progress Notes
   i
-  ----------------------------------------------------------------------
05/03/2014 13:00    ** CONTINUED FROM PREVIOUS PAGE **


 Electronically Filed: 05/03/2014
                by: USER IMEDCONSENT
```

August 10, 2016


To whom it may concern:


I am writing at the request of Dr. John Breda, who requested that I review the 15 allegations apparently used in making a decision to terminate his employment at the Providence, RI VA Medical Center.  He has specifically asked me to render an opinion re: whether or not the allegations rise to the level of warranting disciplinary action or termination.

I have reviewed the allegations in detail, along with Dr. Breda's rebuttals.  In reviewing the allegations, I have tried to maintain my perspective as the former Chief of Staff at the Providence VA Medical Center from 2007 – 2013. In that position, I was by regulation charged with chairing both the Protected Peer Review Committee (a quality management tool protected from legal discovery or from use of its processes and findings in adverse actions) and the Executive Committee of the Medical Staff (a venue available for legal discovery and for adverse actions).  I mention this for the purpose of establishing my credibility as a reviewer, insofar as I have dealt with many similar allegations in one or both listed committee venues.

My opinion after review can be summarized as follows (assuming the allegations and rebuttals as presented to me are accurate):

(1) No single allegation rises to a level warranting automatic disciplinary action or termination.
(2) Collectively, all 15 allegations, even if partially valid as depicted, fail to rise to a level warranting automatic disciplinary action or termination, because they appear to constitute a list of cases selected to find fault. In other words, they do not appear to represent a random or consecutive list of Dr. Breda's cases such that there is a numerator or denominator to give any sense of the frequency or of a pattern of questionable medical judgment or behavior.

It is not my requested role to render an opinion on procedural issues.  However, these apparently isolated and apparently post-hoc-aggregated cases remind me of the kinds of allegations that must, by federal regulation and policy, and by Joint Commission standards, be considered by protected peer review processes with the goal of improving provider performance, and if that process fails, must be adjudicated by the Executive Committee of the Medical Staff, with full involvement of the provider at all phases of this process. A statement I can safely make is that this two-step process was used effectively to address more egregious threats to patient safety by at least one other provider, resulting in no termination, during my tenure as Chief of Staff.

I hope this information is helpful to all concerned.

Sincerely,

Gregory M. Gillette, M.D.

Retired Chief of Staff in Veterans Health Administration

453-C Cerrillos Road, Santa Fe NM 87507

**DEPARTMENT OF THE TREASURY**
BUREAU OF THE FISCAL SERVICE
P.O. BOX 1686
BIRMINGHAM, AL 35201-1686



**THIS IS NOT A BILL**
**PLEASE RETAIN FOR YOUR RECORDS**

10/26/16



BREDA, JOHN A & KAREN S
253 GREENDALE AVE
NEEDHAM, MA 02494-2026

As authorized by federal law, we applied all or part of your federal payment to a debt you owe. The government agency (or agencies) collecting your debt is listed below.

| | |
|---|---|
| Providence VAMC 650 | TIN Num: 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 |
| 830 CHALKSTONE AVENUE | TOP Trace Num: 131806068 |
| PROVIDENCE          RI 02908 | Acct Num: 650E00000000066882 |
| | Amount This Creditor:      $688.63 |
| | Creditor: 04      Site: AA |

**866-601-6286**
PURPOSE: Non-Tax Federal Debt

The agency has previously sent notice to you at the last address known to the agency. That notice explained the amount and type of debt you owe, the rights available to you, and that the agency intended to collect the debt by intercepting any federal payments made to you, including tax refunds. **If you believe your payment was reduced in error or if you have questions about this debt, you must contact the agency at the address and telephone number shown above.** The U. S. Department of the Treasury's Bureau of the Fiscal Service cannot resolve issues regarding debts with other agencies.

We will forward the money taken from your federal payment to the agency to be applied to your debt balance; however, the agency may not receive the funds for several weeks after the payment date. If you intend to contact the agency, please have this notice available.

U.S. Department of the Treasury
Bureau of the Fiscal Service
(800) 304-3107
Hearing impaired customers may utilize the Federal Relay Service by dialing (800) 877-8339 to reach a Communications Assistant (CA) who will dial the toll free number.

**PAYMENT SUMMARY**

| | | |
|---|---|---|
| PAYEE NAME:  BREDA, JOHN A & KAREN S | | |
| PAYMENT BEFORE REDUCTION:      $4162.00 | PAYMENT DATE: 10/26/16 | |
| TOTAL AMOUNT OF THIS REDUCTION:      $688.63 | PAYMENT TYPE: EFT | |
| PAYING FEDERAL AGENCY:  Internal Revenue Service | SPLIT REFUND CODE: | |
| (See Insert on Tax Refund Offsets for Additional Information) | | |



**FOR JOINT TAX REFUND OFFSETS ONLY:**

Tax refunds may be offset per 26 U.S.C. Section 6402( c-f ) of the Internal Revenue Code.

If you filed a joint return and only one spouse is responsible for the debt, the spouse who isn't responsible for the debt, the "injured spouse," may be entitled to his or her share of the joint refund if he or she had income, withholdings, estimated tax payments or refundable credits. If both you and your spouse were offset for separate debts, one of you may be entitled to have more of the overpayment applied to his or her debt and/or refund.

If you lived in a community property state during the tax year, the injured spouse may be entitled to his or her share of the joint refund if he or she didn't have any income, withholdings, estimated tax payments or refundable credits. The community property states are: Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington and Wisconsin.

The injured spouse must complete IRS Form 8379, "Injured Spouse Claim and Allocation," to get his or her share of the refund. Call the IRS at 1-800-829-3676 to request forms. If you have questions about Form 8379 or need help completing it, please call your local IRS office or 1-800-829-1040.

**MAIL THE FORM TO THE SAME IRS OFFICE WHERE YOU MAILED YOUR ORIGINAL TAX RETURN. ALLOW IRS 8 WEEKS TO PROCESS THE FORM.**



DEPARTMENT OF THE TREASURY
BUREAU OF THE FISCAL SERVICE
P.O. BOX 1686
BIRMINGHAM, AL 35201-1686



000062

**THIS IS NOT A BILL**
**PLEASE RETAIN FOR YOUR RECORDS**

10/26/16



131806068

BREDA, JOHN A & KAREN S
253 GREENDALE AVE
NEEDHAM, MA  02494-2026

As authorized by federal law, we applied all or part of your federal payment to a debt you owe. The government agency (or agencies) collecting your debt is listed below.

Providence VAMC 650
830 CHALKSTONE AVENUE
PROVIDENCE          RI  02908

TIN Num: 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
TOP Trace Num: 131806068
Acct Num: 650E00000000066882
Amount This Creditor:     $688.63
Creditor: 04      Site: AA

**866-601-6286**
PURPOSE: Non-Tax Federal Debt

The agency has previously sent notice to you at the last address known to the agency.  That notice explained the amount and type of debt you owe, the rights available to you, and that the agency intended to collect the debt by intercepting any federal payments made to you, including tax refunds.  **If you believe your payment was reduced in error or if you have questions about this debt, you must contact the agency at the address and telephone number shown above.**  The U. S. Department of the Treasury's Bureau of the Fiscal Service cannot resolve issues regarding debts with other agencies.

We will forward the money taken from your federal payment to the agency to be applied to your debt balance; however, the agency may not receive the funds for several weeks after the payment date.  If you intend to contact the agency, please have this notice available.

U.S. Department of the Treasury

Bureau of the Fiscal Service

(800) 304-3107

Hearing impaired customers may utilize the Federal Relay Service by dialing (800) 877-8339 to reach a Communications Assistant (CA) who will dial the toll free number.

**PAYMENT SUMMARY**
PAYEE NAME:  BREDA, JOHN A & KAREN S
PAYMENT BEFORE REDUCTION:        $4162.00
TOTAL AMOUNT OF THIS REDUCTION:        $688.63
PAYING FEDERAL AGENCY: Internal Revenue Service
(See Insert on Tax Refund Offsets for Additional Information)

PAYMENT DATE: 10/26/16
PAYMENT TYPE: EFT
SPLIT REFUND CODE:

FOR OFFICIAL USE ONLY:     0000000038 13180606824010861100001985887ALTR-P01BRED000003
RL101614



**FOR JOINT TAX REFUND OFFSETS ONLY:**

Tax refunds may be offset per 26 U.S.C. Section 6402( c-f ) of the Internal Revenue Code.

If you filed a joint return and only one spouse is responsible for the debt, the spouse who isn't responsible for the debt, the "injured spouse," may be entitled to his or her share of the joint refund if he or she had income, withholdings, estimated tax payments or refundable credits. If both you and your spouse were offset for separate debts, one of you may be entitled to have more of the overpayment applied to his or her debt and/or refund.

If you lived in a community property state during the tax year, the injured spouse may be entitled to his or her share of the joint refund if he or she didn't have any income, withholdings, estimated tax payments or refundable credits. The community property states are: Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington and Wisconsin.

The injured spouse must complete IRS Form 8379, "Injured Spouse Claim and Allocation," to get his or her share of the refund. Call the IRS at 1-800-829-3676 to request forms. If you have questions about Form 8379 or need help completing it, please call your local IRS office or 1-800-829-1040.

**MAIL THE FORM TO THE SAME IRS OFFICE WHERE YOU MAILED YOUR ORIGINAL TAX RETURN. ALLOW IRS 8 WEEKS TO PROCESS THE FORM.**





**VA New England Healthcare System**
Network Office, Building 61
200 Springs Road
Bedford, MA  01730

January 14, 2019

The Honorable Elizabeth Warren
United States Senate
317 Hart Senate Office Building
Washington, DC  20510

SUBJ: Inquiry on behalf of John Breda, MD

Dear Senator Warren,

Please consider the following in response to the query regarding your constituent Dr. John Breda and his allegations that his due process rights were violated when paperwork was submitted to the National Practitioners Data Bank (NPDB) as the report was not the result of a formal investigation.

Dr. Breda was employed by the VA Providence Medical Center, located in Providence, RI. In June 2014, Dr. Breda was provided notification that his supervisor was initiating a fact finding into concerns that were raised to his attention. A fact finding can be conducted into the performance or conduct of an employee at the request of the Medical Center Director, or it can be conducted by the supervisor of the employee in question.

Dr. Breda was provided a letter on February 3, 2015, which indicated that his part-time appointment would be terminated effective February 13, 2015. At this time, Dr. Breda was notified that there were still reviews being conducted by the Medical Executive Committee and as such, if he were to resign before these reviews concluded, then his appeal rights with respect to reporting to the NPDB would be limited to only consideration of whether or not he resigned before the conclusion of an investigation.

Dr. Breda elected to resign, effective February 7, 2015. As such, he was provided a letter advising him that he resigned before the investigation was completed and this would result in a report to the NPDB that he resigned pending the results of an investigation. He was advised of his appeal rights, namely that he could request a hearing to determine solely whether or not he resigned pending an investigation.

Dr. Breda elected to have a hearing convened, which did so on August 27, 2015. The hearing panel concluded that Dr. Breda resigned pending the result of an investigation.

2

In this notice, Dr. Breda was made aware that he would be able to appeal this decision to the Network Director.

Dr. Breda elected to have this decision appealed to the Network Director. The Network Director at the time upheld the decision of the hearing panel. Dr. Breda was provided notice of the Network Director's decision on November 16, 2015. In this notice, Dr. Breda was provided with a final avenue of redress on the report that would be made to the NPDB.

Dr. Breda elected to request reconsideration from the Medical Center Director at VA Providence Medical Center. He was afforded an opportunity to provide information on the inaccuracy of their intent to report to the NPDB that he had resigned while pending the results of an investigation. He provided a reply; however, the Medical Center Director maintained that the reporting to the NPDB was indeed accurate.

Dr. Breda elected to pursue the final avenue of redress and appealed the Agency's report to Health and Human Services (HHS). Again, he was afforded an opportunity to provide information. He was notified of the decision of HHS on March 24, 2016, whereby the Agency determined that the report made by VA Providence Medical Center was accurate.

As indicated above, Dr. Breda was afforded due process during this matter, as evidenced by three appeals available prior to the Agency's report to the NPDB. Further, he was provided with a final appeal to HHS to determine if the report made was accurate.

I hope this helps to clarify any remaining concerns you and your constituents may have with this matter.

Regards,

Ryan S Lilly
123621

Digitally signed by Ryan S Lilly
123621
Date: 2019.01.15 13:44:02 -05'00'

RYAN S. LILLY, MPA
VISN 1 Network Director

John Breda, M.D.
253 Greendale Ave
Needham, MA 02494

January 16, 2015

Laura Burns
Director of Disputes
Division of Practitioner's Databanks
PO Box 10832
Chantilly, Virginia

4094 Majestic Lane
PMB332
Fairfax, Virginia 22033

Re:  DCN No. 5500000100937823

Dear Ms. Burns:

I am writing after having escalated the above referenced report made by the VA Medical Center Providence to dispute resolution status.  On October 27, 2015 the Providence Veterans Administration Hospital (VA) submitted the referenced report stating:

> "Voluntary limitation, restriction or reduction of clinical privilege(s), while under, or to avoid investigation relating to professional competence or conduct."

1)  **Each of the three components of the VA's report are unsubstantiated and taken singly or together are reasons for removal of the NPDB report.**

   a)  **There was no "Voluntary limitation, restriction or reduction of clinical privilege(s)"**

   On June 6, 2014, I took leave without pay after being offered that option by the Chief of Medicine and human resources and did so prior to any discussion of an investigation.  I never returned to work at the VA.

   I advised the VA of my intent to resign in writing on November 14, 2014 and December 16, 2014, given there was no available administrative investigation or forum to voice my defenses to false allegations made against me (See my e-mails to VA Human Resources representative, Tambra Holt, Attached hereto as Exhibit A).

   In late December 2014, the VA agreed to mediation and I held off from formalizing my resignation due to the pending mediation.  My supervisors then acted in bad faith by writing an internal memorandum on January 7, 2015 calling for my termination, only days after the agreement to mediate, resulting in a February 3, 2015 letter to me

terminating my employment while a February 24, 2015 mediation date was pending (See e-mails from Garfield Norris and ORM Agreement to Mediate, Case Number 200H-0650-2014103639  Attached as Exhibit H).  After taking that bad faith action the VA refused to mediate and the mediation never took place. The VA subsequently reported me to the NPDB.

I mailed my resignation letter dated Feb 1, 2015 and e-mailed the same to the VA on Feb 7, 2015.  I asked that my resignation be accepted as of December 16, 2014 (the date of my second e-mail stating my intent to resign). Despite the VA's "termination letter" it still inexplicably contends that I resigned.

b)  **The VA's report suggesting a finding of substandard patient care, professional misconduct, professional incompetence and/or issues of professional conduct are factually baseless and unsubstantiated.**

On May 25, 2014, I learned that two nurses had made complaints against me. I realized immediately that the allegations were untrue and not substantiated by the medical record.  I promptly advised my supervisor and the Chief of Staff verbally and in writing of the falsity of the allegations.

Subsequently, my supervisors took six months to collect a total list of fifteen allegations that were equally untrue and unsubstantiated.  Of the fifteen allegations, four alleged events that did not occur, eight showed no error at all and three showed administrative matters that were immediately corrected.  There were no adverse patient outcomes or any patient suffering of any of the patients I cared for at the VA in five years.  This was confirmed by my supervisor, Dr. Curioso at a November 11, 2014 meeting (See Affidavit of Karen Breda attached hereto as Exhibit B).

Further, the allegations themselves do not rise to the substandard care or conduct addressed in the Health Care Quality and Improvement Act necessitating reporting to "restrict the ability of incompetent doctors and dentists to move from state to state and thereby evade discovery or disclosure of their damaging or incompetent performance" (42 U.S.C. § 11101(2)).  But for the VA's October 27, 2015 report, I have had no malpractice claims, no adverse patient outcomes and no adverse Board actions in my history as a physician.

c)  **The VA has never conducted an administrative investigation as required by the Health Care Quality and Improvement Act as implemented by the NPDB and as required by the Department of Veterans Affairs own policies.**

There was never an investigation carried out by the VA which would qualify as a professional review action (CFR 45 Section 60.3).  The VA has specific protocols for an administrative investigation defined as an Administrative Investigatory Board (AIB), a Focused Practice and Performance Evaluation (FPPE) and an Ongoing Practice and Performance Evaluation (OPPE) (See E.G. VA Handbook 0700, VA Administrative Investigations Handbook).  None of these took place prior to the

NPDB reporting activity as required by the NPDB. The NPDB 2001 Guidebook states in its "Guidelines for Investigations" that:

An investigation must be carried out by the health care entity, not an individual on staff. (See NPDB Guidebook, 2001, "Guidelines for Investigations" at p. E-19, attached hereto as Exhibit I).

- On August 12, 2015 Susan Mackenzie, the Medical Center Director, was questioned under oath about any investigations by the EEO Investigator. No hearing, investigation, AIB, FPPE or OPPE took place. Although Susan Mackenzie claims a "fact finding" took place, this did not happen either as the VA did not follow it own protocols for a fact finding (See VA Medical Center Policy Memorandum 05-29 titled "Supervisory Fact Finding and Administrative Investigations, attached hereto as Exhibit C). As per VA protocols, the Medical Center Director is to convene and direct a Fact Finding (See Exhibit C). Susan Mackenzie stated under oath when she was questioned by the EEO investigator on August 12, 2015 that she was not involved in the alleged "fact finding."

  Susan Mackenzie testified that:

  Q: …To your knowledge has there been an investigation or hearing conducted into Dr. Breda's professional competence?

  A: So it wasn't an investigation or a hearing. It was a fact finding that was conducted through the clinical chain of command and I did not review that document. I don't know what the timeline was on that.

  Q: Were you involved in deciding whether to conduct that fact finding?

  A: No

  Q: Do you know who was?

  A: Well, I'm assuming Dr. Curioso, his supervisor, would probably have initiated that, but I don't know for sure.
  (See Transcript of Mackenzie's testimony before EEO investigator, Attached hereto as Exhibit D)

- Dr. Pirraglia (a member of the Medical Executive Committee) was questioned under oath by the EEO investigator on August 12, 2015 about the presentation of my case to the Medical Executive Committee. Despite the seriousness conclusions, Dr Pirragla remembered little about the proceedings. Given that he did not recall whether or not an investigation took place, his testimony is entirely speculative and indicates

that in reality, no investigation took place by the Medical Executive Committee.

Dr. Pirraglia stated under oath:

Q: Were you involved in any way in the decision to terminate Dr. Breda's employment?

A: Marginally so. As the Chief of Primary Care, I'm a member of the Medical Executive Committee, and concerns regarding Dr. Breda had been brought up to that committee. I do not recall the particulars…
(Exhibit E, pages 3-4)

Q: …To your knowledge has there been an investigation or hearing conducted into Dr. Breda's professional competence?

A: That is in part what is covered in the Medical Executive Committee meetings. You know if there are concerns about a provider's practice that's where those concerns are raised and where they are discussed. I don't recollect details regarding this, but I would expect that if concerns were brought forward that usually what will happen is that there will be some investigation. That investigation might be in a sense of, not in terms of inquisition so much, but closer review of records or observations. So for example if there was (sic) concerns about a providers practice, we may review more charts for that particular person in a thing called a Focused Practice and Performance Evaluation of FPPE. If it's determined by the Medical Executive Committee that a provider is not performing in an adequate fashion, that there are concerns about their practice to the extent that patients may be endangered, the MEC does have the power to terminate somebody's privileges and in turn termination of privileges, can result in the reporting to the national practitioner databases and other entities. So it is entirely possible that there was an investigation. I do not recall the particulars. And it's also equally likely that if the committee had terminated his privileges, that often does result in reporting to the national database.

Q: I see, but to your knowledge such a determination had not yet been made?

A: I do not recollect, I don't recall one way or the other.
(Exhibit E, pages 6-7)
(See Transcript of Pirraglia's testimony before EEO investigator, Attached hereto as Exhibit E)

- Dr. Michael Mayo-Smith of VISN-1in his November 16, 2015 letter denying my appeal (See Letter hereto attached as Exhibit F) relied on two VA Memorandums, 1) Policy Memorandum 05-29 titled "Supervisory Fact Finding and Administrative Investigations" (See Exhibit C) and 2) Memorandum dated Dec 16, 2011 titled "Resignation or Retirement While Under Investigation" (See Dec 16, 2011 Memorandum attached hereto as Exhibit G) when he denied my appeal requesting the VA to retract the report. He claimed that "The Fact Finding in this case evidenced the rigor required to qualify as an investigation." His claim is baseless and self-serving as the review conducted by my supervisor failed to comply with the "Fact Finding" process as outlined in these two documents and thus a fact finding was never done. The Dec 16, 2011 memorandum states that an "investigation…is not considered complete…until the due process…have been exhausted." In this case there was no due process provided to me as I have not had a forum to present my defenses to the VA's false allegations.

- Dr. Michael Mayo-Smith claims that a "Hearing Committee convened to determine whether Dr. Breda did in fact resign while under investigation, or to avoid further investigation or action." That hearing committee (chaired by Dr. Matthew Jankowich) relied on the same two memorandums as cited in Dr. Mayo-Smith's letter making their decisions baseless and unsubstantiated as well.

The VA can only claim that an informal review was conducted by my supervisor who was a biased individual. There has not been an independent review. There was no administrative investigation and I was not provided any forum where I was allowed to present my side of the facts.

**d) There was no Fact Finding.**

The VA claims to have conducted a "Fact Finding," however it failed to follow its own defined protocols designed to provide due process. Accordingly, there was no fact finding. (See VA Medical Center, Providence, Rhode Island, Policy Memorandum 05-26, March 12, 2013, Titled Supervisory Fact Finding and Administrative Investigations attached hereto as Exhibit C)

The VA's actions failed to be a Fact Finding because:

1) The Medical Center Director did not make a determination of whether a Fact Finding would be convened.
2) The Medical Center Director did not appoint a finder or fact.
3) The review was not conducted by an independent party but rather a biased individual, my supervisor.
4) The Medical Center Director did not direct or oversee the review.
5) The review was not conducted immediately.

6) The review was not conducted over fifteen days, but rather was a six month witch hunt by my supervisor.

7) I was told over several months that I was not allowed to know the reasons for my being questioned or the nature of the allegations.

8) I was not allowed to review medical records prior to the November 11 and December 13, 2015 meetings.

9) I was not provided with a written record of my answers after the November 11 and December 13, 2014 meetings.

10) I was not allowed representation during the November 11 and December 13, 2014 meetings.

11) There was no report of findings to the Medical Center Director at the conclusion of the review.

12) The Medical Center Director did not make a decision as to whether an Administrative Investigatory Board needed to be convened and was not involved in the decision as to how to use the results of the review.

13) The supervisory review as performed was not utilized as a preliminary review as described in Policy Memorandum 05-26 (See Exhibit C), after which the Medical Director determines whether a Fact Finding or an Administrative Investigatory Board is convened. The review was used to immediately terminate me and report me to the NPDB without a proper investigatory process.

14) My supervisors were guided by their own animosity, hostility and malice towards me without the required administrative oversight to protect me.

15) Unsubstantiated allegations were taken at face value by others at the VA due to the impropriety of the review at its most basic level.

**Given that the VA failed to follow its own guidelines designed to protect my due process and accurate fact finding, a valid "Fact Finding" never happened.**

e) **Hostile work environment.**

A hostile work environment was the driving force behind the string of events commencing in May, 2014. The nurses made unjustified complaints against me that were untrue causing me to distrust the work place and take leave without pay. My supervisors showed animosity towards me for taking leave, discriminated against me and retaliated against me for filing an EEO complaint.

The Chief of Service (Chief of Medicine) did not request the Medical Center Director for a Fact Finding as required by VA Policy Memorandum 05-29 (See Exhibit C), but rather acted unilaterally to use unsubstantiated and false information from my supervisor 1) to call for my termination, 2) to make unsubstantiated and false conclusions as to my competence and conduct, and 3) to make a false report to the NPDB claiming substandard patient care, professional incompetence and/or conduct issues of which there were none.

f) **The VA Failed to comply with NPDB reporting formats.**

The NPDB Guidelines which went into effect in April, 2015 states:

For each report submitted to the NPDB, reporting entities are required to specify the action taken and include a detailed narrative describing the acts or omissions of the subject of the report upon which the action is based. MMPRs require a description of the alleged acts or omissions and injuries upon which the action or claim was based…

The <u>narrative description</u> must include sufficient detail to ensure that future queriers have a clear understanding of what the subject of the report is alleged to have done and the nature of the reasons for the event upon which the report is based.

Narrative descriptions should be limited to statements of fact and should:

- Summarize the official findings or state the facts of the case
- Include a description of the circumstances that led to the action taken (See NPDB Guidebook, April 2015, page E-11 a copy of which is attached hereto as Exhibit J)

Such a narrative was never submitted by the VA.

g) **The VA has persisted in their reporting to the NPDB despite their knowledge that their report is not justified. My supervisors' actions were improperly motivated by discriminatory animus and hostility. They became angered when I took leave without pay in June, 2014 and filed EEO complaints in August, 2014 and February, 2015 for their discrimination as to age, disability and retaliation. At the December 13, 2014 meeting, the Chief of Medicine verbalized her hostility to me stating, "You have no idea what I can do to you." Knowing that VA procedures had not been followed, the Chief of Medicine terminated me pending a mediation to avoid the independent scrutiny of a mediator.**

**Over the course of several months, my attorney informed the VA medical center's leadership in writing with supporting documentation and legal authorities, that the VA had not followed their own policies and the NPDB's standards, as well as informing them that the allegations against me were unfounded. He further informed them of the harm that would occur to me if a false, unwarranted report was made to the NPDB. The individuals who authorized this report had the responsibility to know the NPDB Guidelines and had every reason to know that reporting in this case would be improper. The only conclusion that can be made here is that the VA acted knowingly and illegally by filing a false report with the NPDB.**

Given the above, I must ask that the report filed against me be reviewed and permanently be deleted from the National Practitioner Data Bank files.

There is an ongoing case in Federal Court.  To date I have spent $70,000.00 in attorney's fees directly relating to the VA's improper reporting.  In December, 2015, I was unable to accept new employment due to credentialing concerns caused by the VA's improper report resulting in a $100,000.00 per year loss in earnings.  Due to the VA's improper reporting, I cannot reliably reap the rewards of my twenty five years of hard work in medicine.

I am sending this letter along with a signed copy of the document sent to the NPDB escalating this report to Dispute Resolution status in order that the Secretary of Health and Human Services and the Division of Practitioners Databanks may commence the process of resolving this matter. This letter is sent only to provide initial information along with my signed authorization to commence the dispute resolution process. I will be sending additional detailed documents. Discovery in our case has yet to begin and I will supplement this report as more information becomes available.


Sincerely,

John Breda

# Exhibit A

3/23/2015

(26044 unread) - johnabreda - Yahoo Mail

Inbox (9999+)
Drafts (232)
Sent
Spam (2882)
Trash

Smart Views
Unread
Starred
People
Social
Travel
Shopping
Finance

Folders (16)
Current (3)
Job Search (4)
Job Search 20... (9)
Mooney
Notes
Sent to Hum or Camer...

Recent

Sponsored

State Farm

You can save $500
on auto insurance
We're here for you
24/7/365.
Get a Quote

Search results ← ← → Delete Move ∨ ··· More ∨ Collapse All ∨ ✕

● Follow-up on Meeting and conversations(2)

me                                          Nov 14, 2014
To: Tambra Holt
CC: me

Dear Ms. Holt:

You indicted to me that you have forwarded my request to Dr. Rounds and Dr. Curioso that our fact finding meeting continue in light of its being cut short yesterday due to my wife's need to be back in Boston.

I indicated to you that I am happy to address Dr. Curioso's concerns to the best of my ability. I further expressed my concerns regarding the tenor of yesterday's meeting and the importance of a summary session to allow me and my supervisors to discuss a positive plan going forward. If this is not possible, I submit my resignation as of this time. If such further discussions are allowed, I am happy to review and reassess this matter with my supervisors and work with them in a positive and constructive way.

Sincerely,
John Breda

Reply, Reply All or Forward | More

me   Dear Ms. Holt: You indicted to me that you have forwarded my re...   Nov 14, 2014

Trending Searches

1  Kym Johnson
2  Audi A3
3  High-speed Internet
4  Type 2 diabetes
5  March Madness
6  Unlimited-data pla...
7  Dee Snider
8  Electric cars
9  Julie Andrews
10  Weight-loss progra...



Inbox (9999+)
Drafts (232)
Sent
Spam (2911)
Trash
⌄ Smart Views
　Unread
　Starred
　People
　Social
　Travel
　Shopping
　Finance
⌄ Folders (16)
　Current (3)
　Job Search (4)
　Job Search 20... (9)
　Mooney
　Notes
　Sent to Hurn or Camer...
⟩ Recent

Sponsored



The Art Institutes
Official Site. Start
Your Education at
The Art Institutes Today
visit.artinstitutes.edu

← Search results　←　«←　→　🗑 Delete　📁 Move ⌄　🚫 Spam ⌄　••• More ⌄　Follow/ke All

[EXTERNAL] Follow-up on Meeting(4)　　　　　People

**me**　　　　　　　　　　　　　　　　　　　　Dec 16, 2014
To: Tambra Holt, Sharma Satish (VISN1), Doug Reynolds

Ms. Holt:

At this point, I feel that I have exhausted all of my remedies at the VA in
Providence, including notifications to the Chief of Staff. I feel that my
department chair and immediate supervisors are on a witch hunt and have
acted unreasonably and unfairly. As a result, I plan to submit my resignation.
Before doing so, I need to contact the benefits departments of the VA and will
not have a chance to do that until later this week. I have contacted Roy
Ferguson and have requested ADR. I also have requested the filing of an
additional EEO complaint where I will allege retaliation. If this matter can not be
resolved satisfactorily, I expect to file an action under the Federal Tort Claims
Act for constructive termination. I will be in touch in the near future.

Sincerely,
John Breda

Reply, Reply All or Forward | More

**Holt, Tambra**　　　　　　　　　　　　　　Dec 16, 2014
To: me, Sharma, Satish (VISN1), Doug Reynolds

Dr. Breda, thank you for your e-mail. Jillian Chapin can assist you with questions
regarding benefits. She may be reached at: 459-4770, extension 4759. If I can provide
further assistance, please feel free to contact me.

Tammy

⟩ Show message history

Reply, Reply All or Forward | More

**me**　　　　　　　　　　　　　　　　　　　　Feb 7
To: Doug Reynolds, me

⟩ Show message history

Reply, Reply All or Forward | More

**me**　　　　　　　　　　　　　　　　　　　　Feb 7
To: Doug Reynolds, me

⟩ Show message history

Reply, Reply All or Forward | More

 

THE 2015
MAZDA CX-9

THE UTILITARIAN-
YET-STYLISH
MAZDA CX-9

VIEW FEATURES
BUILD & PRICE
SEARCH INVENTORY

MazdaUSA.com

Exhibit B

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

JOHN BREDA, M.D.,                     )
                                      )
            Plaintiff,                )
                                      )
v.                                    )      C.A. No. 15-13263-DJC
                                      )
ROBERT A. McDONALD,                   )
*Secretary of Veterans Affairs*, et als.,  )
                                      )
            Defendants.               )

AFFIDAVIT OF KAREN BREDA

I, the undersigned Karen Breda, being first duly sworn, do depose and say that:

1.  I have personal knowledge of the matters stated herein and am otherwise competent to
    testify.

2.  At the request of my husband, Dr. John Breda, I attended a fact-finding meeting on
    November 13, 2014 at the Providence VA Medical Center in Rhode Island.  Presiding
    over the meeting was Ms. Tambra Holt, of the Providence VA Medical Center's Human
    Resources office.  The meeting was attended by Dr. Sharon Rounds and Dr. Wilfredo
    Curioso, in addition to my husband, myself and Ms. Holt.  Ms. Holt greeted me and
    explained that my role was limited to that of a witness. She instructed me that I would not
    be allowed to say anything nor would I be permitted to communicate with my husband
    during the meeting.  She asked me to sit apart from my husband and seated me between
    herself and Dr. Sharon Rounds.

3. Dr. Wilfredo Curioso proceeded to go over a number of complaints that he had received in regards to my husband's work as a staff physician at the Providence VA Medical Center. He asked my husband for his version of what happened in regard to each complaint. His tone of voice was consistent.

4. Throughout the meeting, Dr. Sharon Rounds exhibited a hostile demeanor toward my husband. She frequently interrupted him and talked over him while he attempted to answer Dr. Curioso's questions. Her behavior was in sharp contrast to that of Dr. Curioso and Ms. Tambra Holt. Dr. Curioso asked questions in a level tone of voice, as did Ms. Holt. Dr. Rounds, at times, raised her voice, made scoffing noises, made grimacing facial expressions and interrupted with de-valuing remarks. She made it difficult for my husband to provide answers.

5. For example, when my husband was describing his loyalty and dedication to the Providence VA Medical Center, he recounted two times when he was on his way to his shifts for work when he noticed that he was experiencing disturbing medical symptoms and, rather than call in sick, he showed up for his shifts. One time involved a "drenching sweat" in his car on the way to work (he was later diagnosed with Hodgkin's lymphoma). As soon as my husband mentioned the word "lymphoma", Dr. Rounds interrupted and said that she didn't want to hear anything about [my husband's] cancer; that it was irrelevant.

6. My husband went on to tell about a second time when he put the Providence VA Medical Center's staffing needs before his own personal needs. He related that he experienced right-hand numbness, and, because he was so determined not to let the VA down by failing to show up for his shift, he used his left hand to turn the key in his car's ignition

and to shift into gear. At that point, Dr. Rounds made a scoffing noise and muttered while my husband was still talking, "I would like to think my physicians are self-aware enough to know when they shouldn't come to work."

7.  Later in the meeting, when my husband was trying to explain why he had taken a leave of absence from the VA, Dr. Rounds interrupted and talked over him yet again, this time raising her voice to interject, "what is so wrong with asking you to work with your supervisor?"

8.  During the meeting my husband asked Dr. Curioso, "were there any adverse patient outcomes." He answered that there were none.

9.  Immediately after the meeting adjourned that day, I shared with my husband that I felt the meeting did not go well. I told him that based upon Dr. Rounds' hostility and unwillingness to let him tell his version of the facts and her unwillingness to listen to his explanations, that I felt the whole situation would not likely end well for him and that he would not be treated fairly. I encouraged him to quit and to find work where he would be appreciated.

Signed under the pains and penalties of perjury this 5th day of January, 2016.

Karen Breda

Exhibit C

VA MEDICAL CENTER                                    POLICY MEMORANDUM 05- 29
PROVIDENCE, RHODE ISLAND                             March 12, 2013
                                                    (05)


## SUPERVISORY FACT FINDING AND ADMINISTRATIVE INVESTIGATIONS

### 1.  PURPOSE

To establish a local policy and procedures for authorizing, conducting, reporting, and follow-up of investigations at the Department of Veterans Affairs Providence VA Medical Center (PVAMC).

### 2.  POLICY

Investigations will be conducted in accordance with applicable laws, rules, regulations, and the negotiated provisions of collective bargaining agreements and in accordance with VA Handbook 0700: Administrative Investigations.  This policy applies to all employees of the Providence VA Medical Center.

### 3.  DEFINITIONS

   a.   Fact Finding:  An informal process to obtain and assemble readily available information about an event and their results which may be used for a variety of purposes, including determining the need for an Administrative Investigation Board (AIB).

   b.   Administrative Board of Investigation:  The standard procedures established under VA Directive 0700 and this Handbook for collecting and analyzing evidence, ascertaining facts, and documenting complete and accurate information regarding matters of interest to VA. "Members" are the person or persons appointed by a Convening Authority to conduct the AIB.

### 4.  MEMBERSHIP

None.

### 5.  PROCEDURES

   a.   Fact Finding

   (1)  Normally, once a supervisor is made aware of an event/ incident or allegation, this may be investigated by the immediate supervisor and no further action will need to be taken. However, upon discovery of an event that may require an independent review by management officials outside the service, the Chief of the Service will request a Fact Finding.   The incidents/events and allegations that arise to the level of a Fact Finding are when allegations are made against employees for inappropriate conduct, an event that involves employees of more than one service, or when a group complaint is filed against another employee.  This request,

2.

**Policy Memorandum**                                                        **VAMC-650**

along with any other documentation, will be forwarded in writing to the Medical Center Director through the Executive Leadership member, who will appoint the Finder(s) of Fact.

    (2)   The Medical Center Director or his/her designee will notify Human Resources that a Fact Finding is being initiated, and provide Human Resources with all the documentation related to the Fact Finding.  Human Resources will contact the Finder(s) of Fact to arrange an interview to discuss the information as well as any bargaining unit issues.

    (3)   A Finder of Fact will have 15 business days from the date of notification to conduct the Fact Finding and submit the report of findings.  The Finder of Fact will interview any employees they feel will have information in regard to the event or incident, and collect any documentation they feel may help define the event/incident.  The Finder of Fact should refer to Attachment A (Fact Finding Guide) on how to conduct the Fact Finding.  Once the Finder of Fact has completed the investigation, the Fact Finding will be submitted to the Director, through their Executive Leadership Member, and contain the following information (See Attachment B):

        (a)   Chief Issue:  Brief Synopsis of event and/or incident (include date and time)

        (b)   History/Details of Current Issue

        (c)   Index of documents examined

        (d)   Staff Interviews in summary form

        (e)   Analysis

        (f)   Recommendations/Actions

        (g)   Name/Signature/Date

  b.   Administrative Investigation Board (AIB)

    (1)   Upon determination that an incident or allegation is beyond the scope of a Fact Finding, the Medical Center Director, or his/her designee, will convene an Administrative Investigation Board.  The only exception would be a situation in which the Medical Center Director may be the subject of the investigation, or where there may be a potential for bias in the matter investigated.  In such situations, the VISN Director or his/her designee will be the covening authority for the AIB. When determining whether or not to convene an AIB, the following factors should be considered: risk of adverse consequences from recurrence; need for objective, expert review and analysis of the matter; seriousness of any suspected misconduct, neglect, etc.; and  the degree to which the cause and essential facts of the matter are known, subject to dispute, or unknown, and the potential for an investigation to determine additional relevant information.

3.

**Policy Memorandum**                                          **VAMC-650**

(2)  Once it has been determined that an AIB will need to be convened, the Medical Center Director, or his/her designee will assign individuals to conduct the AIB on behalf of the convening authority via a Charge Letter. The Charge Letter will define the scope of the investigation and document the authority of the investigators to conduct the investigation on behalf of the convening authority.  An example of the Charge Letter can be found in VA Handbook 0700, Administrative Investigations, Appendix O.

(3)  AIBs will be conducted in accordance with VA Handbook 0700.  Once the Board has been chosen and the Charge Letter issued, the Board will meet with Human Resources, who will act as the technical advisor to the Board in matters pertaining to personnel actions and/or regulations. Human Resources will provide all documentation to the Board in regard to the matter being investigated.

(4)  Investigations must be completed within 45 days of the AIB being convened.  Any extensions to this time limit must be submitted by the Board Chairperson in writing to the Director.  This must include the reason for the extension, and the estimated date of completion for the Investigation.  The extension shall be summarized in the Preliminary Statement of the Investigative Report.

(5)  The final Report of Investigation will be submitted to the Medical Center Director, and will follow the standard format in VA Handbook 0700, Appendix N.  The Chairman and Members of the AIB shall return to the Director's office all draft copies, tapes, notes, working papers, etc., relevant to the case and/or used to formula the final Report of Investigation. Nothing relating to the case should be retained by either the Chairman or members of the Board.

(6)  Once the Medical Center Director receives the final Report of Investigation, the Medical Center Director may either re-convene the Board to follow up on any area he/she feels needs further investigation, or certify the investigation as complete. If the Board needs to be re-convened, an amendment to the Charge Letter will be issued to define specifically the matter that is being investigated. If the investigation is complete, the Medical Center Director must certify the report as complete within thirty (30) days of receiving the Report of Investigation. Certification will follow the standard format in VA Handbook 0700, Appendix O.

6.  <u>**RESPONSIBILITY**</u>

a.  The Medical Center Director will:

(1)  make the determination whether an AIB or Fact Finding will be convened;

(2)  determine which individuals will conduct the Fact Finding or comprise the AIB;

(3)  take appropriate action to protect persons who properly provide information to either finder(s) of fact or Board members from reprisal for such cooperation;

4.

**Policy Memorandum**                                                             **VAMC-650**

(4)  review the Finding of Fact and/or the AIB and take appropriate administrative action;

b.   The Executive Leadership Member will:

(1)  ensure services and programs under their supervision understand the priority of a Fact Finding or AIB and those services and programs make staff available to serve and participate as needed in these actitivities.

(2)  ensure Service Chiefs or Program Managers under their supervision, as applicable, complete actions as a result of the investigation and follow up activities in a timely manner.

c.   The Chief, Human Resources will:

(1)  designate a HR Advisor to assist the Finder of Fact and/or AIB Members in matters pertaining to personnel actions and/or regulations;

(2)  ensure that all individuals assigned as a Finder of Fact and/or AIB Member are properly trained to conduct the investigation.

d.   Service Chiefs, Program Managers and Supervisors will:

(1)  make staff available to serve as Finders of Fact and/or AIB members and must ensure that workloads and responsibilities are adjusted to allow for timely completion of their duties.  The are responsible to make staff available for interviews and other AIB support as needed.

(2)  complete any corrective actions as a result of approved recommendation from the Finder of Fact or Board in a timely manner.

e.   Providence VA Medical Center Employees will:  cooperate with Fact Finding and AIBs to the extent permitted by governing laws, regulations, policies, and collective bargaining agreements.  When so directing by convening authorities or members of AIBs or Finders of Fact, they shall refrain from disclosing any information developed in the course of an AIB or Fact Finding, including the substance of their own testimony, except to federal investigators or their designated representatives or advisors, until the investigation is complete.  The requirement is established to enhance the integrity and fairness of the fact finding and investigatory process and does not prohibit disclosures required for official purposes or protected from reprisal by laws such as the Whistleblower Protection Act (5 USC 2302(b)(8)).

5.

**Policy Memorandum**                                        **VAMC-650**

7.  **REFERENCES**

VA Handbook 0700, Administrative Investigations, dated July 31, 2002
VA Directive 0700, Administrative Investigations, dated March 25, 2002

8.  **RESCISSIONS**

Policy Memorandum 05-29 Supervisory Fact Finding and Administrative Investigations dated
March 28, 2012.

**VINCENT NG**
**Medical Center Director**

**Attachments:  A - Fact Finding Guide**
                       **B - Sample Fact Finding Report**

**DISTRIBUTION:  D**

**POLICY MEMORANDUM 05- 29**                                    **VAMC-650**

## FACT FINDING GUIDE

You need to find out what happened!

1.   Fact findings (or investigations) must be conducted immediately after an incident occurs while details are still fresh in everyone's mind.

2.   Prior to commencing any fact-finding, supervisors/managers must review the applicable collective bargaining agreement specifically, Article VI, Section 3, LIUNA Local 1322 (Both Nurses and Non-Professional Units).

3.   Before questioning begins, the employee must be informed of the reason they are being questioned. The employee has a right to union representation if they believe that disciplinary action may result from the questioning and they request to schedule representation.

4.   If an employee is the subject of an investigation, the employee will be informed by the Finder of Fact of the nature of the allegations and the right to union representation before questioning begins.  Normally, the employee will be given (24) hours advance notice of the interview in order to arrange his/her union representation.  For example, you will tell the employee, "Bob, I'm conducting a fact finding into the matter of [absence without leave charge, disrespectful conduct, failure to get an assignment done, alleged patient abuse, etc.]  Please come to my office at 10:00 am on Thursday, January 15, 2009.  You have the right to union representation.  If you would like to have a representative, please make arrangements for the union representative to attend the meeting at 10:00 am on Thursday.  Do you wish to have a union representative present?

5.   If the employee indicates that they would like to have a union representative present, and you would like to have another supervisor with you during the fact finding to record the responses, call the union beforehand to advise them that another supervisor will be present to take the notes.  If the employee indicates that s/he does not wish to have a union representative at the fact finding, do not call the union.  The supervisor that you have with you does not ask questions or interact with the employee.  They are there only to record the responses.

6.   At this time, and throughout your entire fact finding process, the employee and/or union representative is not entitled to see or have a copy of the evidence that you have gathered; i.e. signed statements from other employees, reports of contacts from patients, and other evidence that you may have obtained such as a picture of damaged government property, etc.  If a disciplinary/adverse action will be taken at the conclusion of the fact finding, the employee will get a copy of all evidence that was used as a basis for the action, if any is taken. No information is provided to the employee or his/her representatives until an action is officially initiated.  If no action is taken, the employee and/or his/her representative may request the fact finding

7.

**Policy Memorandum**                                                                                      **VAMC-650**

information under the Freedom of Information Act (FOIA).  FOIA requests are reviewed and responded to by the VAMC Privacy Officer:   Richard Rowe, 401-455-4916.

7.   First, you will map out a plan of what you need to do.  This can just be an informal handwritten document that will help you keep on track.  Your plan will include who you need to interview and what documents you need to obtain.  Documents that you might need include training records, policies, assignment sheet, standard operating procedures, patient's records, etc.

8.   You will then develop questions based on the particular circumstances of what you need to find out. You want to ensure that you obtain full answers from the witnesses and subject of the investigation. Be careful not to ask questions that result in yes or no answers.  You want to gain a full understanding of what happened.  We suggest you brainstorm questions that get answers to the "who, what, where, when and how".  Your draft questions may be reviewed by your HR Employee Relations Specialist for appropriateness and suggestions.

9.   Always meet in a private location. Ask witnesses and the subject open-ended questions as described below.   Do not counsel any employees at this time and tell them what they should have done, simply get their version of the facts. Meet with the subject of the investigation last. Here's what you may need to know at the minimum:

o    What actually happened?
o    When (date/time) did it happen?
o    Where did it happen?
o    Who witnessed the event?
o    How did the event or situation occur?
o    Who was accountable for the incident?

10.  Write/type out the witnesses and subject's answers to the questions prior to their leaving the room. Be sure to leave enough room for you to be able to write the answers after each question. Legibly record the employees' responses as best you can and request that they read the responses and sign and date each page of the response. Make a copy for the employee after he/she signs each page and retain the original for your records. Note: while you cannot require/mandate the employee to sign the document, most employees will review and sign each page as it represents their official response and they want it to be accurate. When employees decline to sign for receipt, the Finder of Fact should properly notate this on each of the pages.

11.  If you have conflicting statements, try your best to develop additional evidence so that you have a clear picture of what happened and resolve issues that don't match up.  In order to initiate a disciplinary action, the evidence must be more likely to be true than not.  In other words, does the evidence tend to support your conclusion that the event/incident did/did not occur?

12. Before writing your conclusions, carefully consider the facts and evidence that your questions/investigation turn up.  How do you know the employee engaged or didn't engage in the

8.

**Policy Memorandum**                                                        **VAMC-650**

conduct in question?  Has the employee admitted it or denied it?  Were there any witnesses?  If there is more than one version of the event, which is more believable, and why?  If the employee denies having done anything wrong, how strong is the evidence indicating otherwise?

13.  Prepare your written summary of the fact-finding.  You will first write a paragraph about the background of what was alleged.  You will then write a paragraph or more about what you found.  These are your "facts" and "findings".  Then you will write your conclusion paragraph.  Attach all evidence.

14.  You will then need to determine whether administrative action is required. If the fact finding does not conclude that the employee did something wrong, this will be your conclusion.  If the conclusion is that the employee did something wrong, you will need to recommend appropriate administrative action be taken, but not the level of administrative action.  This can also include a referral to EAP , particular training, etc.

15.  The employee and the union are entitled to a copy of the complete investigation file, upon request if a disciplinary or adverse action is initiated.  Any information gathered during the fact finding, which was not used to support the action, may be obtained under FOIA.

16.  When you have completed your fact finding and determined what action may be appropriate, contact the Human Resources to review your fact finding and evidence prior to forwarding your report to the Medical Center Director.

<u>ATTACHMENT B</u>

**POLICY MEMORANDUM 05- 29**                                **VAMC-650**

<u>**SAMPLE FACT FINDING REPORT**</u>

DEPARTMENT OF                                          Memorandum
VETERANS AFFAIRS

Date:        February 3, 2012

From:

Subj:        Fact Finding Investigation

To:        Director (00)

A.   Chief Issue

   a.   Complaints were made from the staff on Unit 12c that the Nurse Manager, Nurse Betty, was giving inappropriate patient care by increasing the rate of blood transfusion on a patient and purposely assigning the patient to a multi-patient room as a form of punishment.

B.   History/Details of Current Issue

   a.   The Associate Director for Patient Care Services received complaints from three nurses on Unit 12c alleging inappropriate patient care from the Nuse Manager.  The allegations were that Nurse Betty sped up the rate of the blood transfusion in order to get a patient discharged and that patients were reassigned from a private room  to a multi-patient room as punishment for having too many family members or for being in-patient for too long.

   b.   Nurses reported that they were asked to move patients from a private room to a multi-person room when there were still empty beds in the unit.  This seemed to occur whenever the Nurse Manager had expressed frustration that the patient had been in-patient for too long, or when the patient had visitors on a daily basis.

   c.   Nurses also reported that they would start a blood transfusion at a certain rate, and when they would come back and check on the patient, the rate of transfusion was increased. They had witnessed the Nurse Manager in the vicinity of the are wever this would occur.

C.   Index of Documents Examined

   a.   Report of Contact – Nancy Drew

10.

**Policy Memorandum**                                                                                      **VAMC-650**

      b.   Report of Contact – Ian Fleming

      c.   Report of Contact – Lara Flynn Boyle

      d.   Bed Assignment – Unit 12b

D.   Staff Interviews  - all staff interviews will have a summary of their testimony.

E.   Analysis:

     a. There is no substantiated evidence of inappropriate care by xxx.

In regard to xxx statements that xxxx had purposely moved patients into a 4-man ward or with another patient if the patient's family was being too fussy or demanding, this statement is unsubstantiated.   xxx cannot recall a patient name or date when this occurred, just that it happened on a regular basis.  When she questioned the reason the patients were being moved, she was told that beds were blocked for isolation.  She did now know if it was in fact for a neutropenic patient.

xxx alleged that xxx turned up the rate of a blood infusion on her patient, but cannot recall the patient or the date.  She stated there was no adverse reaction from speeding up the blood, and that she turned it down once she realized the blood rate was increased.  She did not witness xxx or xxx increase the rate of chemotherapy, but did witness them tell other nurses (xxx) on several occasions to speed up the chemotherapy.  She cannot recall the patients name or date, but did state the name of the nurses, who had testified they had not been told to speed up the rate of chemotherapy.  Due to the inconsistency of her testimony with other witnesses, I find xxx testimony to be less than credible in regard to this issue.

F.   Recommendations/Actions

     a. There is a need for training in identifying and reporting patient abuse.

When asked if xxx reported any of these incidents to management, she stated she did not realize that it was patient abuse at the time, but after working as a Patient Safety Manager, she stated it was evident that there was patient abuse on the unit, and it should have been reported.  During previous interviews, when other staff were asked why they did not report a suspected incident of patient abuse, various reasons were given; including they didn't know how, who to report it to, and they feared retaliation.  xxx was asked what the requirement was in regards to training on patient abuse and reporting, and she stated she did not think that it was mandatory training.  This is mandated training that must be done annually.  Follow up is recommended to ensure that there is annual training on this subject.

11.

**Policy Memorandum**                                          **VAMC-650**

_____          _____
Xxxx                                               Date


_____          _____
xxx                                                 Date

# Exhibit D

Breda, 101879, August 12th, 2015, Mackenzie                              1

1   Q:  Dr. Mackenzie my name is John Nicholas.  I am a contract EEO

2   investigator associated with Sierra Tahoe Investigations, assigned to

3   investigate the claim of discrimination that was filed by Dr. John Breda on

4   March 25, 2015.  The date today is August 12, 2015.  The time is 7:10 AM

5   Pacific time.  I'm going to take a statement from you today over the phone.

6   I'll be recording this statement and then I'll have the recording transcribed

7   verbatim.  Do I have your permission to record this interview?

8   A:  Yes.

9   Q:  Great.  I can send the transcript to you in one of two ways.  I can either

10  send it to you as a hardcopy through the mail or I can send it to you as a

11  PDF file attachment to an email.  Which would you prefer?

12  A:  An email.

13  Q:  Okay.  I'll be conducting this interview in a question answer format.  If

14  at any time I ask a question that you're not quite sure you understand

15  please let me know and I'd be happy to explain the question to you or

16  rephrase it for you if necessary.  If you have a question for me that you'd

17  like to discuss off the record before responding to a question that I have

18  posed, just let me know that you want to go off record and I'll put my

19  recording device on pause to give us a chance to discuss your question.

20  A:  Okay, thank you.

21  Q:  Or, for example, if you need to retrieve a document that you don't

22  happen to have at hand and you want a chance to retrieve that document,

Initials _____

Breda, 101879, August 12th, 2015, Mackenzie                    2

1   again, let me know and I can pause the recording device to give you a

2   chance to do that.

3   A: Okay.

4   Q: I take these statements under oath or affirmation whichever you're

5   more comfortable with.  Which would you prefer?

6   A: It doesn't matter.  Either one is fine.

7   Q: Any questions about the procedure?

8   A: No, no questions.

9   Q: Dr. Mackenzie, do you solemnly swear that the testimony that you're

10  about to give is the truth, the whole truth and nothing but the truth?

11  A: Yes I do.

12  Q: Could you please state for the record your full name, your office mailing

13  address and telephone number please?

14  A: Sure.  So my name is Susan Mackenzie and my mailing address is the

15  Providence VA Medical Center, 830 Chalkstone Avenue, Providence,

16  Rhode Island 02908.

17  Q: And your telephone number please?

18  A: Oh sorry, it's 401-457-3042.

19  Q: Thank you and in what city and state are you located right now?

20  A: Providence, Rhode Island.

21  Q: And are you currently employed by the US Department of Veterans

22  Affairs?

Initials _____

Breda, 101879, August 12th, 2015, Mackenzie                3

1    A:  Yes I am.

2    Q:  And in which VA facility are employed?

3    A:  The Providence VA Medical Center.

4    Q:  And what is your current position title?

5    A:  I'm the Medical Center Director.

6    Q:  I see.  And how long have you been employed in that capacity?

7    A:  In this position just under two years.  October will be two years.

8    Q:  In his complaint, Dr. Breda alleges that he was discriminated against in

9    part because of his age.  Are you aware of Dr. Breda's age?

10   A:  I am not.

11   Q:  In what month and year were you born?

12   A:  November 1957.

13   Q:  Dr. Breda also alleges that he was subjected to reprisal for his having

14   previously filed a complaint of discrimination.  Were you aware that Dr.

15   Breda had previously filed a complaint of discrimination?

16   A:  Yes.

17   Q:  Could you give me a sense of when you first became aware of that

18   prior EEO complaint?

19   A:  It was last fall, the fall of 2014.

20   Q:  In his complaint, Dr. Breda also alleges that he was discriminated

21   against in part because of his disability.  Were you aware of Dr. Breda's

22   disability?

Initials _____

1  A: No, I am not.

2  Q: Dr. Breda alleges that he was discriminated against based on age,

3  disability, and reprisal for having filed a prior EEO complaint when on

4  February 3, 2015, you issued a letter terminating his employment but his

5  separation was processed as a "resignation in lieu of involuntary action" on

6  February 7, 2015. Were you involved in any way in the decision to

7  terminate Dr. Breda's employment?

8  A: Yes, I signed the documents.

9  Q: And what was the reason for your decision to terminate his

10  employment there?

11  A: Can we go off the record for just a moment?

12  Q: Yes, let me pause.

13  [OFF RECORD TO DISCUSS QUESTION FROM WITNESS]

14  Q: We're back on record, and I was asking what was the reason for your

15  decision to terminate Dr. Breda's employment there?

16  A: So I want to back up just a moment to explain that Dr. Breda was on a

17  physician part time accepted appointment, so as a part time physician he's

18  an at will employee so he can be let go at any point in time. So he was let

19  go which is why there isn't a charge listed in the letter here.

20  Q: i see. Was there an issue that came up in relation to his practice?

21  A: I couldn't speak to that. I believe you are talking also to Dr. Curioso

22  who is his supervisor and he could speak to the specifics if there were any

Page 4 of 7

Initials _____

1   issues along those lines.  But from my perspective so I signed the letter on

2   February 3 of 2015, and the effective date in the letter, and you have a

3   copy of that, was February 13, 2015.  So when we mailed the letter to him

4   he contacted our HR department, asking if he could backdate his

5   resignation to before the date of this document being issued and we're not

6   allowed to backdate any documents.  And so that's sort of where we're at

7   at this point in time.

8   Q:  So did he in fact resign his position?

9   A:  Well he couldn't resign because, oh yes he did he resigned I'm so

10  sorry.  He resigned, yes.

11  Q:  In lieu of the termination?

12  A:  Right, he emailed a resignation on February 7, 2015.

13  Q:  If I could just have a copy of that email in which he indicated he

14  resigned?

15  A:  Perfect yes.  Can you just give me your email?

16  Q:  Yes:  john.nicholas@sierratahoeinvestigations.com.

17  A:  I'll have HR email it actually.  Very good.  Any other questions?

18  Q:  Yes I wanted to kind of review with you the next issue in his complaint.

19  In Claim B of his complaint, he alleges that he was subjected to a hostile

20  work environment based on his age, disability, and prior EEO complaint as

21  evidenced by a number of events.  I wanted to ask you a few questions

22  related to those events that he listed.

Initials _____

Breda, 101879, August 12th, 2015, Mackenzie                              6

1   A:  Sure.

2   Q:  In the first item, Dr. Breda alleges that in November of 2014, Dr.

3   Curioso expressed animosity toward him and questioned him about his

4   medical judgement in a review of his patient files from a previous year

5   without allowing him representation or accepting explanations that care

6   was not sub-standard.  My question to you is did this discussion between

7   Dr. Curioso and Dr. Breda in November of 2014, come to your attention at

8   some point?

9   A:  I did not speak to Dr. Curioso about this at all.

10  Q:  I see.  Did Dr. Breda ever indicate to you that he believe that Dr.

11  Curioso's discussion worked to create a hostile work environment for him?

12  A:  I've never meet Dr. Breda and I've never spoke to him.

13  Q:  Well that answers the question.  In Item 2 of his hostile work

14  environment claim, Dr. Breda alleges that since November 2014 Dr.

15  Curioso implied that he should not work evenings when Dr. Breda would

16  occasionally yawn which Dr. Breda attributed to Dr. Curioso's animosity

17  about his age.  So was that ever brought to your attention by either Dr.

18  Curioso or Dr. Breda?

19  A:  No.

20  Q:  In the last item of his hostile work environment claim, Dr. Breda alleges

21  that since on or about February 27, 2015, the Providence VA Medical

22  Center has subjected him to an investigation into his professional

Page 6 of 7

Initials _____

1  competence to determine whether he should be reported to the National

2  Data Bank and State Licensing Board which he contends could negatively

3  affect his ability to earn a living as a physician.  To your knowledge has

4  there been an investigation or hearing conducted into Dr. Breda's

5  professional competence?

6  A: So it wasn't an investigation or a hearing.  It was a fact finding that was

7  conducted through the clinical chain of command and I did not review that

8  document.  I don't know what the timeline was on that.

9  Q: Were you involved in deciding whether to conduct that fact finding?

10  A: No.

11  Q: Do you know who was?

12  A: Well, I'm assuming Dr. Curioso, his supervisor, would probably have

13  initiated that, but I don't know for sure.

14  Q: Well I'll ask Dr. Curioso about that when I interview him.  Those are all

15  of the questions that I have for you Dr. Mackenzie.  Is there anything else

16  that you would like to add to the record in connection with what we

17  discussed?

18  A: No, not at this time.  If you have any questions that come up just feel

19  free to get in touch with me.

20  Q: Okay, thank you and that concludes my interview then and I want to

21  thank you again for taking the time to provide me with this statement.  I'm

22  going to turn off the recording device now.

Initials _____

Exhibit E

1   Q:  Dr. Pirraglia my name is John Nicholas.  I am a contract EEO

2   Investigator associated with Sierra Tahoe Investigations assigned to

3   investigate the claim of discrimination that was filed by Dr. Breda, on

4   March 25, 2015.  The date today is August 20, 2015.  The time is 10:08

5   AM Pacific time.  I'm going to take a statement from you today over the

6   phone.  I'll be recording this statement and then I'll have the recording

7   transcribed verbatim.  Do I have your permission to record this interview?

8   A:  Yes, you do.

9   Q:  Okay.  Now I can send the transcript to you in one of two ways.  I can

10  either send it to you through the mail as a hardcopy or I can send it to you

11  as a PDF file attachment to an encrypted email.  Which would you prefer?

12  A:  Email please.

13  Q:  Okay.  I'll be conducting this interview in a question answer format.  If

14  at any time I ask a question that you're not quite sure you understand, just

15  let me know and I'd be happy to explain the question to you or rephrase it

16  for you if necessary.  If you have a question for me that you'd like to

17  discuss off the record before responding to a question that I have posed,

18  just let me know that you want to go off record and I'll put my recording

19  device on pause to give us a chance to discuss your question.  Or if, for

20  example, there is a document that you'd like refer to that you don't happen

21  to have at hand and you need a chance to retrieve that document, again

22  let me know and I can pause the recording device to give you a chance to

Initials _____